IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

|  |  |  |
|---|---|---|
| MARY ELLEN BOHNEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-00904-RPM |
| | ) | |
| KENNEDY AND COE, LLC, WILLIAM | ) | |
| JENKINS, SIDNEY REITZ, | ) | |
| | ) | |
| Defendants. | ) | |

---

SCHEDULING CONFERENCE
TRANSCRIPT OF PROCEEDINGS

---

Proceedings held before the HONORABLE RICHARD P. MATSCH, U.S. District Judge for the District of Colorado, beginning at 11:01 a.m. on the 8th day of August, 2008, in Conference Room, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiff:     William R. Gray, Esq.
                       Purvis Gray, LLP-Boulder
                       4410 Arapahoe Avenue, #200
                       Boulder, Colorado  80303

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



APPEARANCES: (Continued.)

For Kennedy and Coe:          Keith Patrick Ray, Esq.
                              Lathrop & Gage, LC-Denver
                              370 - 17th Street, #4650
                              Denver, Colorado  80202


                              Timothy Kevin McNamara, Esq.
                              Lathrop & Gage, LC-Kansas City
                              2345 Grand Boulevard
                              #2800
                              Kansas City, Missouri  64108

3

P R O C E E D I N G S

(At 11:01 a.m. on August 8, 2008, in the United States District Court at Denver, Colorado, before the HONORABLE RICHARD P. MATSCH, U.S. District Judge, with counsel for the parties present, the following proceedings were had.)

THE COURT:  Good morning.

Who is J. Alison Auxter?

MR. MC NAMARA:  That is another lawyer in my office, Your Honor, and she's not with us today.  She's assisting me with the case.

THE COURT:  She filed a motion for summary judgment.

MR. MC NAMARA:  Yes, Your Honor.

THE COURT:  Two days ago.

MR. MC NAMARA:  Yes.

THE COURT:  Come as a surprise to you?

MR. GRAY:  Well, without any discovery in this case, it did, Your Honor, yes.

THE COURT:  Why did you sign the scheduling order and then file a motion for summary judgment?

MR. MC NAMARA:  Your Honor, I'm sorry, I didn't think that was inconsistent--

THE COURT:  Well, why isn't it inconsistent?  You're agreeing to discovery here.

MR. MC NAMARA:  Yes, Your Honor.

THE COURT:  Yeah.  And, then, somebody in Kansas City

4

throws in a motion for summary judgment?  This person never signed any pleadings before this either; right?

MR. MC NAMARA:  I'm sorry, Your Honor, I don't know for sure if she has or not.

THE COURT:  Well, who's handling this case?

MR. MC NAMARA:  I'll take responsibility for it, Your Honor.

THE COURT:  Have you reviewed the motion for summary judgment?

MR. MC NAMARA:  Yes, I have.

THE COURT:  Well, you know, I'm not accustomed to this type of practice.

MR. MC NAMARA:  I apologize, Your Honor.  We didn't feel like it was appropriate for a motion to dismiss because there was--

THE COURT:  Well, I understand that.  You're entitled to file a motion for summary judgment.  But, I would think that professional courtesy would indicate that when you're doing the scheduling order with Mr. Gray, you would identify that you intend to file a motion for summary judgment.  Don't you think that would have been courtesy?

MR. MC NAMARA:  It would have been, Your Honor.  At that time, I had contemplated that issue, and it was--at the time we had our conference, had not determined what we thought was the appropriate thing to do on the legal front.  I certainly

5

meant no disrespect to him or the Court, and I apologize for having done so.

THE COURT:  Well, have you reviewed it?

MR. GRAY:  Barely, Your Honor.

THE COURT:  Okay.

MR. GRAY:  Certainly not in anticipation, especially this morning.  I just saw it.

THE COURT:  Well, it does raise an issue that of course is critical to this case, and that is just exactly what the engagement of Jenkins and his firm was with respect to estate planning in this matter.  Now, looking at the--you know, I'm not an estate planner, but I guess I have a general awareness of the existence of marital deduction trusts and the tax avoidance effect of a marital deduction trust, and then a different trust, like family trust, in this case.  What--and this was done, I assume, the contact here was by Richard Cure, or Cure (pronouncing), I can't remember which it--

MR. GRAY:  Cure.

THE COURT:  Cure.  And, I don't know whether Mary, his daughter Mary, was involved in that.

MR. GRAY:  In the estate planning, Your Honor?

THE COURT:  Yes.

MR. GRAY:  She attended the meetings.  She participated in the discussions.

THE COURT:  Was there any kind of an engagement letter?

6

MR. GRAY: Not that I'm aware of, Your Honor, not that has been produced to date.

THE COURT: Okay. Well, you know, there are sort of two versions possible here. One is that the Kennedy and Coe, and Jenkins in particular, outlined what ought to be done to minimize the tax consequences after his death--well, actually, for both of them, the husband and wife, and recommended the establishment of these trusts. And, then, the law firm simply was to carry it out. Or, the other way around, the law firm was to do the actual estate planning.

MR. GRAY: That's a--I'd be happy to--

THE COURT: Yeah, just expand on that. I mean, I'm not hearing the motion for summary judgment this morning. But, these are the same questions I was prepared to ask anyway, where do we get the duty and the breach of contract. So, you know, obviously, I anticipated the defendants' position being that all of this is the fault of the lawyers, and particularly Wade being the last lawyer.

MR. GRAY: Yes.

THE COURT: And--but, to back up for one thing, and that is the letter that went from Jenkins to Reitz--

MR. GRAY: Yes.

THE COURT: Do you have that?

MR. GRAY: Yes.

THE COURT: Was it correct as to which trust was the

Case No. 1:08-cv-00904-RPM    Document 30-2    filed 06/04/09    USDC Colorado    pg 7 of 21

7

power of appointment to the exercise board?

MR. GRAY:  The letter to Reitz written by--of this office correctly explained what was to be done.  Reitz did the wrong thing.

THE COURT:  Yes.

MR. GRAY:  And, wrote a letter back correctly explaining what he did wrong.  He doesn't acknowledge that he did it wrong, but he--his letter tells what he did.

THE COURT:  And, that letter goes to Jenkins?

MR. GRAY:  Yes.

THE COURT:  And--

MR. GRAY:  Either he doesn't read it, or he doesn't appreciate that the wrong powers were being exercised. Ernest Cure never ever meets or speaks to the lawyer who--

THE COURT:  Reitz.

MR. GRAY:  Reitz.  All his communications were with Kennedy and Coe.  They made the decision about what estate planning should be done, and depending on one's point of view, either--they certainly engaged Reitz from our point of view, because we didn't know Reitz from anybody.

THE COURT:  Yeah.  Might as well be a scrivener, from your standpoint.

MR. GRAY:  Well, yes, conceptually.  But, he drew the estate plan according with that, or it was assumed, according to instructions, but he did explain what he did in the letter

that he sent.

THE COURT: Now, was that in like a memorandum outlining what the world says?

MR. GRAY: I believe it's in the letter that accompanies the estate planning documents that were sent back to Kennedy. They then proceeded to--execution, which Jenkins attends, and from that point onward, the Kennedy and Coe firm continues to represent Cure, Inc. and Ernest Cure and Mary Bohnen, give advice to them about the operations of Cure, Inc. I know the Court has seen that--

THE COURT: So, during the period that ultimately results in the breach of fiduciary duty--

MR. GRAY: Yes. And, they're giving advice during that period of time to Ernest Cure, to Cure, Inc., and, of course, to Mary Bohnen, who is a director and an officer of Cure, Inc.

THE COURT: Consistent with that the power of appointment has been exercised on the family trust, which includes the Cure, Inc.

MR. GRAY: Exactly. So, from our point of view, at least, we believe that they gave advice to Ernest Cure, Cure, Inc.--

THE COURT: Prepared tax returns for the company?

MR. GRAY: I believe they did, Your Honor, yes. Yes.

THE COURT: Was this like a Subchapter S corporation?

MR. GRAY: It's a closely held corporation, with essentially at this point in time really only what Mary and Ernest Cure and Jenkins believed were two putative shareholders.

THE COURT: This is running the farm, wasn't it?

THE COURT: This is running a farm, yes, sir, out in Eastern Colorado.

THE COURT: Yeah.

MR. GRAY: So, they make their decisions about what their responsibilities are, not appreciating that the sisters continued to be shareholders and would be shareholders going on into the future.

THE COURT: Okay. Now, we get to the second--

MR. GRAY: The second point, yes.

THE COURT: That Wade--

MR. GRAY: Yes.

THE COURT: Using the first will; is that your understanding?

MR. GRAY: Well, in part, yes, Your Honor. Wade inquires--Wade meets with Ernest Cure, but also in attendance are Mary Bohnen and Mr. Jenkins. If I'm misstating any of this, please speak up. I believe these--

THE COURT: Well, we'll get to their side. I just want to hear your side.

MR. GRAY: Okay. All right. Wade meets with Ernest

10

Cure, Mary, and Jenkins.  In anticipation or as part of that meeting, a letter is sent to Jenkins--sent by Jenkins to Jim Wade, where Wade is inquiring about the assets, how are they held, and they tell him in correctly what they have believed, and everyone has believed since 1995, that there are no assets remaining in the trust concerning which the power of appointment should have been exercised.  So, Wade makes the inquiry--

THE COURT:  So, the assets are the farm.  Where is the farm?

MR. GRAY:  Well, the stock of the farm, what entity-- where are the--who are the shareholders of this entity.  So, Jenkins responds incorrectly, and Wade drafts the will based on the belief derived from Jenkins that that power would be exercised under the will, and that's the way they did it all along, so despite Ernest Cure's best efforts to, quote, make his will bullet proof, as the judge found in the underlying breach of fiduciary duty case, Wade drafts the will based on the belief derived from Jenkins and Kennedy and Coe that the assets are held in the wrong trust.

THE COURT:  Remind me, I did ask this before on the motion to dismiss by the other defendant, about the reformation.  There was an effort to add reformation of the second will?

MR. GRAY:  There was.

11

THE COURT: And, that--and, what happened on that? Was that in the same lawsuit as the breach of fiduciary duty?

MR. GRAY: No. Separate lawsuit, same district in Eastern Colorado, different judges. Judge Ben White (phonetic) granted summary judgment because under Colorado law, he concluded that the will could not be reformed unless the inconsistency or defect was apparent in reading the instrument. He would not permit the parties to go outside of the instrument.

THE COURT: What the testator's intent was?

MR. GRAY: As to what the testator's intent was, yes, despite the fact that Jenkins doesn't dispute that this does not embody Jenkins as an--or, Earnest Cure--

THE COURT: Yeah. Okay. Well, there's a lot more to it than just the drafting of the will.

MR. MC NAMARA: There is, Your Honor. The position, our position is that the mistake that Mr. Wade made in drafting the will, and the improper designation or exercise of the power, is the causation or causative, if you will, the event from which all these damages spring.

THE COURT: Well, that isn't what I just heard. What I just heard is, you know, that what she seeks to recover is what she had to pay her sisters for breach of fiduciary duty, which goes to the operation of the farm, the corporation, during the time that she's the fiduciary, thinking that she

12

has no duty to anybody else, that she has the property under the power of appointment.

MR. MC NAMARA:  I think the distinction, Your Honor, that we would--that I think is important is that the total universe of damages is made up of two components.  In part, it is because the sisters in fact had an interest that nobody thought they had, and it was owed to them, and that Ms. Bohnen argues now I should have had it all--

THE COURT:  Yeah, I know, but Jenkins is giving advice during this time.

MR. MC NAMARA:  He is giving advice, tax claiming advice, during that time.

THE COURT:  Yeah.

MR. MC NAMARA:  The damages that flow from that advice is a fairly small chunk.  And, so, where it would make a huge difference, Your honor, is what duties are we talking about here, and the issue about which we believe there can be no dispute as a matter of law is that Jenkins did not have the duty to make sure the will was drafted properly.  And, that duty was a legal duty, and he's an accountant not a lawyer. He had duties without a doubt with respect to any tax planning and other accounting advice that he rendered in the interim.  Most of the advice that he gave, and his firm gave, was actually found by the court to have been appropriate. And, there were no damages awarded for many of the claimed

13

damages in the lower court case.

THE COURT: Well, the way I read this some time ago was that the court went through all the expenditures--

MR. MC NAMARA: They did.

THE COURT: --and found that these expenditures, many of them, violated the fiduciary duty because they were not for the benefit of the farm, the corporation, but for personal benefit.

MR. MC NAMARA: The court found that as to some of them, Your Honor.

THE COURT: Yeah. Well, that's part of the damages.

MR. MC NAMARA: Correct, and that bucket of damages relates to a duty that the accountants had to render appropriate tax advice.

THE COURT: Well, let me ask the pointed question. Is it your position that Jenkins be involved in the estate planning, having sent the letter to Reitz, had no responsibility to read Reitz's letter back, or the will?

MR. MC NAMARA: I think the only duty that he had, Your Honor, was to--his duty was to render--

THE COURT: Answer my question.

MR. MC NAMARA: I don't think he had--he did not have a duty to do read that, Your Honor.

THE COURT: That's your position?

MR. MC NAMARA: I think that letter that came--he was

14

relying on the attorney, and he gets a five and a half page, single spaced letter that lays out all these different issues that Mr. Reitz undertook. And, I don't think, I mean, he's not qualified as a lawyer, and you'd have to be a lawyer specializing in that practice area to understand that letter.

THE COURT: You think an accountant doesn't understand tax planning?

MR. MC NAMARA: He understands tax planning and estate planning, but he's not the person who can draft an instrument--

THE COURT: Come on. Your motion for summary judgment is denied. This is a factual case, and it has a lot to do with exactly what Jenkins was doing, and you're going to be able to take his deposition, I trust. Where is he now?

MR. GRAY: He's in Kansas, Your Honor.

THE COURT: And, he's no longer practicing. He's retired?

MR. GRAY: He's retired, yes, sir.

THE COURT: Is he healthy?

MR. GRAY: So far as I know.

MR. MC NAMARA: He is very--he's actually been deposed twice, Your Honor, not by Mr. Gray but--

THE COURT: Yeah. Well, do you have transcripts of those earlier depositions?

MR. GRAY: I do, Your Honor, yes.

15

THE COURT:  Well, that was the other thing.  I'd assume that both of you have the discovery that came out of the-- well, there are two lawsuits now, the reformation and the breach of fiduciary duty case.

MR. GRAY:  They were handled by the same law firm, Your Honor.  And, so, we have all of the materials that were generated, and we have provided those, along with--

MR. MC NAMARA:  That's correct, Your Honor.

THE COURT:  Okay.  So, you've got all that.  So, really, you're going to--I'm looking for the deposition schedule.  Here it is.  Who is Linda Runwald (phonetic)?

MR. GRAY:  She's the woman who is the CPA in the same firm, Your Honor.  She's the one who wrote the letter to--

THE COURT:  To Reitz?

MR. GRAY:  To Reitz.  And, apparently, received his correspondence back.  But, it's a little cloudy to me at least--

THE COURT:  As to what her exact role was?

MR. GRAY:  Whether she read the letter and didn't appreciate that it didn't match up with what she requested, or whether that went directly to Jenkins.

THE COURT:  And, who's Steven Warley (phonetic)?

MR. MC NAMARA:  He is a lawyer--he's no longer at the Wade Ash firm, Your Honor.  He was at the time, and witnessed the will and wrote some memos about Mr. Cure's competence.

16

THE COURT:  Is there a problem about that?

MR. MC NAMARA:  No, Your Honor.

THE COURT:  The will got probated.

MR. MC NAMARA:  Yes.

THE COURT:  There wasn't any--yeah.  And, remind me, is there still a probate proceeding that hasn't been closed?

MR. GRAY:  No, Your Honor.  The court gave Mary 60 days from the date of his order to pay her sisters.

THE COURT:  Oh, yeah.

MR. GRAY:  And, as part of the court's resolution of the matter, the court decided that it probably would not be a good idea to have these people continue to be shareholders. So, their interest in the Cure farm was bought out as part of the--

THE COURT:  Part of the settlement of the--

MR. GRAY:  Part of the court's resolution of the matter.

THE COURT:  So, Mary has the farm today?

MR. GRAY:  Cure, Inc. still owns the farm, and Mary is the sole shareholder now.

THE COURT:  Okay.

MR. GRAY:  And, a million-7.

THE COURT:  Yeah.  This--

MR. GRAY:  It's the--

THE COURT:  Yeah, the circles.

MR. GRAY:  The circles, yes.

THE COURT: Okay. Well, you've got a provision in here that I don't want to include, and that is on your joint meetings with clients regarding settlement, that you would advise the Court, and the results will be reported in a confidential report, I don't want.

MR. GRAY: You don't--

THE COURT: No, I don't want anything to do with the settlement.

MR. GRAY: Okay.

THE COURT: If you want to have a magistrate judge after this for purposes of settlement proceedings, I can do that on a joint motion. But, you know, long ago I don't--I've never done settlements, and--

MR. GRAY: Oh, it wasn't our intent, Judge.

THE COURT: Well, I mean, and I don't want to know about them because it's going back to where I practiced law. Let settlements be handled by somebody else. I always thought about going to trial, and I'm still of that mind.

MR. GRAY: Well, we'll just take that out then.

THE COURT: Yeah, I'll just strike through it. You know, we don't have to be fancy about it. I'll just strike it and I'm not going to ask you to advise the Court at all. So, I'm just going to take that joint meetings with clients, and strike through that. There doesn't appear to be any areas of--

18

MR. GRAY: No, Your Honor. The only thing I would say is that I think that seven hour forecast for the depositions, given the fact that we already have depositions, is probably generous.

THE COURT: Yeah.

MR. GRAY: I don't think it's going to take that long because I just build on what we already have, assuming that we have no problem with using those prior depositions.

THE COURT: Yeah, I wouldn't expect you to be duplicating.

MR. GRAY: No. ...

MR. MC NAMARA: Agreed.

THE COURT: Yeah. Okay. So--and, you know, I'm not big on encouraging interrogatories. I'm big on discouraging interrogatories, especially claims interrogatories and requests for admission, because that simply causes a lot of aggravation, in my experience. And, if I could rewrite the rules of discovery, I'd take those things out. But, I can't.

But, you know, the practice, my practice is that I hold this type of conference, we get acquainted with the issues, we discuss them. Then, after discovery, I hold a pretrial conference. The issues get narrowed at the pretrial conference so that we can slenderize the trial, and we go to trial on those things that a jury should hear and nothing else. And, therefore, I don't see the need for things like

19

what are you claiming about this and that, and so forth. And, requests for admissions generally are just authenticity of that.

MR. GRAY: Okay. Frankly, I don't think there's any question about that.

THE COURT: Yeah. So, you know, I don't assign, or refer I guess is the word, most of my cases to magistrate judges because I feel one judge is enough. And, when it comes to discovery disputes, if there are any, I like to deal with them myself. I don't like them, but I deal with them myself, I should say. So, I expect counsel to work through discovery problems.

MR. MC NAMARA: I don't anticipate we're going to have--

THE COURT: No.

MR. MC NAMARA: --much of that at all, Your Honor.

THE COURT: Yeah. Well, so, it's a modification that I made by striking this out, I'm saying your scheduling order, without making you redo it. So, you know, I guess it's because I'm an old man and I'm in an old building, and I like to do things the old way as much as possible, which is get your witnesses and get them in here and let's try it. Okay?

MR. GRAY: Thank you, Your Honor.

THE COURT: If you want to go to a--who is the magistrate judge here? If you want to go to a magistrate judge for--who? Boland would be the judge. So, that's up to

20

you folks, and I would think you're going to do some discovery before you decide on that.

So, the motion for summary judgment is denied. You can tell the lawyer in Kansas City she didn't--

MR. MC NAMARA: That's my motion, Your Honor. I'll take my lumps on that.

THE COURT: Okay.

MR. MC NAMARA: I appreciate the timing of the conference at 11 o'clock to accommodate travel as well. Thank you.

THE COURT: Sure. Okay, thank you.

MR. GRAY: Thank you, Your Honor.

(11:26 a.m. - Whereupon, the proceedings were concluded.)

21

TRANSCRIBER'S CERTIFICATE

I hereby certify that the foregoing has been transcribed by me to the best of my ability, and constitutes a true and accurate transcript of the mechanically recorded proceedings in the above matter.

Dated at Aurora, Colorado, this 19th day of May, 2009.

/s/ Mary Chevalier

Mary Chevalier

Federal Reporting Service, Inc.

17454 East Asbury Place

Aurora, Colorado   80013

(303) 751-2777