<table>
<tr><td>

DISTRICT COURT, KIT CARSON COUNTY, COLORADO<br>
Kit Carson County Courthouse<br>
251 16th Street, Room 301<br>
Burlington, Colorado 80807<br>
Telephone: (719) 346-5524<br><br>

IN THE MATTER OF THE FAMILY TRUST OF<br>
EILEEN RITA CURE

</td><td>

EFILED Document<br>
CO Kit Carson County District Court 13th JD<br>
Filing Date: Jun  1 2007 11:56AM MDT<br>
Filing ID: 15080039<br>
Review Clerk: Sharlene K Mills<br><br>

▲COURT USE ONLY▲<br><br>

Case No. 03 CV 29<br><br>

Division D

</td></tr>
<tr><td colspan="2">

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

</td></tr>
</table>

THIS MATTER came on for trial before the Court sitting without a jury on April 2, 3, 4 and 5, 2007. Anthony K. Mallgren and Robert A. McDermott, Mallgren & Ferrell, P.C., appeared as counsel for the Petitioners, Jane Elizabeth Hubbard, Kathleen Ann Unrein and Theresa Muniz (herein "Petitioners"); and, Justin D. Cumming, Rothgerber Johnson & Lyons LLP, appeared as counsel for Respondent, Mary Ellen Bohnen (herein "Respondent" or "Mary"). The Court having heard the testimony and having examined the proofs offered by the respective parties, and being fully advised in the premises, FINDS and DETERMINES:

### I. Findings of Fact

1. The Court has personal and subject matter jurisdiction in this proceeding.

#### A. Background Information – Corporation/Family Trust

2. Ernest R. Cure (herein "Ernest") was a farmer from Stratton, Colorado. In 1972, Ernest and his first wife, Eileen Rita Cure (herein "Eileen"), created a closely held corporation.

EXHIBIT
2
tabbies

A Certificate of Incorporation was issued by the Colorado Secretary of State to Cure, Inc. (herein sometimes referred to as the "corporation") on March 6, 1972. (Respondent's Trial Exhibit R-1.) Thereafter, Ernest and Eileen transferred the ownership of their real property to the corporation. The corporation now owns over 3,500 acres of farmland in Kit Carson County, Colorado.

3. Ernest and Eileen had eight children, four sons and four daughters. The four daughters are the Petitioners, Jane Elizabeth Hubbard, Kathleen Ann Unrein and Theresa Muniz, and the Respondent, Mary Ellen Bohnen. The four sons are Edward J. Cure, Michael R. Cure, William E. Cure and John P. Cure (herein "Cure Brothers").

4. As of August 16, 1976, the shares of common stock of the corporation were owned by the following persons: Ernest and Eileen (1,275 shares), Edward J. Cure (166 shares), Mary (66 shares), Michael R. Cure (92 shares), William E. Cure (104 shares), John P. Cure (104 shares), Kathleen A. Cure (48 shares), Jane E. Cure (48 shares), and Theresa M. Cure (48 shares). On or about November 4, 1976, Ernest and Eileen transferred their stock in the corporation to the Ernest Richard Cure Trust (638 shares) and the Eileen Rita Cure Trust (637 shares). (*See* Petitioners' Trial Exhibit 8.) On January 16, 1987, the Eileen Rita Cure Trust transferred 280 shares to Mary and 357 shares to Ernest. On the same date, the Ernest Richard Cure Trust transferred all of its shares to Ernest. (*See* Petitioners' Trial Exhibit 8.) On December 7, 1987, Ernest transferred 497 shares to Eileen. (*See* Petitioners' Trial Exhibit 8.)

5. The Petitioners retained their shares of the corporation until March, 1986, at which time the shares were redeemed by the corporation. The Petitioners were minority shareholders of the corporation from 1976 until March, 1986. (*See* Petitioners' Trial Exhibit 8.) The Petitioners were never officers or directors of the corporation.

6. The shares of stock held by Edward J. Cure, Michael R. Cure, William E. Cure, and John P. Cure were redeemed in December, 1988. They were minority shareholders of the corporation from 1976 until December 31, 1988. (*See* Petitioners' Trial Exhibit 8.)

7. As a result of the foregoing stock redemptions and various stock transfers over the years, from December 31, 1988, until Eileen's death, the shares of stock in the corporation were owned by Ernest (498 shares), Eileen (497 shares), and Mary (346 shares). (*See* Petitioners' Trial Exhibit 8.)

8. The redemption of the shares owned by the Cure Brothers was the result of a certain agreement entered into by the parties on or about December 31, 1988. On that date, the parties signed a Settlement Agreement and other documents which provided, among other things, that the Cure Brothers would no longer be shareholders of the corporation. (*See* Petitioners' Trial Exhibit 8 and Respondent's Trial Exhibit R-3.) The agreement obligated Ernest, Eileen, Mary and the corporation to assume and pay the balance of a debt owed to a third party lender in the amount of $1,284,615.43. (*See* Respondent's Trial Exhibit R-3.) Although the Cure Brothers no longer owned stock in the corporation, they continued to do business with the corporation. Specifically, the agreement provided that the corporation would lease the farm land to Cure Brothers pursuant to a cash lease arrangement. (*See* Respondent's Trial Exhibit R-3.)

9. From January 1, 1989, until his death on September 11, 2002, Ernest served as President of the corporation. During this period, Mary acted as Secretary-Treasurer for the corporation. After January 1, 1989, Ernest made all of the business decisions for the corporation.

10. Eileen died testate on March 27, 1992, with a traditional estate plan dividing her estate into two shares, a Marital Trust and a Family Trust (herein "Trust Agreement"). (Petitioners' Trial Exhibit 1)

11. Ernest and Mary were named co-trustees of both the Marital Trust and the Family Trust. Ernest served in this capacity until his death on September 11, 2002.

12. At the time of her death, Eileen owned 497 shares of Cure, Inc. In accordance with her Will and Trust Agreement, 85 shares were transferred to the Marital Trust and 412 shares were transferred to the Family Trust. The only assets ever held in the Family Trust were the 412 shares of common stock of Cure, Inc.

13. Ernest held a general power of appointment over the assets held within the Marital Trust. (*See* Petitioners' Trial Exhibit 1, pp. 7-1 to 7-2.) If Ernest declined to exercise the general power over the Marital Trust, the assets in the Marital Trust were to be added to the Family Trust and administered pursuant to the provisions of the Family Trust. (*See* Petitioners' Trial Exhibit 1, p.7-3.)

14. Ernest also held a "limited and special power of appointment" over Eileen's Family Trust enabling him to appoint all of the Family Trust assets to the benefit of any one or more of his daughters. (*See* Petitioner's Trial Exhibit 1, p. 8-3.)

15. The initial beneficiaries of the Family Trust were Ernest and his four daughters. If the limited power of appointment over the Family Trust was not exercised by Ernest prior to his death, the Family Trust was to be divided into four equal shares, one for each of Ernest's daughters. (*See* Petitioner's Trial Exhibit 1, p. 8-4.)

16. Following Eileen's death on March 27, 1992, the Petitioners and Mary became the current discretionary beneficiaries of the Family Trust subject to divestment by Ernest if he exercised the limited power of appointment. (*See* Petitioners' Trial Exhibit 1, p. 8-4.)

17. The Petitioners received a copy of the Trust Agreement in June, 1992. (*See* Respondent's Trial Exhibit R-4.) Prior to their father's death, the Petitioners did not request any information concerning the corporation and/or the administration of the Family Trust.

18. The Family Trust was not registered until July 3, 2003, which was more than ten years after Eileen's death. §15-16-101, C.R.S. As a result, the Petitioners were not notified of the registration of the trust as required by §15-16-303, C.R.S.

19. Ernest and Mary, as co-trustees, did not prepare or distribute any periodic reports to the beneficiaries of the Family Trust as required by Article XIII, Section 4 of the Trust Agreement and by §15-16-303, C.R.S. (*See* Petitioners' Trial Exhibit 1, p. 13-1.)

20. After Eileen's death, Ernest and Mary were the only officers and directors of the corporation. The Family Trust, as the owner of 412 shares of stock in the corporation, was a minority shareholder.

21. The corporation has never paid dividends to its shareholders.

22. After Eileen's death, Ernest and Mary became co-trustees of the Family Trust.

23. Since its formation, the Family Trust has not made any distributions to its beneficiaries.

B. Ernest's 1995 and 2000 Wills

24. Ernest married his second wife, Inez, in late 1992.

25. In December, 1994, Ernest met with his accountant, Bill Jenkins (herein "Jenkins"), for the purpose of discussing his estate and revising his will. Jenkins was a Certified Public Accountant and partner with the accounting firm, Kennedy & Coe.

26. Following the 1994 meeting, Jenkins understood that it was Ernest's intent to revise his estate plan in a manner that would eliminate the Petitioners as potential beneficiaries under his will. It was further understood by Jenkins that Ernest would exercise his powers of appointment under Eileen's trusts so that all of the property, including the shares of stock in the corporation, would pass to Mary.

27. At the conclusion of the meeting, Jenkin's assistant prepared and sent a letter to Sid Reitz (herein "Reitz"), an estate planning attorney in Salina, Kansas. In the letter, Reitz was directed to draft estate planning documents which, among other things, provided for the exercise of the limited power of appointment by Ernest with regard to the assets of the Family Trust. The limited power of appointment was to be exercised for the benefit of Mary.

28. Ernest did not personally meet with Reitz regarding the provisions of the will.

29. On January 31, 1995, Ernest signed the will prepared by Reitz. (Respondent's Trial Exhibit R-11.) Jenkins was present and acted as a witness. In the will, Ernest exercised the power of appointment with regard to the Marital Trust, but did not exercise the special or limited power of appointment regarding the Family Trust. Nevertheless, Jenkins believed that the will provided that upon Ernest's death, all of the shares of stock in the corporation would pass to Mary.

30. After the 1995 will was signed by Ernest, Mary believed that Ernest had exercised the limited power of appointment over Eileen's Family Trust, and that the 412 shares of stock in

the corporation held by the Family Trust would pass to her at the time of her father's death. After the 1995 will was signed by Ernest, Mary believed that the Petitioners were no longer discretionary beneficiaries of her mother's Marital Trust or Family Trust.

31.   In 2000, Ernest decided to have his estate planning documents reviewed by a Colorado attorney. With Jenkins' assistance, Ernest contacted James Wade (herein "Wade"). At their first meeting with Wade, Ernest expressed concerns regarding the three daughters (Petitioners herein) who he believed had been disinherited. Wade testified that their strategy in updating Ernest's will was to make it "bullet proof" or more difficult to attack by the daughters who had been excluded.

32.   Wade testified that he was directed to prepare a will which would make Mary the sole beneficiary of Ernest's estate, including a provision regarding the exercise of the power of appointment over Eileen's trust for the benefit of Mary.   The shares of stock in the corporation held by the trust were to pass to Mary.   The Petitioners were not to receive anything from their father's estate or from their mother's trust unless Mary predeceased Ernest.

33.   In May, 2002, Wade received a letter from Kennedy & Coe which indicated that the 412 shares of corporate stock were held in Eileen's "Marital Trust." (*See* Respondent's Trial Exhibit R-16.) The letter does not mention the Eileen Cure Family Trust. Jenkins acknowledged that this information was incorrect as most of the shares of corporate stock were actually held by the Family Trust, not the Martial Trust.

34.   On October 10, 2000, Ernest met with Wade in Denver, Colorado and executed his will. (Respondent's Trial Exhibit R-17) On October 18, 2000, Ernest executed an identical will in Burlington, Colorado in the presence of his bankers and Wade. In this will, Ernest exercised

his general power of appointment over Eileen's Marital Trust, but he did not exercise the limited power of appointment over Eileen's Family Trust.

35. After the 2000 will was signed by Ernest, Mary believed that Ernest had exercised the limited power of appointment over Eileen's Family Trust and that the 412 shares of stock in the corporation would pass to her upon her father's death. Therefore, Mary believed that the Petitioners were not beneficiaries under Eileen's Marital Trust or Family Trust.

36. Ernest died on September 11, 2002, and the 2000 will was admitted to probate.

37. As the limited power of appointment over the Family Trust was not exercised by Ernest, the Petitioners, as beneficiaries of the Family Trust, own a beneficial interest of 23.1% of Cure, Inc. The remaining 76.9% of Cure, Inc. is owned directly or indirectly by Mary.

38. Mary is the sole beneficiary of the Ernest Richard Cure Trust.

39. The current fair market value for the land owned by Cure, Inc. is $2,817,000.00. The Petitioners own 23.1% of the stock in the corporation and the value of their share in the real estate is $650,727.00, or $216,909.00 each.

40. After Ernest's will was admitted to probate, Jenkins discovered that the limited power of appointment over Eileen's Family Trust had not been exercised by Ernest. The will did not provide for the exercise of the limited power of appointment over the Family Trust by Ernest. After discovering the error, Jenkins contacted Wade and informed him that the will was incorrect. Wade testified that the will he had prepared was not consistent with Ernest's testamentary intent as it failed to leave all of the stock in the corporation to Mary. Jenkins and Wade then contacted Mary and advised her of the error.

41. Until this error had been disclosed to Mary, she believed that under the terms of Ernest's will, the 412 share of corporate stock held by Eileen's Family Trust would pass to her. Based upon the information that she received from Ernest, Jenkins and Wade, she believed that all of the corporate stock held by Ernest or her mother's trust would pass to her upon her father's death. As a result of her reliance upon this information, she incorrectly believed that her sisters had no beneficial interest in the Family Trust or the corporation.

42. Mary directed Wade and Jenkins to contact the Petitioners for the purpose of negotiating the purchase of their interest in the corporation. At Mary's request, Wade did not disclose the mistake in Ernest's will to the Petitioners as she believed such disclosure would be counter productive in their negotiations. (*See* Petitioners' Trial Exhibit 47.)

43. When negotiations ceased, a petition was filed by Mary in the probate proceeding seeking reformation of Ernest's will (herein "Reformation Case). Judge Vannoy found that the will could not be reformed and ruled against Mary. Judge Vannoy's decision in the Reformation Case was recently affirmed by the Colorado Court of Appeals, judicial notice of which is hereby taken by this Court.

44. In June, 2004, the Court appointed Robin Wiley (herein "Wiley") as custodian for the corporation.

C. Lease with Bohnen Farms and Sprinkler Repair Payments to Bohnen Farms

45. On or about January 1, 1999, Cure, Inc. entered into a lease agreement with Bohnen Farms, Inc. (herein "Bohnen Farms"). Under the lease, Bohnen Farms was entitled to immediate possession of the irrigated farm ground. The prior tenant, Cure Brothers, a Colorado general

partnership (herein "Cure Brothers"), retained possession of the dryland farm ground pending the completion of harvest. The terms of this lease were apparently not reduced to writing.

46. On November 1, 2001, Cure, Inc. entered into a five (5) year cash lease with Bohnen Farms. (Petitioners' Trial Exhibit 41) The term of the lease commenced on January 1, 2002, and ended December 31, 2006. The lease covered 1,691.5 total acres, including 887.6 acres of dryland and 725.5 acres of irrigated farm ground. Under the lease, Bohnen Farms paid $50,000.00 per year to the corporation.

47. Bohnen Farms is owned by Michael Bohnen, who is Ernest's grandson and Mary's son. The terms of the lease were negotiated by Ernest on behalf of Cure, Inc.

48. From September, 1999, to April, 2001, the corporation paid a total of $126,000.00 to Bohnen Farms or Michael Bohnen for costs and expenses related to the center pivot irrigation systems and wells located on the property owned by the corporation. The dates and amounts of these payments are as follows: (1) $14,000.00, to Bohnen Farms on September 23, 1999, for "repairs"; (2) $56,000.00, to Bohnen Farms on December 28, 2000, for "sprinkler"; (3) $10,000.00, to Michael Bohnen on February 27, 2001, "sprinkler expense"; and (4) $46,000.00, to Bohnen Farms on April 30, 2001, for "sprinkler lease."

49. The Petitioners contend that the corporation should not have incurred any expenses related to the repair of the irrigation sprinklers from 1999 through 2001.

50. In 1999, the corporation's lease with Cure Brothers ended and the property was leased to Bohnen Farms. There were fifteen (15) center pivot sprinklers located on the property and four (4) of these systems belonged to the prior tenant. Cure Brothers had farmed the property under a lease agreement with the corporation since 1986 and had either replaced

sprinkler systems or made improvements to them. When the lease ended, Cure Brothers removed its sprinklers from the property and dismantled the irrigation equipment that it had previously improved or repaired. When Bohnen Farms took possession of the property, four (4) sprinklers had been removed and three (3) of the remaining sprinklers did not work and were beyond repair. An irrigated crop could not be grown on the property until the sprinklers and wells had been repaired or replaced.

51. In 1999 and 2000, Bohnen Farms purchased seven (7) center pivot irrigation systems for use on the property. (*See* Respondent's Trial Exhibit R-27.) The total purchase price for the irrigation equipment was approximately $245,000.00.

52. In 1999 and 2000, Bohnen Farms incurred expenses in the amount of $33,271.46 for the repair of the wells and irrigation equipment owned by Cure, Inc. (*See* Respondent's Trial Exhibit R-28.) In 2001, Bohnen Farms incurred expenses in the amount of $33,759.09 for the repair of the wells and irrigation equipment owned by Cure, Inc. (*See* Respondent's Trial Exhibits R-28 and R-41.) For example, Schall Drilling Company removed the pumps from three (3) wells located on Cure, Inc. property and cleaned and disinfected the systems and replaced motors and bowls at a cost of $20,302.20. (*See* Respondent's Trial Exhibit R-41.) During the first few years of the lease, Bohnen Farms expended $67,030.55 for the repair of wells and irrigation equipment owned by the corporation. These costs were not related to the normal and routine maintenance of the irrigation systems, but were major repairs to the wells or were costs associated with repairing the equipment that had been dismantled by the previous tenant. The corporation, as the landowner, was responsible for the payment of these costs.

53.     In 2003 and 2004, Bohnen Farms continued to oversee the repairs to the corporation's wells and irrigation equipment. Schall Drilling Company pulled wells, installed new bowls and replaced motors and pumps for the corporation. During this period, Bohnen Farms paid Schall Drilling Company the sum of $21,555.35. (*See* Respondent's Trial Exhibit R-28.) On or about January 22, 2003, Bohnen Farms paid Hitchcock, Inc. $3,392.73 for converting the drive units on one of the corporation's sprinklers. (*See* Respondent's Trial Exhibit R-28.) These costs were not related to the normal and routine maintenance of the irrigation systems, but were major repairs to the wells or equipment. The corporation was clearly responsible for the payment of these costs.

54.     The expenses incurred by Bohnen Farms were not related to the ordinary maintenance of the irrigation systems, which under the lease the tenant would be required to pay. (*See* Petitioners' Trial Exhibit 41, Section 16.) Rather, these were major repairs to the wells or costs related to upgrading the sprinkler systems which were the responsibility of the corporation. (*See* Petitioners' Trial Exhibit 41, Section 4(c).) From the evidence presented, the Court can reasonably infer that the corporation's existing irrigation systems were out-dated and inefficient and required extensive repairs when Bohnen Farms negotiated its lease with the corporation.

55.     From the invoices and billing statements provided by Bohnen Farms, it is clear that major repairs to the irrigation system and wells of the corporation were necessary during the first few years of the lease.

56.     The Farm Services Administration, United States Department of Agriculture, reimbursed the corporation the sum of $14,000.00 (government cost share) for the installation of

low pressure nozzles on the some of the corporation's sprinklers, an expense paid by Bohnen Farms.

57. From January, 1999, to June, 2004, Bohnen Farms expended $91,978.63 in repairing and upgrading the irrigation wells and sprinklers owned by Cure, Inc. (*See* Respondent's Trial Exhibits R-28 and R-41.) These expenses should have been paid by the corporation and not by Bohnen Farms. At the beginning of the lease, Ernest recognized the need to repair and upgrade the irrigation systems and authorized the corporation to advance these sums to Bohnen Farms. After deducting the government cost share from the amount advanced to Bohnen Farms, the corporation may have overpaid Bohnen Farms the sum of $20,021.37.

58. By repairing the wells, replacing motors and pumps, and upgrading the sprinklers, Bohnen Farms improved the corporation's irrigation systems. Without these repairs, there would have been a significant reduction in the value of the real property owned by Cure, Inc.

59. The payments by the corporation for sprinkler repairs authorized by Ernest to Bohnen Farms were made in good faith and for the purpose of preserving the value of the irrigated farm land owned by the corporation. There was no evidence presented to suggest that Ernest or Mary acted in bad faith or with the intent to harm the minority shareholders of the corporation by authorizing these transactions.

60. The Petitioners assert that the cash rent paid by Bohnen Farms to the corporation under the lease agreement of November 1, 2001 (Petitioners' Trial Exhibit 41), was significantly below market and that the corporation suffered a loss in the amount of $294,724.20.

61. The Petitioners' appraiser, Donald L. Jones (herein "Jones"), testified that the fair market rent for the property was $93.01 per acre for the irrigated land and $60.80 per acre for the

dryland, or $108,944.84 per year. (*See* Petitioners' Trial Exhibit 60, pp. 286-298.) Under his analysis, the corporation was losing $58,944.84 each year because of the lease with Bohnen Farms. During the five (5) year term of the lease, the Petitioners believe that the corporation lost $294,724.20.

62. The Respondent's appraiser, Virgil H. Holtgrewe (herein "Holtgrewe"), testified that the fair market rent for similar property located in Kit Carson County was $90.00 per acre for irrigated land and $20.00 per acre for dryland. As the Bohnen Farm lease covered 1,691.5 acres of farm ground, consisting of 887.6 acres of irrigated land and 725.5 acres of dryland, the fair market rent was $83,047.00. Under this analysis, and disregarding the other factors Holtgrewe considered, the corporation lost $33,047.00 per year, or $165,235.00 during the five (5) year term of the lease.

63. Holtgrewe determined that the fair market cash rent for the property owned by the corporation was $131,523.00 per year. Therefore, the combined leases were only $21,523.00 below market value. Under this analysis, the corporation lost $107,615.00 during the five (5) year term of the lease.

64. Michael Bohnen testified that at the time he entered into the lease agreement with the corporation, Ernest was seeking cash rent for the entire property in the amount of $110,000.00. In order to reach this amount, Bohnen Farms paid S50,000.00 and Triple H Farms, Inc. (herein "Triple H Farms") paid $60,000.00.

65. The prior tenant, Cure Brothers, paid the corporation $135,000.00 per year as cash rent for the property. (*See* Respondent's Trial Exhibit R-19, Exhibit A.) Edward J. Cure

testified that he told Ernest that the partnership was not willing to renew the lease at that rate, as it was too high.

66. On November 1, 2001, Cure, Inc. entered into a three (3) year cash lease with Triple H Farms. The term of the lease commenced on January 1, 2002. The lease covered 730.5 total acres, including 246.7 acres of dryland and 483.8 acres of irrigated farm ground. Under the lease, Triple H Farms paid $60,000.00 per year to the corporation. (*See* Petitioners' Trial Exhibit 40.)

67. Before entering into the written cash lease agreement with Triple H Farms, the corporation leased the property to Triple H Farms on a crop share basis. Under the crop share lease, the corporation was entitled to one-third of the dryland crops and one-fourth of the irrigated crops grown on the property.

68. Triple H Farms considered the land that it was leasing to be very productive farm ground and one of its officers stated that "there was no better ground in the county." (*See* Petitioners' Trial Exhibit 60, pp. 270-271.) Due to the quality of the farm ground and its proximity to the headquarters of Triple H Farms, it paid a premium rate for the property it was leasing. Unlike Bohnen Farms, it does not appear that Triple H Farms incurred any expenses related to the repair of the wells and irrigation systems at the beginning of the lease. At least one of the irrigation sprinkler systems used by Triple H Farms had been purchased by Bohnen Farms.

69. On January 31, 2007, the custodian, on behalf of Cure, Inc., entered into a one (1) year lease with Bohnen Farms, commencing January 1, 2007, and ending on December 31, 2007. (*See* Petitioner's Trial Exhibit 43.) Under this lease, Bohnen Farms is paying $61,047.25 as cash rent for 1,129.1 acres of land, which includes 765.5 acres of dryland farm ground and 363.6

acres of irrigated farm ground. The remainder of the land owned by the corporation and included in the previous lease with Bohnen Farms (approximately 562.4 acres) has been placed in the CREP program and will not be used for crop production this year.

70. At the time possession of the land was delivered to Bohnen Farms, some of the land and irrigation systems were in poor condition. It was necessary for Bohnen Farms to eradicate large areas of noxious weeds and to repair or replace many of the sprinkler systems. The prior tenant had also placed a large number of dead cattle on the land in violation of the CRP (Conservation Reserve Program) contract with the Farm Services Administration, which had to be removed by Bohnen Farms.

71. As previously noted, Bohnen Farms purchased seven (7) Valley center pivot sprinkler systems for use on the corporation's property. Michael Bohnen testified that each system cost $35,000.00. Under the lease agreements with Bohnen Farms and Triple H Farms, the corporation would have been required to either purchase new sprinkler systems or make extensive repairs to the existing systems. In either case, the corporation would have incurred significant expenses in replacing or repairing these systems.

72. Neither appraisal considered the benefit conferred upon the corporation by Bohnen Farms in purchasing seven new sprinkler systems for use on the corporation's property. Jones testified that the cost of the sprinklers purchased by Bohnen Farms was not a factor that he considered in completing his appraisal. Holtgrewe testified that he did not take into account the sprinklers purchased by Bohnen Farms in his analysis. However, he did indicate that the fair market lease rate for the irrigated land would be reduced if the tenant owned the sprinklers being used on the property.

73. After considering the testimony of the experts and the other evidence presented by the parties, the Court finds that the fair market rent for the property being leased by Bohnen Farms was $83,047.00 per year. The Court concludes that if Ernest had leased the property to an unrelated third party, he would have reasonably expected cash rent in the amount of $83,047.00, regardless of the corporation's agreement with Triple H Farms concerning the balance of the property.

74. At the time Ernest negotiated the lease agreement with Bohnen Farms, he knew that extensive repairs were necessary with regard to the irrigation equipment. He also knew that the corporation or Bohnen Farms would have to replace the sprinkler systems removed by Cure Brothers and those sprinklers that were beyond repair. If Bohnen Farms had not purchased the sprinkler systems used on the property, the corporation would have been obligated to pay this expense. Clearly, Ernest took this into consideration when he leased the property to Bohnen Farms.

75. Michael Bohnen testified that he believed the corporation saved approximately $4,500.00 per year for each sprinkler provided by Bohnen Farms. As Bohnen Farms purchased seven sprinklers for use on the property, he believes that the corporation saved $31,500.00 per year. These savings were based upon the "life" of the sprinklers and the interest that would have been charged to the corporation for any loans used to purchase the equipment. Since this was not specifically addressed by the parties in the lease agreement, the Court is unable to determine the amount that the lease payments should have been reduced under these circumstances.

76. The lease transaction between the corporation and Bohnen Farms was negotiated in good faith by Ernest, as president of the corporation, and was not intended to harm the interests

of the minority shareholders. However, the Court is unable to determine whether the discount approved by Ernest on behalf of Bohnen Farms was reasonable.

### D. Disputed Corporate Transactions with Ernest and/or Mary

77. The Petitioners question the compensation paid by the corporation to Ernest and Mary. Their accounting expert, Ronny Farmer (herein "Farmer"), separated the alleged damages into two categories: "Improper Costs" and "Lost Income." (*See* Petitioners' Trial Exhibit 68.) In his report, Farmer indicates that Ernest and Mary authorized the corporation to pay out $1,109,874.00 in improper costs. (*See* Petitioners' Trial Exhibit 68.) In his opinion, the corporation lost $716,106.00 in income by failing to charge Ernest and Mary rent while they were living on corporate property and by entering into a below market lease with Bohnen Farms. (*See* Petitioners' Trial Exhibit 68.)

78. The "Improper Costs" category consists of twenty-one different types of questioned business expenditures by the corporation. Some of the "Improper Costs" have been characterized by the Respondent as compensation or benefits paid by the corporation to its officers, Ernest and Mary. In Farmer's opinion, all of these expenditures were improper and should not have been authorized by the corporate officers. The Respondent's accounting expert, Rick Doty (herein "Doty"), concluded that these expenditures were customary, reasonable and appropriate under the circumstances. (*See* Respondent's Trial Exhibit R-33.)

79. The remaining categories concern corporate expenditures which were not related to officer compensation. These include charitable contributions, farm expenses and interest. Farmer testified that all of these expenditures were improper and should have not been authorized by Ernest and Mary. On the other hand, Doty concluded that most of these

expenditures were customary, reasonable and appropriate under the circumstances. Doty testified that $103,000.00 of these expenditures were questionable.

(1) Medical Reimbursement Plan.

80.    Between 1993 and 2003, the corporation expended $95,176.00 in medical reimbursements for Ernest and Mary. (*See* Petitioners' Trial Exhibit 68.) In January, 1992, the corporation established a Medical Reimbursement Plan. (Petitioners' Trial Exhibit 4 and 5) The medical reimbursement plan for Ernest and Mary was established based upon advice that they received from the corporation's accountant, Hildebrand & Associates, P.C. (herein "Hildebrand"). During the period this plan was in effect, Ernest and Mary each received approximately $360.50 per month in compensation.

81. In 1994, Kennedy & Coe replaced Hildebrand as the corporation's accounting firm. Between 1997 and 2003, Jill Eberhart (herein "Eberhart"), a Certified Public Accountant employed by Kennedy & Coe, prepared the corporation's income tax returns. She testified that medical reimbursement plans are commonly used by family farm corporations as the payments are deductible to the corporation, and are not income to the recipient. Eberhart felt that the corporation's medical reimbursement plan was reasonable and appropriate.

82. In Farmer's opinion, any compensation received by Ernest or Mary under the plan was improper. As the plan was established for full-time employees, and as Ernest and Mary did not meet the commonly accepted standard of a full-time employee, he did not believe that they should receive any compensation under the plan. He further stated that the expenses incurred under the medical reimbursement plan were not necessary for the operation of the corporation.

19

83. On the other hand, Doty testified that the corporation's medical reimbursement plan was reasonable and proper. He felt that Ernest and Mary were entitled to compensation under the plan by virtue of the services they provided to the corporation.

84. The Court finds that the compensation Ernest and Mary received under the corporation's medical reimbursement plan was proper. The plan was implemented for the benefit of the corporation's officers, Ernest and Mary, after consultation with the corporation's accountant. A medical reimbursement plan is commonly used by closely held corporations as a means of providing compensation to its officers and employees, and the corporation's plan was never questioned by its accountants. The amount of compensation paid to Ernest and Mary under the medical reimbursement plan was reasonable.

85. The medical reimbursement plan was implemented by the corporation for corporate tax planning reasons. The plan was administered by Ernest and Mary in good faith and without intent to harm the interests of the minority shareholders.

(2) Meal Reimbursement Plan.

86. Between 1996 and 2003, the corporation reimbursed Ernest and Mary the sum of $67,250.00 for meals. In 1996, the corporation implemented a meal reimbursement plan for its corporate officers, Ernest and Mary. During the period the plan was in effect, they each received approximately $350.25 per month in compensation.

87. Prior to 1996, the corporation had expended $1,589.00 in meal reimbursement costs, or approximately $500.00 annually. Ernest and Mary would have each received approximately $20.00 per month. This amount is clearly reasonable and will not be considered in terms of damages or as wrongful conduct by the corporate officers.

88.    The meal reimbursement plan was implemented by the corporation upon the professional advice of its accountants, Kennedy & Coe.

89.    In Farmer's opinion, any payment made to Ernest and Mary under the meal reimbursement plan was improper.    Farmer testified that these payments did not qualify as a deduction for the corporation under the Internal Revenue Code; there were no documents provided in support of these payments; that these costs were not necessary for the operation of the corporation; and, that the amount paid by the corporation to Ernest and Mary was excessive.

90.    Eberhart testified that the meal reimbursement plan was customary for family farm corporations and that the compensation paid to the corporate officers was reasonable.    Doty testified that the corporation's meal reimbursement plan was reasonable and proper.

91.    The Court finds that the compensation Ernest and Mary received under the corporation's meal reimbursement plan was proper.    Meal reimbursement plans are commonly used by closely held corporations as a means of providing compensation to its officers and employees.    The compensation paid to Ernest and Mary under this plan was actually a salary and not reimbursement for meals.    Nevertheless, the amount paid to Ernest and Mary appears to have been based upon the services being provided by them to the corporation.

92.    Clearly, the meal reimbursement plan was implemented by the corporation for corporate tax planning reasons.    The corporate expenditures under the plan were reasonable and the plan was administered by Ernest and Mary in good faith and without intent to harm the interests of the minority shareholders.

(3)  Rent and Housing for Officers

93. The corporation paid rent on an apartment in Burlington, Colorado for Ernest between 1992 and 1996. During that period, the corporation expended $31,350.00 in order to rent an apartment for Ernest, or the sum of approximately $600.00 per month.

94. Farmer testified that any rent paid on the apartment in Burlington was improper as the apartment was not located on corporate property. In his report, he indicated that the amount of rent paid by the corporation was excessive considering the services being provided by Ernest. On the other hand, Doty concluded that it was acceptable for a corporation to provide housing for its president and the amount of $600.00 per month for the president was reasonable.

95. After Eileen's death, the corporation built a home for Ernest which cost $466,411.00. Construction of the home began in 1994, and was completed in 1996. In November, 1996, the house and the adjoining 320 acres of land were conveyed to Ernest in order to retire a debt owed by the corporation to him. (*See* Petitioners' Trial Exhibit 38.) The Petitioners do not object to the sale of the property to Ernest in satisfaction of the debt.

96. After the property was conveyed to Ernest, the corporation began leasing the property from Ernest, but allowed him to continue to reside in the home. Between 1996 and 2002, the corporation paid rent to Ernest in the amount of $81,791.00, or approximately $1,300.00 per month. By entering into this agreement, the corporation was in effect providing Ernest with housing as compensation for his services as president.

97. This transaction was entered into by the corporation and Ernest upon the professional advice of their accountants, Kennedy & Coe. Jenkins testified that the corporation was able to provide Ernest with income in a tax-advantaged manner by renting the property back from him.

Eberhart testified that it was customary for a family farm corporation to provide housing for its officers and that the amount of rent being paid to Ernest was reasonable.

98. Mary lived rent free in a home owned by the corporation. Farmer believes that the corporation lost approximately $400.00 per month by failing to collect rent on this property. (*See* Petitioners' Trial Exhibit 68.) Between 1992 and 2002, Farmer believes that Mary should have paid rent in the amount of $52,800.00.

99. Since the creation of the corporation, it had provided housing for its officers as part of their compensation package.

100. The Court finds that the compensation Ernest and Mary received from the corporation in the form of housing or rental payments was proper. These types of benefits are commonly used by closely held corporations as a means of providing compensation to their officers and employees; the corporation's rental payments were approved by its accountants; and, the rent free housing provided to Mary was approved by the corporation's accountant. The amount of compensation paid to Ernest and Mary, as corporate officers, in the form of rent or rent free housing was reasonable.

101. The Court finds that the rental payments made by the corporation on behalf of Ernest were made in good faith and without intent to harm the interests of the minority shareholders. The Court further finds that the decision to provide Mary with rent free housing was made in good faith and without intent to harm the interests of the minority shareholders.

(4) Health Insurance.

102. Between 1993 and 2003, the corporation paid health insurance premiums for Ernest and Mary in the amount of $33,987.00. (*See* Respondent's Trial Exhibit R-33 and Petitioners'

Trial Exhibit 68.) During this period, the corporation paid each of its corporate officers approximately $129.00 per month for health insurance premiums. Doty testified that it is very common for closely held corporations to provide health insurance for its officers. This amount was deductible for tax purposes by the corporation and was not considered income to the recipient.

103. The Court finds that the compensation Ernest and Mary received from the corporation in the form of health insurance was proper. The health insurance was obtained for the benefit of the corporation's officers, Ernest and Mary, after consultation with the corporation's accountants. This type of fringe benefit is commonly used by closely held corporations as a means of providing compensation to its officers and employees, and the corporation's payments for health insurance were approved by its accountants. The amount of compensation paid to Ernest and Mary for health insurance was reasonable.

104. The Court finds that the health insurance payments made by the corporation for the benefit of its officers were made in good faith and without intent to harm the interests of the minority shareholders.

(5) Motor Vehicles.

105. Between 1993 and 2001, the corporation purchased four (4) Cadillacs for use by Ernest at a cost of $171,963.00. During this period, Ernest essentially received a vehicle allowance in the amount of $1,302.75 per month from the corporation

106. Eberhart and Doty testified that it is customary for a family farm corporation to provide vehicles for use by corporate officers. Eberhart indicated that she felt that it was

appropriate for the corporation to provide Ernest with a vehicle as a means of compensating him for the services he was providing to the corporation.

107. Although the amount of compensation paid to Ernest as a vehicle allowance was somewhat excessive, the total amount of compensation that he was receiving from the corporation on a monthly basis was still reasonable. The corporation provided Ernest with a vehicle for corporate tax planning reasons and this was done in good faith and without intent to harm the interests of the minority shareholders.

(6) Telephone and Utilities.

108. Between 1993 and 2003, the corporation expended $46,770.00 on utilities for Ernest and Mary, or approximately $177.00 per month for each person. During that same period, the corporation paid Ernest and Mary's telephone bills in the amount of $10,352.00, or approximately $48.00 per month for each officer.

109. The amount paid by the corporation for these items is reasonable. The corporation paid these expenses for corporate tax planning reasons and this was done in good faith and without intent to harm the interests of the minority shareholders.

(7) General Comments – Officer Compensation

110. Following Eileen's death, Ernest served as president and Mary acted as secretary-treasurer of the corporation. During this period, the average annual officer compensation for Ernest was $34,632.00 and $21,000.00 for Mary. (See Respondent's Trial Exhibit R-34, Exhibit B.) It is customary for a family farming corporation to provide compensation packages to its officers consisting of wages and fringe benefits. Doty testified that closely held corporations provide compensation to its officers by providing fringe benefits, paying salaries or by

authorizing the payment of dividends. He further testified that the payment of fringe benefits by the corporation to its officers is the most efficient means of providing compensation as they are deductible for tax purposes to the corporation and are not includable as income to the employee or officer. (*See* Respondent's Trial Exhibit R-33.)

111. Between 1992 and 2002, the Court finds that the corporation was expending approximately $3,225.00 per month on behalf of Ernest. During that same period, the corporation expended approximately $1,465.00 per month on behalf of Mary. Rather than paying a salary, which would have been taxable to the recipient, the corporation chose to pay its officers by providing fringe benefits. The corporate managers were receiving benefits from the corporation equaling $4,690.00 per month, or $56,280.00 annually. As corporate officers, Ernest and Mary were responsible for maintaining the integrity of the property owned by the corporation; ensuring that the land was being properly farmed and maintained by the tenants; negotiating farm leases with potential tenants; maintaining the records and providing bookkeeping and accounting records for the corporation; monitoring compliance by tenants with programs administered by the Farm Services Administration; paying bills; coordinating the preparation of corporate tax returns; employing accountants and attorneys; and, handling all of the other activities related to the management of a large and relatively complex farm. This amount was exceedingly reasonable given the fact the corporation was valued at almost $3,000,000.00.

112. The corporation was created by Ernest and Eileen and had always been managed by Ernest. After Eileen's death, Ernest continued to manage the corporation and was entitled to compensation for the services that he provided to the corporation. Mary assisted Ernest in the

management of the corporation and was also entitled to reasonable compensation for her services. The corporation was not harmed by providing fringe benefits to the officers, rather than paying salaries.

113. The Court finds that the costs incurred by the corporation in providing benefits to Ernest and Mary were reasonable and necessary. As officers and controlling shareholders of the corporation, Ernest and Mary acted in good faith and did not breach any fiduciary duties that they may have had to the remaining shareholders with regard to the payment of these benefits. The did not breach any fiduciary duty that may have had to the Petitioners as co-trustees of the Family Trust by approving reasonable compensation to the corporation's managers.

(8) Other Corporate Expenditures Contested by Petitioners.

114. From 1999 to 2003, the corporation expended $4,339.00 in miscellaneous expenses. (*See* Petitioners' Trial Exhibit 68.) Mary has provided no evidence that these are proper corporate expenses.

115. From 1999 to 2003, the corporation incurred farm expenses in the amount of $25,569.00. (*See* Petitioners' Trial Exhibit 68.) Some of these expenditures are related to the corporation's obligations under a crop share lease with Triple H Farms and planting grass on land enrolled in CRP (Conservation Reserve Program). The Court finds that these costs were incurred by the corporation in order to meet its obligations under the crop share lease with Triple H Farms and the CRP contract, with the exception of $646.00.

116. In 2002, the corporation incurred legal fees in the amount of $6,976.00. These fees were related to a dispute between the corporation and Cure Brothers at the time the lease

between the parties was terminated. These Court finds that these fees were properly paid by the corporation as the attorneys were representing the corporation, not Ernest, in this matter.

117. In 1995, the corporation paid legal fees in the amount of $2,614.00 on behalf of Ernest. These fees were incurred in connection with the preparation of Ernest's 1995 will and a deferred compensation agreement. As these fees related primarily to estate planning for Ernest, they should not have been paid by the corporation.

118. Between 1993 and 2003, the corporation expended $97,778.00 in repairing the homes used by Mary and Ernest. (*See* Respondent's Trial Exhibit R-33.) Mary testified that these repairs were for property owned or leased by the corporation. Doty concluded that of this amount at least $48,620.00 could be confirmed as corporate related expenses. As the expenditure of the remaining sums could not be verified as a corporate expense, Doty included those sums as "questionable costs" to the corporation. The Court finds that the sum of $49,156.00 cannot be accounted for by the Respondent and should not have been paid by the corporation.

119. Between 1993 and 2003, the corporation paid out $38,727.00 for items identified as business expenses. Mary testified that these expenses were related to reimbursement of credit card charges by Ernest. As the purpose of these expenditures could not be verified, Farmer and Doty could not determine if these costs were personal or business. The Court finds that as these expenditures cannot be accounted for by the Respondent, they were improper expenses of the corporation.

120. Between 1993 and 2003, the corporation expended $17,031.00 on fuel and oil for vehicles used by Ernest and Mary. Farmer testified that the payment of these expenses by the

corporation was improper. Doty concluded that the officers of the corporation used the vehicles for business purposes at least 50% of the time. The Court finds that these costs were primarily related to personal use of the vehicles by Ernest and Mary and were improperly paid by the corporation.

121. Between 1995 and 2003, the corporation paid St. Mary's Catholic School the sum of $33,475.00, in order to cover a student's tuition. Mary testified that her father was a man of firmly-held religious convictions and that these contributions were made to a seminary for the benefit of an acquaintance. In Farmer's opinion, it was improper for the corporation to make this type of a charitable contribution. In contrast, Doty believed that such charitable contributions were common and entirely appropriate. The Court finds that these charitable contributions were unreasonable and were improperly paid by the corporation.

122. In 2003, the corporation paid Inez Cure, Ernest's second wife, $15,000.00 as deferred compensation. Inez Cure was never an officer or employee of the corporation, but was paid this amount pursuant to a deferred compensation agreement. (*See* Petitioners' Trial Exhibit 3.) The agreement provided monthly payments of $2,500.00 beginning upon the death, disability or retirement of Ernest. Upon Ernest's death, Inez received $15,000.00 from the corporation before she died. Mary testified that the deferred compensation agreement was adopted by the corporation upon the advice of its accountants and as a means of providing support to Inez Cure upon Ernest's death. It does not appear that the corporation derived any benefit from the deferred compensation agreement as it was designed to provide monetary assistance to Inez Cure, who was never an employee or officer of the corporation. The Court finds that the amount paid to Inez Cure under the deferred compensation agreement was unreasonable and improper.

123. As the result of debts owed by the corporation to Ernest and Mary, the corporation expended $222,394.00 on interest. Much of this was returned to the corporation to increase the debt owed to Ernest and was ultimately retired by the distribution of the house constructed by the corporation to Ernest. At the time the corporation entered into the settlement agreement with Cure Brothers, the shareholders of the corporation assumed the responsibility of paying a debt owed to a third-party lender in the amount of approximately $1,280,000.00. (*See* Respondent's Trial Exhibit R-3.) In connection therewith, the corporation had to borrow significant funds from Ernest. During the three year period following the assumption of this loan, the corporation borrowed more than $240,000.00 from Ernest. (See Respondent's Trial Exhibit R-13.)

124. Mary testified that Ernest loaned money to the corporation at various times when the corporation was in need of capital.

125. In Farmer's opinion, all of the interest expenses incurred by the corporation with regard to loans with Ernest were improper. Doty testified that the corporation required working capital in order to operate and that it was proper for Ernest to loan the company money. Eberhart also testified that it was customary for family members to loan money to closely held farm corporations and that she did not perceive anything improper with regard to these loans. The Court finds that these loan transactions were necessary for the operation of the corporation and that the amount paid to Ernest as interest was reasonable. These loan agreements were entered into in good faith by the corporate officers and without intent to harm the interests of the minority shareholders.

126. The Court finds that there is nothing unreasonable with regard to the penalties paid by the corporation to the IRS.

## E. Current Corporate Assets

127. The parties agree that the current fair market value for the land owned by the corporation is S2,817,000.00. The parties further agree that the other assets of the corporation are valued at $311,208.00, for a total of $3,128,208.00. The Petitioners' share in the corporation is 23.1%, which is worth $722,616.00. Each of the Petitioners is entitled to $240,872.00 for their interest in the corporation.

128. Farmer included a S250,000.00 component in his chart attributable to the "increase in value of the corporate property if fair market rent were in place . . ." per the appraisal prepared by Jones. Jones utilized the cost approach when calculating the $250,000.00 amount. In that regard, Jones opined that the fair market value of the corporate real property, using the cost approach, was $2,850,000.00. Under this analysis, Jones assumed that the higher lease rate was paid for all of the land, including the land leased by Bohnen Farms. (*See* Petitioners' Trial Exhibit 60, pp. 2 and 307.) When factoring in the lower lease rate paid by Bohnen Farms, Jones' cost approach valuation for the corporate real property was reduced to $2,600,000.00, the difference between the two cost approaches being $250,000.00.

129. The parties have stipulated and the Court concludes that the fair market value of the corporate real property, using the *sales comparison approach*, is S2,817,000.00. An award of damages which included the $250,000.00 component discussed above would be impermissibly duplicative of the Court's ruling that the Petitioners are entitled to their share of the value of corporation's real property as determined by the agreed upon sales comparison approach.

130. The Court further finds that in providing for distributions under the trust agreement it would not be appropriate to apply a marketability or minority shareholder discount.

## II. Conclusions of Law

1.  Under Colorado law, trustees of a trust owe the highest fiduciary duties to the beneficiaries of the trust. A trustee owes a duty of loyalty to the beneficiary of a trust to administer the trust solely in the interest of the beneficiary, and the trustee must exclude all self-interest. *Klarner v. Katz*, 98 P. 3d 892, 897 (Colo.App. 2003), *rev'd on other grounds*, 113 P.3d 150 (Colo. 2005), *citing* George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees*, §543, at 218 (2d ed.1993). The trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. *Klarner v. Katz*, 98 P.3d at 897-898, *citing Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Judge Benjamin Cardozo).

2.  Persons who are officers, directors and majority shareholders of a closely held corporation also owe the highest fiduciary duties to minority shareholders. The courts have previously recognized that corporate directors owe a fiduciary duty to shareholders in exercising their responsibilities. This duty encompasses the requirement that directors of a corporation and its controlling shareholders act with an extreme measure of candor, unselfishness, and good faith in relation to remaining shareholders. In addition, it is widely recognized that the fiduciary duty imposed on corporate directors and officers dealing with minority shareholders is enhanced in the context of closed corporations. *Van Schaack Holdings, Ltd. v. Van Schaack*, 867 P.2d 892, 897-98 (Colo.1994), *cited in Wisehart v. Zions Bancorporation*, 49 P.3d 1200, 1204 (Colo. App. 2002). *See also River Management Corp. v. Lodge Properties, Inc.*, 829 P.2d 398, 404 (Colo.App. 1991). The director of a corporation and its controlling shareholders owe a fiduciary duty to the remaining stockholders. *Id.* This duty requires directors to act with an extreme

measure of candor, unselfishness and good faith as "[t]heir office is one of trust and they are held to the high standard of duty required of trustees." *Id. citing Colgren v. Navy Gas and Supply Co.*, 110 Colo. 454, 135 P.2d 1007 (1943). *See also Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1056 (Colo. 1995) (directors of a corporation owe fiduciary duties to the corporation and to the shareholders of the corporation).

3. Officers, directors and majority shareholders of a corporation owe the highest duties of disclosure to minority shareholders when the majority shareholders are attempting to acquire stock from the minority shareholders. *Van Schaack*, 867 P.2d at 897, *see also Wisehart*, 49 P.3d at 1204.

4. Good faith and reliance on advisors, including counsel, are not defenses to the breach of fiduciary duties owed in the trust context. "A trustee commits a breach of trust not only where he violates a duty in bad faith, or intentionally although in good faith, or negligently, but also where he violates a duty because of a mistake as to the extent of his duties and powers. This is true not only where his mistake is in regard to a rule of law, whether a statutory or common-law rule, but also where he interprets the trust instrument as authorizing him to do acts which the court determines he is not authorized by the instrument to do. *In such a case, he is not protected from liability merely because he acts in good faith, nor is he protected merely because he relies upon the advice of counsel.* . . . If he is in doubt as to the interpretation of the instrument, he can protect himself by obtaining instructions from the court. The extent of his duties and powers is determined by the trust instrument and the rules of law which are applicable and not by his own interpretation of the instrument or his own belief as to the rules of law." (emphasis added) *Restatement (Second) of Trusts*, §201, Comment b (2007).

5. Upon Eileen's death, Ernest and Mary assumed the duties of co-trustees of the Family Trust. As co-trustees of the Family Trust, Ernest and Mary became obligated to exercise their duties of loyalty and disclosure to the beneficiaries of the Family Trust, including Petitioners, to the exclusion of their self-interest.

6. In addition, in their roles as officers, directors and majority shareholders of the corporation, Ernest and Mary were obligated to exercise their duties in operating the corporation with an extreme measure of candor, unselfishness and good faith in relation to remaining shareholders, including the Family Trust. The corporation does not provide a shield to the actions of Ernest and Mary with regard to their management of the assets of the Family Trust. Their multiple conflicting roles require the absolute highest regard for the interests of the other beneficiaries.

7. Ernest and Mary breached their fiduciary duties of disclosure and candor by failing to provide information to Petitioners that was required by the terms of the Family Trust as well as Colorado law. Ernest and Mary failed to disclose to Petitioners the assets of the Family Trust and the properties and assets of the corporation and failed to provide annual reports to the Petitioners as required by the Trust Agreement and Colorado law.

8. Ernest and Mary breached their fiduciary duties of loyalty and selflessness by engaging in some acts of self-dealing, including the use of corporate assets for their own personal benefit and the diversion of corporate income to their personal use.

9. In summary, Ernest and Mary owed the highest fiduciary duties to Petitioners with regard to their operation and management of the corporation and Family Trust. Ernest and Mary were required to act with extreme measures of candor, disclosure, loyalty and unselfishness.

After Eileen's death and the establishment of the trust, some of their activities constitute breaches of their fiduciary duties.

10. The statute of limitations and time period for laches commence only when the person alleging a breach of a fiduciary duty knew, or reasonably should have known, that a breach of fiduciary duty has occurred. Neither time period commences when the fiduciary violates his or her duty of disclosure by not providing information to the beneficiary. "If the beneficiary does not learn of the breach or repudiation because the trustee, by fraud, concealment or other wrongful conduct keeps the beneficiary in ignorance of the situation, clearly the Statutes of Limitations should not run." George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees,* §951 (2d ed. 1993). "To cause the statute to begin running during the life of the trust, there must be some unequivocal act in violation of the duties of the trustee or in repudiation of the trust, as where he *declines to account* to the beneficiary . . . ." *Id.* (emphasis added).

11. A higher standard for reasonable knowledge applies when the person breaching the duties is in a confidential relationship with the persons injured by the breach. *Equitex, Inc. v. Ungar,* 60 P.3d 746, 752 (Colo.App. 2002), *cert. denied* (2003). *See Higby v. Walsh,* 229 Iowa 408, 294 N.W. 597 (1940) (where a cause of action exists against one in confidential relations with a plaintiff, and the plaintiff is ignorant of the existence of the cause of action, and the defendant kept silent and did not reveal the status of affairs, the statute of limitations does not run during the period of ignorance); *Fleury v. Chrisman,* 200 Neb. 584, 264 N.W. 2d 839 (1978)(where a confidential relationship existed, and evidence showed that defendant had recognized plaintiff's interests, defenses of statute of limitations and laches were not applicable

where there were no facts from which a repudiation could be inferred and no change in the condition or relation of the property or the parties); *Demoulas v. Demoulas Supermarkets, Inc.*, 424 Mass. 501, 677 N.E.2d 159 (1997), app. after remand, 428 Mass. 543, 703 N.E.2d 1141 (1998), app. after remand, 432 Mass. 433, 732 M.E.2d 875 (2000), on subsequent appeal, 57 Mass. App. 456, 784 N.E.2d 1122 (2003) (the statute of limitations tolled an action which included breach of fiduciary duty by corporate officers based on director's failure to fully disclose material facts known to them on which the claims were based).

12. Fraudulent concealment arises when: (1) the defendant conceals material existing facts that in equity or good conscience should be disclosed; (2) the defendant conceals defendant's knowledge of the facts; (3) the plaintiff is ignorant of the fact; (4) the defendant intends that the plaintiff act on the concealed fact; and (5) the plaintiff's concealment results in damages to the plaintiff. *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 918 (Colo.App. 1991), citing *Berger v. Security Pacific Information Systems, Inc.*, 795 P.2d 1380 (Colo.App. 1990).

13. The Petitioners have failed to carry their burden of establishing fraudulent concealment. The evidence was insufficient to prove that either Ernest or Mary intentionally concealed information in a manner that caused damages to the Petitioners. Moreover, any damages that could be awarded on the fraudulent concealment claim would be duplicative of those awarded on the breach of fiduciary duty claim.

14. The remedies for breach of fiduciary duty are to place the plaintiffs in the position they would have been in had the defendants not breached their fiduciary duties. *Heller v. First National Bank*, 657 P.2d 992 (Colo. Ct. App. 1982). Specifically, the remedies include the payment of damages suffered by the Petitioners as a result of the actions of Ernest and Mary that

36

constituted the breaches of their duties. Colorado Jury Instructions, 4th, §26:5; *Buder v. Sartore*, 774 P.2d 1383 (Colo. 1989). Those damages include (a) any loss of value or profit which the Petitioners suffered as a result of the breaches of fiduciary duty, (b) any loss of profit or income which Petitioners could reasonably have expected to earn had the fiduciary duties not been breached and (c) litigation costs, including accountants' and attorneys' fees. Colorado Jury Instructions, 4th, §26:5(2)(b) and §26:5(2)(c); *Heller, supra; Buder, supra; Murphy v. Central Bank and Trust Co.*, 699 P.2d 13 (Colo. Ct. App. 1985).

15. An award of exemplary damages is appropriate in breach of fiduciary duty cases which are attended by wanton and reckless conduct. *Tyson v. Nino*, 2004 WL 3611657 (Colo. Dist. Ct. 2004), *citing Virdanco, Inc. v. MTS Intern*, 820 P.2d 352, 354 (Colo. App. 1991).

16. A claimant may be awarded punitive damages only when demonstrating beyond a reasonable doubt that the injury is "attended by circumstances of fraud, malice, or willful and wanton conduct." §13-21-102(1)(a) and §13-25-127, C.R.S.; *Webster v. Boone*, 992 P.2d 1183, 1187 (Colo. App. 1999). The statute requires that the defendant be conscious of their conduct, and that they know (or should have known) that an injury would result. *Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 65-66 (Colo. 2005). Conduct that is merely negligent cannot serve as a basis for punitive damages. *Sheron v. Lutheran Med. Ctr.*, 18 P.3d 796, 802 (Colo. App. 2000).

17. Willful and wanton conduct means conduct that is "purposefully committed" and which the defendant must have realized is "dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." C.R.S. §13-21-102(1)(b), C.R.S.; *Razi v. Schmitt*, 36 P.3d 102, 105-06 (Colo. App. 2001). It is conduct

that creates a substantial risk of harm to others and that is purposefully performed with an awareness of the risk and a disregard of the consequences. *Miller v. Solaglas California, Inc.*, 870 P.2d 559, 568 (Colo. App. 1993).

18. As recognized by the Colorado Supreme Court, a claimant cannot recover punitive damages unless they have established all the statutory elements beyond a reasonable doubt. *Ballow v. Phico Ins. Co.*, 878 P.2d 672, 682 (Colo. 1994). Even if all elements are established, a punitive damages award remains in the discretion of the trier of fact. *Id.*

19. The evidence at trial demonstrated that Mary acted in good faith and did not intend any of her actions to harm the minority shareholders of the corporation. Moreover, Mary believed that she and Ernest were the sole owners of the corporation following the signing of her father's 1995 will. Mary did not intentionally or purposefully set out to defraud or harm the minority shareholders of the corporation or beneficiaries of the Family Trust. An award of punitive damages against Mary is not appropriate in this case.

20. Section 13-20-101(1), C.R.S., provides that "[a]ll causes of action . . . shall survive and may be brought or continued notwithstanding the death of the person in favor of or against whom such action has accrued, *but punitive damages shall not be awarded nor penalties adjudged after the death of the person against whom such punitive damages or penalties are claimed.*" (Emphasis added.) *See also Mangus v. Miller*, 535 P.2d 219 (Colo. App. 1975) (court refused to admit evidence of provocation against decedent because the evidence was offered to prove punitive damages, which are not recoverable in wrongful death action); *Sanchez v. Marquez*, 457 F. Supp. 359, 364 (D. Colo. 1978) (plaintiff's claim for punitive damages against decedent's estate were stricken). The Petitioners' request for imposition of punitive damages

against Ernest's Estate is contrary to Colorado law and is hereby rejected. Further, an award of punitive damages against Ernest is also not warranted for the reasons discussed above.

21. The primary goal of the Petitioners' remedies for breach of fiduciary duty is to place them in the position they would be in had Ernest and Mary not breached their fiduciary duties.

22. The Trust Agreement calls for the division of the Family Trust into four equal shares following the death of Ernest. The Petitioners and Mary agree that the continuation of the ownership of the corporate stock by the separate share trusts is not viable and would likely lead to continuing management difficulties as Mary is the majority shareholder and would have the ability to control the management of the company. The only practical remedy is to order Mary, Estate or corporation to acquire the corporate stock held by the separate share trusts of the Petitioners at a price equal to the hypothetical value of such stock had the breaches of fiduciary duty not occurred.

23. The hypothetical value of the corporate stock would be equal to the value of the land owned by corporation, plus the value of the assets being managed by the custodian, plus the amount of damages resulting from the breaches of fiduciary duty by Ernest and Mary.

24. Once the Petitioners present a *prima facie* showing that transactions occurred between the corporation and the trustees, Mary must show that the transactions were fair and reasonable, and not in the self interest of Ernest or Mary. *In re Estate of Heyn*, 47 P.3d 724, 726 (Colo.App. 2002). *See also Eads v. Dearing*, 874 P.2d 474, 477 (Colo.App. 1993) (shifting the burden to the fiduciary after a prima facie case is established); *Terrydale Liquidating Trust v. Barness*, 642 F.Supp. 917, 919 (S.D.N.Y.1986) (after a prima facie showing, the burden shifts to the fiduciary to show that the transaction was fair and reasonable to the trust).

25. Based upon the evidence presented at trial and applying the above standards, the Court finds that the following transactions were not proper and provided personal benefits to Ernest and/or Mary:

(a) The corporation lost income from the below market rental of farmland to Bohnen Farms between 1999 and 2006, in the total amount of $165,235.00.

(b) The corporation paid Bohnen Farms certain sums for the repair of the wells and irrigation equipment located on the corporation's property and it appears that the corporation overpaid Bohnen Farms the amount of $20,021.37.

(c) The corporation paid $4,339.00 in improper miscellaneous expenses.

(d) The corporation paid $646.00 in improper farm expenses.

(e) The corporation improperly expended $2,614.00 in connection with legal fees for estate planning for Ernest.

(f) The corporation expended $49,156.00 in repairs that cannot be specifically tied to corporate property and may be improper.

(g) The corporation expended $38,727.00 on business expenses which were for the benefit of Ernest and/or Mary, not the corporation.

(h) The corporation improperly expended $17,031.00 on fuel and oil for vehicles for Ernest and Mary.

(i) The corporation improperly expended $33,475.00 as a charitable donation to St. Mary's Catholic School.

(j) The corporation improperly paid Inez Cure the sum of $15,000.00 as deferred compensation pursuant to the deferred compensation agreement.

26. The increase in the shareholders' equity of the corporation, to remedy the breaches of fiduciary duty by Ernest and Mary is $346,244.37.

27. Thus, as of the date of the trial, the corporate land was valued at $2,817,000.00, cash or other liquid assets under the control of the custodian valued at $332,064.00, and additional shareholders' equity in other assets of $346,244.37, for a total value of $3,495,308.37.

28. In the context of an acquisition of the corporate stock from the separate share trusts, and given the highest fiduciary duties that are owed to beneficiaries, the application of a minority interest marketability discount or any other type of discount is improper. Accordingly, each separate share trust's 7.7% of the overall value of the corporation is $269,138.73.

29. The damages shall also include a "rate of return" of 7.50% which has not been calculated by the Court. Farmer included a "rate of return" of 13.20% in calculating the amount the corporation may have received if these funds had been available and invested; Doty concluded a 5.00% "rate of return" was reasonable and proper under the facts of this case. The Court concludes that a 7.50% "rate of return" should be included as a component of the damages.

### III. Judgment

IT IS ORDERED, ADJUDGED AND DECREED that Petitioners' First Claim for Relief asserting breach of fiduciary duties by co-trustees is hereby GRANTED IN PART.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Petitioners' Second Claim for Relief asserting breach of fiduciary duties by officers of the corporation is hereby GRANTED IN PART.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Petitioners' Third Claim for Relief asserting fraudulent concealment is hereby DENIED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Petitioners' Fourth Claim for Relief requesting judicial dissolution, winding up and liquidation of the corporation is hereby DENIED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Petitioners' Fifth Claim for Relief requesting appointment of receiver pending dissolution of the corporation is hereby DENIED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Petitioners' Sixth Claim for Relief requesting exemplary damages is hereby DENIED.

IT IS FURTHER ORDERED that the Family Trust shall be divided into four separate trusts as provided in the Trust Agreement. The Court appoints Jane Elizabeth Hubbard, Kathleen Ann Unrein, Theresa Muniz and Mary Ellen Bohnen as the sole successor trustee of their respective separate share trusts. Mary Ellen Bohnen shall relinquish her rights under Article XIII, Sections 10 and 11, to remove and replace trustees with regard to the Petitioners' separate trusts. Otherwise, the separate share trusts shall continue to be administered in accordance with the terms of the Trust Agreement.

IT IS FURTHER ORDERED that each of the Petitioners' separate share trusts shall be funded with 7.7% of the common stock of the corporation (the Petitioners collectively own 23.1% of the corporation).

IT IS FURTHER ORDERED that Mary and Ernest's Estate, jointly and severally, shall within sixty (60) days of this order, pay $269,138.73, plus the "rate of return" calculated at 7.50% per annum on the damages, into each of the separate trust estates in exchange for the stock. Upon receipt of this amount, all shares of stock in the corporation held by each separate

share trust shall be transferred to the corporation. Thereafter, the Petitioners and their respective trusts shall have no further rights or interest in the corporation.

IT IS FURTHER ORDERED that Mary and Ernest's Estate shall reimburse Petitioners for all reasonable litigation costs, including attorneys' fees. Costs and attorneys' fees incurred in the Reformation Case shall only be considered by this Court if all parties agree to consolidate the motion and hearing on attorneys' fees and costs and such agreement is approved by Judge Vannoy.

Entered this 1st day of June, 2007.

BY THE COURT:

_____
District Court Judge

STATE OF COLORADO, COUNTY OF KIT CARSON - ss CERTIFIED TO BE FULL, TRUE AND CORRECT COPY(IES) OF THE ORIGINAL(S) IN MY CUSTODY.

Sharlene K Mills 5/26/09

**Clerk of the District Court**

By:_____Deputy

43

## CERTIFICATE OF SERVICE

I certify that, on June 1, 2007, I served a copy of the within order or document upon all counsel of record; all *pro se* parties, if any; and all persons or entities, if any, listed below, in the following manner: _____ (mailed by regular mail, postage prepaid, to the addresses as stated in the records of this case); or _____ (transmitted by facsimile copy to the numbers as stated in the record of this case); or _____ (hand delivered); or __X__ (filed and served electronically via Lexis/Nexis).

Deborah L. Welsch
~~Court Reporter/~~(Deputy) Clerk~~/Judge~~