IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

MARY ELLEN BOHNEN, et al,

    Plaintiffs,

    -vs-    Case No. 1:08-cv-00904-RPM

KENNEDY & COE, LLC, et al,

    Defendants.

DEPOSITION

The Deposition of WILLIAM H. JENKINS, taken on behalf of the Plaintiff, pursuant to the Federal Code of Civil Procedure and Notice, before:

    Paula A. Keller, RPR, CRR
    P. O. Box 846
    St. Francis, Kansas 67756

a Registered Professional Reporter of Kansas, at 520 Main, Goodland, Kansas, on the 16th day of December, 2008, starting at 8:00 a.m. MST

APPEARANCES:
Mr. William R. Gray
Purvis Gray, LLP
4410 Arapahoe Avenue, Suite 200
Boulder, Colorado 80303

    Appeared on behalf of the Plaintiffs.

---

**Page 2**

Mr. Timothy K. McNamara
Lathrop & Gage, LC
2345 Grand Boulevard, Suite 2800
Kansas City, Missouri 64108

    Appeared on behalf of the Defendants.

EXHIBIT
3
tabbies

---

**Page 3**

INDEX

Deposition of WILLIAM H. JENKINS
    Direct Examination by Mr. Gray    4

EXHIBITS

Jenkins Exhibit No. 1 marked
for identification    14

Jenkins Exhibit No. 2 marked
for identification    39

Jenkins Exhibit No. 3 marked
for identification    57

SIGNATURE OF WITNESS    92

CERTIFICATE OF REGISTERED PROFESSIONAL
REPORTER. . . . . . . . . . . . . . . . . . 94

---

JENKINS-Direct by Mr. Gray

**Page 4**

    WILLIAM H. JENKINS, of lawful age, having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, deposes and says:

DIRECT EXAMINATION

BY MR. GRAY:

Q. Would you tell us your name please, sir?

A. William H. Jenkins.

Q. Mr. Jenkins, we've met before this deposition started. My name is Bill Gray, I represent Mary Bohnen and the plaintiffs, Mary in other capacities, various capacities, in this litigation. We're here today to take your deposition, and you, of course, understand all that?

A. Yes.

Q. And we have the benefit of having reviewed depositions that were taken in underlying cases, so it's going to be my effort to try not to replow much of the ground that you've already testified about, but to go into perhaps some other areas that haven't been to my satisfaction fully developed yet, so I wanted to give you some idea about that. We have our next deponent scheduled at 11 a.m. this morning and so

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 13

this binging, but unfortunately because I was ill when we were previously going to do your deposition I have a mediation in Montana that I have to have my phone on for because today's the second day. I'm supposed to be there and somebody else is there, and so if the phone rings I'm going to have to recess the deposition for a few minutes and assist in making some decisions; and I apologize for this, I really wish I didn't have to have the email aspect of this on, too, but that's what it's for. I'm sorry for the distraction. Does Kennedy & Coe generally lay out the work or clarify an understanding with a client of the work that they are undertaking to do for that client?

A. If it's outside the area of audits or reviewed financial statements, there was no policy requirement in Kennedy & Coe for written letters of understanding or engagement letters.

Q. During the time that you were a licensed CPA, were you a member of the AICPA?

A. Yes.

Q. And are or were, at the time that you were CEO here, essentially all other CPAs employed by Kennedy & Coe also members of AICPA?

JENKINS-Direct by Mr. Gray

Page 14

A. Yes, I believe so.

Q. Did Kennedy & Coe, during the time that you were CEO, strive to comply with the standards of AICPA?

A. Yes.

MR. GRAY: Tim, rather than try to figure out, I mean, the old -- whatever the old scheme was since we had multiple depos, I think I'm just going to start over with 1 for Bill Jenkins' depo --

MR. MCNAMARA: Yeah.

MR. GRAY: -- and go with that, if that's agreeable with you.

MR. MCNAMARA: That is.

(Whereupon, Jenkins Exhibit No. 1 was marked for identification)

Q. This is an extract of an AICPA "Statements on Responsibilities in Personal Financial Planning Practice." You recognize this as a copy of that aspect of the standards, don't you, sir?

A. Yes.

Q. Would you turn to paragraph 13? Would you take a moment and read that please, sir?

A. (Witness complies to Counsel's request) I've

JENKINS-Direct by Mr. Gray

Page 15

read it.

Q. Did Kennedy & Coe with regard to any of the engagements for Ernest Cure, Cure, Inc., Mary and Joe Bohnen, Michael Bohnen or any of the Bohnen-related work that Kennedy & Coe undertook document an understanding of the scope and nature of the services that were to be provided?

A. There's no documentation outside of what you undoubtedly have already seen in the form of my memos from meeting with the clients and objectives that came out of these meetings.

Q. Okay. Do you see the statement that says the documentation could be in the form of an engagement letter or in the form of file memos that document oral understandings?

A. Yes, I see -- see that sentence.

Q. Okay. Did you in any written record identify the roles and responsibilities of Kennedy & Coe that were being undertaken?

A. No.

Q. Did Kennedy & Coe identify in any written form the fee arrangements that were being put in place with regard to the services it was rendering to Ernest Cure, Cure, Inc., Joe and Mary Bohnen, Michael Bohnen or any of the other

JENKINS-Direct by Mr. Gray

Page 16

Bohnen-related entities?

A. I don't know of any written fee arrangements. I'm not hesitant to suggest, however, that I think there was a general understanding on the part of all of those entities that you named that we generally billed by the hour and had billing rates; but no, as far as a formal letter describing the fee arrangement, there is none.

Q. Is there any writing or record that sets forth limitations or other constraints on the scope of the undertakings that Kennedy & Coe was setting out to perform?

A. No.

Q. At anytime during your tenure as CEO for Kennedy & Coe -- and I'd like to focus primarily on the period fall of 1994 through the date of Ernest Cure's death in September of 2002. Did Kennedy & Coe avail itself of any peer review processes offered by AICPA or other CPA organizations to assess Kennedy & Coe's policies, practices or procedures or interim controls?

A. We would have had peer reviews as required by the American Institute. I don't recall their dates or how frequently, but we're a peer review firm.

JENKINS-Direct by Mr. Gray

Page 25

planning services to clients, what was the concept of estate planning to you, what did it involve?

A. (Pause) Well, that's a question that's going to take some babbling on my part, not having thought about how to define estate planning. I would say it would vary a good deal from one set of circumstances to another as to how much planning needed to go into achieving what the client ultimately wanted to see happen to -- to their properties. So certainly it would start with financial information, what's the net worth, start with family information, what are peoples' sources of income, who's relying on the estate for income and support, what are relationships within the families, who do they want to see to benefit, what you want to see happen to your property; and of course, I guess being CPAs, a lot of what we did was tax-motivated or driven, explaining to the client what the tax consequences were of various schemes or ways of approaching estate planning. I'll stop babbling now and see whether or not I'm getting to what you were looking for or --

Q. It's a good running start, yes, thank you. I

JENKINS-Direct by Mr. Gray

Page 26

appreciate that. In 1994 when Ernest Cure met with you about estate planning work, were you then internally the primary responsible CPA for that estate planning engagement?

A. Yes.

Q. What is the term -- I don't want to misuse terminology, what is the terminology that Kennedy & Coe uses to identify what I'm calling the principal client contact CPA or the primary client responsible CPA, if there is a term?

A. I -- there are positions within Kennedy & Coe, managers and principals and that sort of thing, but at least during that period of time you can't go from the title that someone holds to -- and translate that into what necessarily their client responsibility is.

Q. I don't want to confuse you. I'm not -- I'm not speaking of whether someone is a partner or shareholder and CPA or a principal CPA, I'm really focusing on the lines of internal responsibility for the work that's being done for a given client. Is there one person, one CPA who is, at least with regard to estate planning work for Ernest Cure, the lead CPA or the primary responsible CPA within the Kennedy &

JENKINS-Direct by Mr. Gray

Page 27

Coe structure? I'm just trying to understand how the responsibility lines lie.

A. Well, it would be a client -- it would be client-specific.

Q. Yes sir.

A. So in the case of Ernest Cure, I was responsible --

Q. All right.

A. -- for the planning.

Q. All right. Now, would someone else then have been the primary responsible person for work being done by Kennedy & Coe for Cure, Inc. or would that person necessarily have been you because of the -- of the close relationships involved?

A. I was responsible for the estate planning. The other services -- when I say other services, whatever record-keeping was done, income tax return preparation or I'm not sure what else, possibly payroll tax returns or whatever -- I had no contact with that, no responsibility for it. That would have been whoever the other CPA on the ground at the time was, and that would -- that would be very typical in Kennedy & Coe for certain people to be responsible for one range

JENKINS-Direct by Mr. Gray

Page 28

of services and somebody else to be responsible for some other service.

Q. How are those various services or closely-related individuals or businesses coordinated within Kennedy & Coe? How were they coordinated within Kennedy & Coe in this 1995 through 2002 time frame?

A. Well, I have the sense maybe you're looking for something pretty formal there. There isn't -- it really isn't that, it's -- these clients generally are not -- don't have more than one or two or three people that are working on the client. They're usually in the same office, they oftentimes meet together with the client. So it's -- it's a very informal system, I would say, of people being face-to-face and talking to each other about what they're running into or what he's trying to achieve, and so I don't feel like certainly in this case or really most cases coordination of services and the right hand knowing what the left hand is doing hasn't been an issue.

Q. All right. Well, just by way of example, in your work with Ernest Cure's estate plan I take it you, if you wanted to do so, could review or

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 29

have access to documents, data, notes, and the like that would have been generated in the preparation of the tax returns for Cure, Inc. or for Ernest Cure?

A. That's right.

Q. You could have done that if you wanted it all, true?

A. Absolutely, yes.

Q. And if someone who was working on the tax aspects of Cure, Inc. or for Ernest Cure or for Mary or Joe Bohnen had wanted to or felt the need to review any of the documents from any of the other files that pertained to Mary Bohnen, Joe Bohnen, Ernest Cure, Cure, Inc., they would have the same freedom or were available to review those files?

A. That's right.

Q. And collect that information if they needed?

A. Correct.

Q. Okay. Forgive me for asking, but was your compensation in 1995 before you became CEO related in any way in -- a portion of your compensation related to client generation or work generation?

A. No.

JENKINS-Direct by Mr. Gray

Page 30

Q. So you were on a salary and paid the same whether you were what sometimes is referred to as a rainmaker and brought in a lot of clients versus someone who did a lot of detailed work within the firm, is that true?

A. I'll expand that -- that is true. I'll expand that just a bit. Compensation is set by the board, set by the managing partners subject to the board's approval, and compensation isn't a salary or guarantee, but a percentage of the firm's profits. So I was entitled to X percent of the firm's profits whether I generated business or whether I didn't or whether I billed my time or whether I didn't.

Q. Some firms' compensation on a year-to-year basis depends on a variety of factors; if someone brought in a lot of business that year their compensation percentage might go up. I'm just curious whether or not Kennedy & Coe was structured that way.

A. No, no formulas, totally discretionary with the managing partner.

MR. MCNAMARA: Excuse me, are you switching topics?

MR. GRAY: Sure, is this a good time to

JENKINS-Direct by Mr. Gray

Page 31

stop?

MR. MCNAMARA: Just take a quick -- very quick break?

MR. GRAY: Let's do.

MR. MCNAMARA: I just need to run out to my car real quick.

(Whereupon, a recess was taken, after which the following was had)

Q. Mr. Jenkins, just before the break we were talking about some things about Kennedy & Coe. I'd like to ask you a few questions about you as a CPA. During the time that we're speaking of, let's say fall of '94 through September of 2002, were you -- did you have any certification as a financial planner?

A. No.

Q. Were you a personal financial specialist?

A. No.

Q. Did you have any certifications through AICPA, any --

A. No, no, I think I know what you're asking, no.

Q. Okay. Have you as of the fall of 1994 taken any special training that you felt qualified you to provide estate planning or financial planning

JENKINS-Direct by Mr. Gray

Page 32

services to clients?

A. Well, we're going back here 14 years and I'm not going to be able to specifically recall what continuing education courses I took over the years prior to that, but I would have attended any number of estate planning continuing education seminars and -- (Pause) -- involved with -- coached by other members of the firm that I grew up under.

Q. All right, and were those estate planning CLE programs or training seminars, at least the one -- speaking of the ones that were done by individuals outside of Kennedy & Coe, CLE-type programs or continuing education?

A. Yes, outside the firm?

Q. Yes.

A. Um-hmm.

Q. Were there any certifications associated with that beyond the continuing education?

A. No.

Q. All right. During this same time period, fall of 1994 through September of 2002, did Kennedy & Coe have internal quality control procedures over its work product, specifically estate planning and financial planning services

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 37

Kennedy & Coe who you feel was a supervisory partner or CPA above you with regard to any of the estate planning services that were being rendered for Ernest Cure?

A. Not with regard to the -- excuse me -- specific services that were being rendered to Ernest Cure. That's not to say that I don't think there were people in the firm that knew more than me or had deeper expertise, but certainly in the case of Ernest Cure there was no partner or member of the firm beyond myself that was engaged in reviewing the services that were delivered.

Q. Okay. Let's talk about Kennedy & Coe for a few minutes. Was Kennedy & Coe a Top 100 CPA firm at any time during the period that you were its CEO?

A. I think all of the time, all the time.

Q. And in addition to -- well, first of all, how many CPAs approximately did Kennedy & Coe employ during the time period that you were CEO? I'm just looking for an approximate number, a ballpark number.

A. (Pause) Seventy five to a hundred.

Q. In addition to that, Kennedy & Coe employed

JENKINS-Direct by Mr. Gray

Page 38

accountants?

A. Correct.

Q. And also paraprofessionals?

A. Correct.

Q. And did it also have attorneys on staff?

A. Yes.

Q. So Kennedy & Coe had resources at its disposal or you had, if you wished to use them, assets of specialized expertise within Kennedy & Coe?

A. That's right.

Q. And that would include in the fields of estate planning, in law, tax, wealth management, true?

A. I'd leave wealth management off the end of that list, but --

Q. Okay.

A. -- other than that, yes.

Q. Did Kennedy & Coe have practice groups during the time that you were CEO focusing on, for example, agriculture?

A. I don't remember just when we started setting up practice groups. I think by the time I retired we probably had a banking group, a manufacturing group, feedlot group. I don't know if we had an agricultural group formally. By then, if from the standpoint so much of the firm was involved

JENKINS-Direct by Mr. Gray

Page 39

in agriculture, maybe a separate designation wasn't helpful.

Q. Thank you.

(Whereupon, Jenkins Exhibit No. 2 was marked for identification)

Q. Mr. Jenkins, I want to show you what's been marked as Exhibit 2. This is just a printout of the Kennedy & Coe's current website. Would you turn to -- under Careers there is a section that says, "Why Kennedy & Coe?" It says, "Not Your Average Accountants," with people sitting on an outside patio?

A. There's a page.

Q. Yeah, flip it over to the next page.

A. I've got page one of one and one of three, two of three, three of three.

Q. That's the one I'm looking for. (indicating)

A. One of one?

Q. Yes. Actually, flip it to the next page after that page.

A. Okay. "Not your average accountants."

Q. Yes. You see that in the second paragraph it says, "Kennedy & Coe is the largest regional CPA and consulting firm based in the state of

JENKINS-Direct by Mr. Gray

Page 40

Kansas"?

A. Yes.

Q. Was that true in that time period '94 through 2002 also?

A. Yes.

Q. And you've previously told me it was one of the top 100 CPA firms in the nation, true?

A. Yes.

Q. The next paragraph says, "We offer a collaborative, team-oriented work environment," true? Is that true in that same time period, sir?

A. I would like to think so.

Q. Okay. Do you believe that Kennedy & Coe brought a collaborative, team-oriented work environment to the accounting services that were rendered for Cure, Inc.?

A. Yes.

Q. And was a collaborative, teamwork-oriented environment implemented in the work and estate planning work done for Ernest Cure?

A. I would say for -- yes, but certainly not as collaborative as maybe other services that were being rendered in that I principally drove that engagement. I wasn't consulting with other

10 (Pages 37 to 40)

JENKINS-Direct by Mr. Gray

Page 41

partners or principals in the firm.

Q. Okay. When you reviewed the Eileen Rita Cure Trust back in 1994, I believe, when Ernest Cure first came to be a client of yours as you testified earlier today and previously, you made notes about the Eileen Rita Cure Trust, true?

A. True.

Q. And you were aware in 1994 that there were assets held both in her marital trust and in her family trust, true?

A. True.

Q. Those assets were essentially shares of stock in Cure, Inc., true?

A. True.

Q. When Ernest came to see you in 1994, you understood that Eileen's estate plan gave Ernest a general power over the marital trust and a limited power of appointment over Eileen's family trust, true?

A. True.

Q. And that Ernest had the discretion under that trust to exercise that power of appointment in favor of any of Eileen and Ernest's daughters, true?

A. True.

JENKINS-Direct by Mr. Gray

Page 42

Q. At the point in time that Ernest came to see you, you understood that Ernest and Mary were co-trustees of the Eileen Rita Cure Trust, didn't you?

A. Yes.

Q. And that they had therefore responsibilities as trustees?

A. Correct.

Q. Did you understand that they had fiduciary responsibilities as trustees?

A. I want to answer that by saying yes, but make it clear that it was my understanding that as a result of Ernie's intention to exercise his limited power of appointment over the family trust all in favor of Mary, that they didn't have fiduciary -- would not have -- after he exercised that power, would not have any fiduciary responsibilities to other members of the family.

Q. Okay. In the estate plan that you recommended to Ernie after the discussions you had with him, it was your understanding that Ernie was -- Ernie's intent was to exercise that limited power of appointment over the Eileen Rita Cure Family Trust in favor of Mary, true?

JENKINS-Direct by Mr. Gray

Page 43

A. True.

Q. And that was to be exercised in his will, true?

A. True.

Q. What did you say to Ernie and Mary about the fiduciary responsibilities they had up until the point in time that that power was exercised?

A. Nothing.

Q. Why not?

A. I felt like no one other than Mary or Ernest would ever receive any benefits from or be entitled to any benefits as long as Ernie was alive. Mary would not distribute or in any other way benefit the other members of the family and so what Mary and I, I feel, were driven by was how to preserve and enhance the net worth of the company for who we understood was going to be the ultimate beneficiary, which would be Mary.

Q. But --

A. I didn't -- I'm not saying I've drawn any conclusions about whether I should or shouldn't have. I was not advising Mary or Ernest about fiduciary -- I didn't give them any advice about fiduciary duty and responsibility.

Q. Did you believe that they had any?

JENKINS-Direct by Mr. Gray

Page 44

A. No, and when I -- when I say -- at probably some level I would have understood they had a responsibility, but the way I was interpreting what we had done and what we were doing is that the responsibility was -- they ultimately -- Mary would ultimately receive everything, so there would be no beneficiaries to challenge or be concerned about fiduciary roles.

Q. Okay. You understood while giving this advice both to Mary and to Ernest that Mary was an officer of Cure, Inc., correct?

A. Correct.

Q. And a shareholder of Cure, Inc.?

A. Correct.

Q. And you understood that Ernie was an officer and a shareholder of Cure, Inc., true?

A. True.

Q. And were you aware that there were -- whether there were other shareholders of Cure, Inc. at the time that you were engaged in this estate planning work for Ernest Cure?

A. My understanding was the other shareholders would have been the trust created under Eileen's will and trust agreement.

Q. Both marital trust and the family trust?

11 (Pages 41 to 44)

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 45

A. Correct.

Q. Okay. So -- and if the power of appointment under the family trust was to be exercised at the time of Ernie's death, did you speak to Mary and Ernest at all about the fact that this would only take effect as of the date of Ernest's death?

A. (Pause) I -- I understand that it took effect at the date of death, but I certainly didn't feel like there was any -- any intent on the part of Ernie to do anything other -- to change his mind or do something different, or I just wasn't, I guess I'm going to say, aware enough of the legalities involved that once somebody had said I'm leaving this all to you, that they continued to have a -- at my death you get all of this, that somehow in the interim they continued to have a fiduciary responsibility to people that weren't going to inherit.

Q. I take it you were aware in the estate planning work that you had done up until this time that trustees have fiduciary duties?

A. (Witness nods head up and down)

Q. True?

A. True.

JENKINS-Direct by Mr. Gray

Page 46

Q. You were aware of that? And did you ever inquire of either Sid Reitz or anyone within Kennedy & Coe or any of its attorney employees or partners who had even more involvement in estate planning than you did about the extent of fiduciary duties that might be owed to discretionary beneficiaries?

A. Not prior to Ernie's death, no.

Q. Okay. Did it ever occur to you to ask or to make certain that you understood that aspect?

A. Ask me that once more.

Q. Sure. If you were aware that trustees owed fiduciary duties, I take it you were also aware that the corporate officers owe fiduciary duties to minority shareholders of corporations?

A. Correct.

Q. You were aware of that in 1994?

A. Correct.

Q. Were you aware that following Eileen's death in 1992 that Mary and her three sisters became at that point in time the current discretionary beneficiaries of the Eileen Rita Cure Family Trust?

A. Yes.

Q. Okay, but you were also, I take it, aware

JENKINS-Direct by Mr. Gray

Page 47

that -- well, or were you aware that fiduciary duties were owed or might be owed to Mary's sisters by Mary as a trustee of the Eileen Rita Cure Trust, or owed by Mary to her three sisters as an officer of Cure, Inc.?

A. I would have been aware that she had those responsibilities up until the time I thought Ernie had executed his special power over the family trust. What I wasn't -- did not have an understanding of is that those fiduciary responsibilities to her sisters continued after Ernie had disinherited them or said that he was going to disinherit them.

Q. All right. In fact, he didn't do anything as of the point in time that he signed his will, even if it had been done the way he wanted it done, isn't that true?

A. That's true.

Q. It was only going to be exercised -- that is, that power of appointment was only going to be exercised as of the date of his death, true?

A. That's true.

Q. So would you agree with me that Mary owed fiduciary duties to her sisters from the point -- even if the will had been done the way

JENKINS-Direct by Mr. Gray

Page 48

Mr. Cure wanted it done --

A. (Nods head up and down)

Q. -- did you understand in 1994 and 1995 that Mary had ongoing fiduciary obligations to her sisters that would continue even if the will was done the way Ernest Cure wanted it done and that those obligations would continue up until the point in time that Ernie died and that power of appointment was actually exercised?

A. I understand that now, I didn't then.

Q. Okay. You understood that Ernie Cure was looking to you as the primary person, primary contact person to advise him concerning the structuring of his estate plan, didn't you?

MR. MCNAMARA: Objection to form, speculation.

A. Correct. I kind of got disjointed from the question with the interruption there, but I'm trying to say that I agree with what you said.

Q. Okay. All right, and based on your conversations with Mr. Cure, were you aware that -- whether or not he ever spoke to Sid Reitz?

A. He never spoke to Sid that I'm aware of.

Q. All right. Did you speak to Ernie about whether

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 49

he ever spoke to Sid Reitz or is this something that you learned after the fact? I'm trying to understand what you knew at the time the estate planning work was being done, not what you've learned since then.

A. Give me the question once more then.

Q. Sure. To your knowledge, at the time the estate planning work was being done, was there ever any telephone call, correspondence or other communications face-to-face or otherwise between Ernest Cure and Sid Reitz?

A. Not to the best of my knowledge.

Q. So you understand as part of this estate planning work that you were the conduit for communications that were informing Mr. Reitz about what Mr. Cure's assets were, what his desires were, and what your idea of his estate planning would be, is that true?

MR. MCNAMARA: To clarify, you're talking about at the time Sid Reitz was doing work, not Jim Wade, am I right?

MR. GRAY: Yes.

Q. At the time Sid Reitz was doing work that's true, isn't it?

A. Um-hmm, correct.

JENKINS-Direct by Mr. Gray

Page 50

Q. Thank you. Since I don't know at this point in time whether or not you might offer expert testimony in support of your own case, I just want to ask you a few questions since I may not have an opportunity to come back to do that since I'm exercising my opportunity today to take your deposition. Do you intend to offer any opinions, sir, at trial about what -- on the subject of whether or not in your opinion you met the standard of care for CPAs engaged in estate planning work on behalf of Ernest Cure?

MR. MCNAMARA: Object to the question; asking the witness really for a legal conclusion as a practical matter, but also as you know, Bill, the deadline for Kennedy & Coe to designate its experts is still several months away, and I can tell you as their lawyer that the decisions as to who our experts will be is not one that's been made yet.

MR. GRAY: Okay.

Q. Do you today believe that you met the standard of care for CPAs engaged in estate planning work in the work that you did for Ernest Cure?

A. Yes.

Q. Would you look at the bottom of the page that we

JENKINS-Direct by Mr. Gray

Page 51

were just referring to? There's a sentence that reads "Our alliance with this firm, Seidman Alliance, enables us to provide our clients access to all the services of an international firm." Did Kennedy & Coe have an alliance with BDO Seidman Alliance at anytime during the period fall of '94 through fall of 2002?

A. I don't remember just when we developed our relationship with BDO Seidman, but it would have been certainly in place somewhere there in the mid -- mid-nineties.

Q. It was in place during at least part of the time that you were CEO?

A. Yes.

Q. All right. Would you turn to the section that's marked About Us in the website?

A. (Witness complies to Counsel's request)

Q. At the bottom of the page there's a statement Our List of Services Includes?

A. Um-hmm.

Q. Do you see that?

A. Yes.

Q. I want to just list five of them off. On this form is listed, among other things, estate planning, family business consulting, farm

JENKINS-Direct by Mr. Gray

Page 52

program services, succession planning through tax planning and research. Were all of those services offered by Kennedy & Coe to its clients during the time that you were CEO, sir?

A. Yes.

Q. And during the time that you were CEO, was it your intention that Kennedy & Coe offer what's called in the first paragraph a hands-on approach to business that reflects its midwestern roots?

A. (Pause) I got involved in seeing what the firm is saying about itself. Now, so specifically ask me the question again about this hands-on issue or what you were trying to ask there.

Q. Yes, I just wanted to know whether it was part of Kennedy & Coe's presentation to its clients that it offered a hands-on approach to business that deeply reflects its midwestern roots?

A. Not to be hard to get along with or silly, but I don't know what that means and I don't know.

Q. You didn't --

A. I didn't write that.

Q. You didn't assist in formulating this statement of a firm profile then?

A. No.

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 53

Q. Fair enough. One of the individuals who is listed has a number of -- with the firm of Kennedy & Coe is Tom Peebles who, according to his individual profile here on the firm website, is a member of the Kansas, Nebraska and American Bar Association. So he is an attorney --

A. Yes.

Q. -- is that true? During the time that you were CEO, was Mr. Peebles an employee of Kennedy & Coe?

A. Yes.

Q. And were there other attorneys in addition to him that were also employed by Kennedy & Coe?

A. Yes.

Q. Can you tell me the names of any of the other attorneys, please?

A. Gary Rogers, another attorney whose name I can't get to surface right now that was in our Denver office with Gary that is still with the firm, and we can -- or maybe he's in here somewhere. It's -- I think -- I think maybe those are the only other two attorneys that were employees of the firm; and then during a part of that time from '94 to 2002 we had a law practice that had a couple of attorneys in it whose names I can't,

JENKINS-Direct by Mr. Gray

Page 54

you know, recall right now, but -- .

Q. Okay. If you would turn, please, to the Services section of that notebook? One of the services that's several pages in is called estate planning. I'd like to look at that if you would, please, for me. (Pause) In the introductory section it says -- in the middle of the introductory section "The professionals at Kennedy & Coe offer expertise that goes far beyond accounting." Is that true in 1994 through 2002?

A. You know, again I'm not trying to be critical of what's here or what somebody has done, but I don't know what that means or what the intent of what somebody's trying to express there other than if it means we have people that know about estate planning in addition to knowing about accounting services. If that's what it means, why -- .

Q. Well, the next sentence does add some clarity, it simply says, "Our financial planners, IT consultants, human resources experts, industry specialists and strategic planners can help you improve virtually every facet of your business all in one place."

JENKINS-Direct by Mr. Gray

Page 55

A. What page -- I may not be at the right -- in the right pew here; and you were reading --?

Q. I was reading the sentence --

A. Oh, okay.

Q. -- that's just below the one we previously referred you to, sir, in that first paragraph. (Pause) All I'm asking in relation to that sentence was during the period 1994 through 2002, did Kennedy & Coe encourage its clients that financial planners, IT consultants, human resources experts, industry specialists and strategic planners were available to assist in virtually every facet of the business?

MR. MCNAMARA: Right there on the top. (indicating)

A. Are you certain that we're on the right --

Q. Yes sir. Right here starting with -- (indicating)

A. Oh, okay.

Q. -- with "Our financial planners, consultants" --

A. Oh, okay.

Q. That's where I'm reading. I'm just wondering whether or not those assets were in place at Kennedy & Coe during 1994 through 2002.

A. I don't -- I don't think we had a formal

JENKINS-Direct by Mr. Gray

Page 56

designation of financial planners in the organization until after 2002. IT consultants we did have. Human resource experts, I don't think we were making that claim in 2002. We do have some industry specialists.

Q. Do have or did have?

A. Do, did and do.

Q. Thank you.

A. And I don't know what strategic planners means, so -- I'm not trying to be critical of what's here, I'm not trying to say that I didn't think we had a full range of expertise to deliver services to Ernie and Mary and that, but as far as trying to take language out of this and apply it to what I did, you know, I -- .

Q. All I'm trying to do, Mr. Jenkins, is to find out whether or not the statements that I'm referring you to were also true during the period of '94 through 2002, that's -- I'm not trying --

A. Okay.

Q. -- trying to make it complicated here.

A. That statement in its entirety would not be true.

Q. Would part of it be true?

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 61

A. I would have to refer back to the document just -- this is one of those things where I'm not sure this is the right answer, but my feeling sitting here today is that he could not exercise a power except at death, and he and Mary must have had some ascertainable standard rule that guided them in distributions from that family trust to the daughters. I would have to get back into the document to speak clearly about that.

Q. You don't have any current recall --

A. No.

Q. -- about the provisions of that trust, the Eileen Rita Cure Trust?

A. Correct.

Q. Did you believe that you were Ernest Cure's most trusted professional advisor?

A. At least with regard to the estate plan, I think I was.

Q. Okay.

A. But my involvement with Ernie outside estate planning was, well, limited or nonexistent in other areas.

Q. Did you discuss with Ernest Cure what the consequences were likely to be of leaving all of

JENKINS-Direct by Mr. Gray

Page 62

the estate, his estate, to Mary and also exercising the limited power of appointment over the Eileen Rita Cure Family Trust in favor of Mary to the exclusion of the other three daughters?

A. What I specifically remember saying to Ernie was Ernie, if you do this you need to understand that we -- there's not going to be a way to make any distribution out of your estate to your other daughters? My understanding is is that you -- you're closing the door to them receiving anything out of your estate, and his response to that was, I'm going to leave that up to Mary. If Mary thinks they should have some distribution, then she can make it.

Q. If you understood that Mary and Ernest owed fiduciary duties -- well, let me start again. It's my impression from your earlier testimony that you believed that at the point in time that Ernest executed his will, had it been done the way he intended it to be done, that there would no longer be any fiduciary duties owed either by Ernest or Mary to Mary's three sisters; did I say that -- did I capture your --

A. I think so.

JENKINS-Direct by Mr. Gray

Page 63

Q. -- thought process accurately?

A. Yes.

Q. What was that understanding based on, sir?

A. That the only people that were going to get anything out of the estate, the only person that was going to get anything was Mary and she was acting in her best interest. There was no one else to inherit and certainly no intent on the part of Ernie or Mary that the daughters not only don't get anything at his death, they don't get anything now. They -- Ernie was clear that nobody was to get anything ever except Mary, that we would advise Mary from an income tax standpoint to preserve and enhance the value of the corporation to, you know, the extent that we could.

Q. Did you ever confer with anyone else at Kennedy & Coe engaged in the income tax work being done for Cure, Inc. or for Ernest Cure about Ernest's desires and intentions in this regard? In other words, was the tax planning coordinated with Ernest's estate plan so far as you know?

A. Yes.

Q. All right. Do you recall having conversations or discussions or exchanges of information or

JENKINS-Direct by Mr. Gray

Page 64

clarifications with anyone at Kennedy & Coe who was engaged in doing the tax work for Kennedy & Coe and/or Ernest Cure?

A. Well, certainly when I first got involved in reviewing Cure, Inc. and how things were being done and things that Ernie wanted to do and Mary wanted to do, I lent my advice to how we could handle some transactions and where we could pay some expenses from and how we could provide medical care and those sorts of things with whoever was preparing, doing income tax work at the time. So yeah, there was substantial discussion about income tax on my part, about income tax strategies to help preserve the net worth of the company.

Q. I'm finished with that notebook for now, thank you.

A. I might call a restroom break.

MR. GRAY: Oh sure, let's do it.

THE WITNESS: Okay.

(Whereupon, a recess was taken, after which the following was had)

Q. Mr. Jenkins, in your previous deposition testimony you were asked questions about the

441b6eab-137a-4224-8f1e-2936742141f0

JENKINS-Direct by Mr. Gray

Page 65

estate planning documents that were sent back to you by Sid Reitz, and my recollection is that in that deposition testimony you said you did not read the will or the trust instrument itself; that is accurate, isn't it, sir?

A. Um-hmm.

Q. That's a yes?

A. That's a yes.

Q. Did you read the letter from Mr. Reitz that accompanied the documents he returned to your office?

A. I don't know.

Q. Did you expect that someone else within Kennedy & Coe would review Mr. Reitz's letter, the revised will or the -- and the trust instrument that Mr. Reitz generated to make certain that it contained the changes that you wanted made?

A. I don't believe I expected somebody to.

Q. Okay. Without reading the will or the trust instrument and not recalling whether you read the letter or not, you nevertheless did explain to Ernest Cure what those documents contained, is that true?

A. What I -- I explained to him what I thought they contained, yes.

JENKINS-Direct by Mr. Gray

Page 66

Q. You thought they contained? Why would you not read the will knowing the family conflict that it was likely to generate, knowing that Ernest had told you he did not want to tell his three to-be-disinherited daughters that he was going to do that? Why would you not read the will to make certain that it was the way you intended it to be?

A. The only thing I can say is I expected that Sid Reitz and Hampton Royce had done what I had asked them to do. I have a long association with the firm and created a lot of estate plans through them and had gotten out of the thought process that I needed to review his work.

Q. Had you reviewed work that he or Hampton & Royce had done for previous clients?

A. Oh, I'm sure I had, at some point in the development of my career or over my career, would have reviewed.

Q. Many of them?

A. Yes, I would say many of them.

Q. Did you review Colorado law to see what requirements Colorado law had with regard to any aspect of Ernest Cure's estate plan or the Eileen Rita Cure Trust administration?

JENKINS-Direct by Mr. Gray

Page 67

A. No.

Q. Did you ask Sid Reitz to review that?

A. No.

Q. Did you consider that there may be some requirements of Colorado law that might impose specific obligations in trust administration?

A. First, the answer is no; secondly, the firm of Hampton Royce had created any number of estate planning documents on behalf of Colorado Kennedy & Coe clients and I would not have felt any need to give Sid any specific instructions or request anything specific from Sid with regard to Colorado law because he had had a lot of experience in doing work with our clients in Colorado.

Q. Okay. You had done estate planning work with Colorado clients previously?

A. Correct.

Q. And at least with regard to Ernest Cure, you knew that essentially all of his assets were located in Colorado --

A. Yes.

Q. -- true? And you knew that all of Cure, Inc. assets were located in Colorado, true?

A. Yes.

JENKINS-Direct by Mr. Gray

Page 68

Q. And you knew he was a Colorado resident, correct?

A. Yes.

Q. You knew that at the point in time that Ernest Cure died, that it was essentially a certainty that the will and trust would be probated in Colorado, true?

A. I'm not quite sure about the word probated, but I knew that Colorado law would govern --

Q. Okay.

A. -- the administration.

Q. Okay. You knew it would be administered in Colorado?

A. Yes.

Q. You knew that he lived in Colorado and indeed was even building a home, another home in Colorado, true?

A. Um-hmm, correct.

Q. You were not aware of any plans of his to move somewhere else?

A. That's correct.

Q. Okay. After this estate plan was -- or when the estate plan was put in place, at the time of executing his will it's my understanding that you explained to Ernest Cure what you thought

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 69

the will and trust document that Mr. Reitz had generated contained?

A. Correct.

Q. Did you do that from notes or from, for example, the letter that you had sent to Mr. Reitz? What did you use, if anything, to explain the contents of Ernest Cure's will to him, sir?

A. I don't recall using any notes or agreements or guides. My best guess is is I would have told Ernie that on execution of those agreements he was leaving his daughters without an inheritance.

Q. Okay.

A. And confirming that's what he wanted to do.

Q. Now, several years later it's my understanding that you had a further conversation concerning Mr. Cure's estate plan initially with Mary Bohnen?

A. Correct.

Q. And that she conveyed to you at least the sense that her father wanted to make certain that his will was unassailable or bullet-proof or that it could not be undone by her sisters, true?

A. Correct.

Q. And that he was even anticipating that they

JENKINS-Direct by Mr. Gray

Page 71

look at it.

Q. Okay. Well, let's find that document.

(Whereupon, an off-the-record discussion was had)

Q. Let's go back on the record. Mr. Jenkins, I'm going to show you a copy of a letter that's marked as Exhibit AA, double A, in one of the two underlying cases. This is a letter on Kennedy & Coe letterhead dated May 8th, 2000 addressed to James Wade and it's over your signature, do you see that?

A. Yes.

Q. And this states that -- answers four questions or it provides responses to a letter that Mr. Wade had apparently sent to you asking four questions, and the first answer is that Mr. Cure had not executed a living will or a health care Power of Attorney or a property management Power of Attorney, true?

A. True.

Q. In doing his estate plan, did you confer with Ernest Cure in 1994-1995 about doing a living will or health care Power of Attorney and he declined, or was that just not brought up?

A. I don't recall.

JENKINS-Direct by Mr. Gray

Page 70

could make an effort to do that?

A. He must have been. He didn't say that to me directly, but -- .

Q. All right. Then as I understand it, there was contact made with Jim Wade. Did you convey the referral to Jim Wade? Did you -- were you the one that gave Ernie Cure or Mary Bohnen the name of Jim Wade?

A. Yes.

Q. All right. Then in the course of communicating with Mr. Wade, you wrote to Mr. Wade and told him the location of the assets of Cure, Inc.; do you recall that letter?

A. Certainly I recall providing financial information about Ernest and Cure, Inc. to Wade.

Q. All right. Have you reviewed the letter and the attachment that was sent to Jim Wade by you?

A. Is that what you showed me yesterday?

MR. MCNAMARA: Well, we're not supposed to -- anything we discussed yesterday --

A. Oh, okay.

MR. MCNAMARA: -- ever so briefly is attorney-client privilege.

A. Well, I -- to be absolutely certain, I know what you're referring to, I guess I would have to

JENKINS-Direct by Mr. Gray

Page 72

Q. Okay. None of your notes reflect that?

A. That's right.

Q. Okay. Paragraph two of this lists in summary form a listing of the assets held by Cure, Inc., the Ernest Cure Revocable Trust, and the Eileen Cure Marital Trust, true?

A. True.

Q. Now, in preparing this letter and the attachment, there are two other points that I may cover later but those are the two -- number two is the one I wanted to focus on. Attached to this is a list of the Ernest Cure Trust, Cure, Inc. and Eileen Cure Marital Trust assets, they're in several categories. With regard to the Eileen Cure Marital Trust your attachment lists stock in Cure, Inc. 412 shares, do you see that?

A. Yes.

Q. What was the source that you reviewed in order to report to Mr. Wade what assets were held in the Eileen Cure Marital Trust?

A. Well, I would not -- the original source would have been the 706, but that is in error. That stock was held by the Eileen Cure Family Trust, not marital trust.

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 77

Hampton, Royce, Engelman & Nelson had done, I clearly understood that the 412 shares owned by the family trust, I would have had to have misspoke to Jim as I misspoke in that letter, and I would like to think I didn't continually misspeak about what my understanding was, but --

Q. Okay.

A. -- I --

Q. I'm trying to separate, with all due respect, what sounds look wishful thinking --

A. Um-hmm.

Q. -- from what your memory actually is.

A. Yeah, I -- I have very little memory from 15 years ago, I guess.

Q. Okay.

A. Or eight years ago, whatever is right.

Q. Well, is the answer then that you do not recall any conversation in which you told Mr. Wade that 412 shares of stock in Cure, Inc. were held in the Eileen Cure Family Trust?

A. Correct.

Q. And am I also correct that you don't recall any conversation with Jim Wade in which you told him that 412 shares of stock in Cure, Inc. were held in the Eileen Cure Marital Trust?

JENKINS-Direct by Mr. Gray

Page 78

A. Correct.

Q. You don't remember telling him either way whether it was held in the marital trust or held in the family trust, true?

A. True.

Q. And don't have any notes that reflect having told him --

A. True.

Q. -- either of those alternatives, true?

A. True.

Q. And the only writing that you authored on this subject to him was your letter of May 8, 2000 with this attachment which is wrong, correct?

A. I -- I think that's correct. I would have to look back through that book again to see if there's another writing, but that's the only one I'm aware of.

Q. All right, thank you. There is Exhibit CC that I'd like to show you for a second, sir. This is again an exhibit from the underlying case, and this looks like handwriting as a precursor to some correspondence to Jim Wade. Is this your handwriting, sir?

A. Yes, it is.

Q. Okay, and it's dated October 15th of 2000?

JENKINS-Direct by Mr. Gray

Page 79

A. Correct.

Q. So this is around the time that Mr. Wade was preparing his -- or doing his review of the estate planning work undertaking for Ernest Cure, correct?

A. Yeah.

Q. On page two we have Eileen -- you see where it says -- Eileen Cure Marital Trust is circled and then family trust is written above it and then is says stock in Cure, Inc., 412 shares?

A. Yes.

Q. Both family and marital trust are written there, correct?

A. Right.

Q. But marital trust is circled?

A. Yes.

Q. And do you know why you did that or why both of those components of the Eileen Cure Trust -- that is, the family trust and the marital trust -- are entered on that handwritten note?

A. Well, I know just from the way we do things at Kennedy & Coe when we want to eliminate something we circle it and write in the correction, but I don't know, I'm confused by the fact that I would have sent -- I don't know

JENKINS-Direct by Mr. Gray

Page 80

when that correction was made.

Q. You're talking about this circling of marital trust?

A. Right, the circling of the marital trust, that's an error, and writing in family means that's correct, but I can't -- it's hard for me to think that I would have sent something to Jim without correcting it if I knew what the correction was.

Q. Well, the letter to Mr. Wade is May 8th, 2000 and this is October 15th of 2000, and so what I'm trying to understand is you wrote him a letter on May the 8th that had erroneous information and then October 15 of 2000, from your testimony it seems to suggest that where you wrote marital, by circling it would, in your personal practice, indicate that that meant that was an error and that the correction that should have been there was written above it, you see that?

A. Yes.

Q. Did I say that correctly?

A. Yes.

Q. All right. Do you have any recall of correcting to Jim Wade the error which you noted on

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 81

Exhibit CC on October 15th of 2000?
A. No.
Q. But this would indicate to you that you did detect the error that you had made in listing this as a family trust asset? I mean -- pardon me -- listing this as a marital trust asset when, in fact, it was a family trust asset, true?
A. True.
Q. Do you know or have you ever seen any communication by you or anyone at Kennedy & Coe on or after October 15th of 2000 clarifying to Jim Wade that the assets of stock in Cure, Inc. -- that is the 412 shares held by the Eileen Cure Trust -- were in fact held in the family trust, not in the marital trust as you had previously represented?
A. I can't remember now if that -- was that a yes or -- I got a little lost.
Q. I'm sorry, it was a long question.
A. I'm agreeing with what you said, but I'm not sure how to agree, by saying yes or --
Q. Okay. What I was really focusing on was did you ever verbally or in writing clarify to Jim Wade this realization that you had made an error in

JENKINS-Direct by Mr. Gray

Page 82

how these assets were held?
A. Not that I recall.
Q. Okay. Why would you not have made that correction or clarification to Mr. Wade?
A. I don't know.
Q. Do you believe that you met the standard of care for CPAs by knowing at this point in time, October 15th of 2000, that an error had been made in reporting the assets but failing to communicate that to the person who was doing Mr. Cure's revised estate plan?
A. No.
            MR. MCNAMARA: Objection as to form.
Q. In any advice that you were giving to Ernest Cure and to Mary Bohnen about -- well, with regard to any advice that you gave to them, did you give them that advice -- I'm speaking of after -- let me start over. After Ernest Cure signed his will in 2005 that you assisted him in working up his estate plan, after that document was signed by Ernest Cure --
A. Now, this would be the document prepared by Wade?
Q. No, this is '95 I'm talking about.
A. Oh, I'm sorry, I'm sorry.

JENKINS-Direct by Mr. Gray

Page 83

Q. The document prepared by Sid Reitz.
A. Okay.
Q. I'm going back in time now.
A. Okay.
Q. It's not my intention to confuse you, so if you are confused at all about time frame, please ask for a clarification, I'm glad you did. After the Sid Reitz will and estate plan documents were signed by Ernest Cure, did you continue to give advice to Ernest Cure and to Mary Bohnen following that execution?
A. Well, certainly I was giving advice when we started to redo the estate plan or re-confirm it, but are you asking me kind of on a continuing association between '95 and --
Q. Yes, between '95 and 2000 did you render any accounting services to Ernest Cure, Mary Bohnen, Cure, Inc., or any Cure-related business entity or person?
A. I don't know, I don't recall, I'd have to get into time records or something to -- .
Q. Well, we know for certain that Cure, Inc. and Ernest Cure and Mary Bohnen and Joe Bohnen and other Bohnen-related businesses and individuals such as Michael Bohnen and Bohnen Farms had

JENKINS-Direct by Mr. Gray

Page 84

additional accounting services rendered by Kennedy & Coe during that period of time.
A. Yes, I understand that.
Q. You knew that?
A. Yes.
Q. And what you're telling me is that you don't personally recall whether or not you were personally involved in any of those services, is that true?
A. That's correct, that's correct.
Q. All right. Just give me a couple of minutes and I'm going to -- . (Pause) In 1994 and 1995, Mr. Jenkins, did you know what the term current discretionary beneficiaries of the family trust meant?
A. Well, I think I would have had an understanding generally of what that meant.
Q. Okay. What did it mean at that -- in that time frame to you, sir?
A. That at the discretion of some trustee, the discretion of one or more of the trustees, they could have made a distribution to a beneficiary.
Q. Okay. Did you understand in 1994 prior to the time that Ernest Cure executed the Sid Reitz estate plan that Mary and her sisters were

441b6eab-137a-4224-8f1e-2976742141f0

JENKINS-Direct by Mr. Gray

Page 85

current discretionary beneficiaries of the Eileen Rita Cure Family Trust?

A. Yes.

Q. Okay, and did you believe that as a result of the execution of the Sid Reitz drafted -- Sid Reitz written estate plan that their status changed; that is, that either Mary or any of her sisters were no longer current discretionary beneficiaries of the Eileen Rita Cure Family Trust?

A. I don't -- I don't think that their legal status changed.

Q. You understood that whatever legal status that might be changed as a result of Mr. Cure's 1994-1995 estate plan would only take effect as of his death, true?

A. That's true.

Q. All right. Did you then believe that Mary and Ernest as trustees of the Eileen Rita Cure Family Trust owed fiduciary duties to Mary's three sisters up until the point in time of Ernest's death?

A. I, with hindsight, understand that that was a continuing responsibility, a trustee's responsibility; and I promise not to say it

JENKINS-Direct by Mr. Gray

Page 86

again, but Ernie made it absolutely clear that it was not his intent to use discretion in that manner.

Q. Okay. Whether he intended to use his discretion in that manner or not, did you understand that he and Mary nevertheless did owe fiduciary duties to his other three daughters in the administration of the Eileen Rita Cure Family Trust?

A. I understand that now.

Q. Did you understand it in 1994-1995?

A. The simple answer is no, I didn't consider it, I didn't reflect on it or think of its consequences. I didn't -- if I would have -- well, I don't know what would happen if I would have done whatever, but -- .

Q. Do you believe that you met the standard of care for CPAs engaged in estate planning work particularly considering the fact that you recognize that Ernest Cure considered you his most trusted financial or estate planning advisor --

A. Yes.

Q. -- even though you did not consider or reflect on these fiduciary duties that might be owed to

JENKINS-Direct by Mr. Gray

Page 87

Mary's three sisters?

A. (Pause) Yes.

Q. Do any of the engagements that you or others at Kennedy & Coe -- well, let's just speak about what you personally did. In any of the occasions in which Kennedy & Coe hired Hampton & Royce to draft estate planning documents, did Hampton & Royce follow different practices than they did in this instance in terms of communication with clients versus communication through you, or was this generally a typical kind of engagement of Hampton & Royce?

A. I would say it was typical.

Q. Okay. So would it be correct to say that in the typical situation in which an estate planning client of Kennedy & Coe wanted to have documents drafted, that Kennedy & Coe would hire Hampton & Royce to do the actual drafting of the documents and that Kennedy & Coe would draft those documents pursuant to instructions from -- I'm sorry, Hampton & Royce would draft the documents pursuant to instructions from you at Kennedy & Coe and would then send those documents back to you for execution; is that typically the process that was followed, sir?

JENKINS-Direct by Mr. Gray

Page 88

A. That's true, except to the extent that when you started that you used the word that Kennedy & Coe would hire Hampton & Royce, and we didn't hire them or do their billing, they billed directly to the client. We referred the client to them, but --

Q. Okay. Well, actually in this instance, if you will recall, Hampton & Royce sent the bill for Ernest Cure's accounting, for Ernest Cure's estate planning work that they did to Kennedy & Coe.

A. Oh.

Q. Didn't they?

A. You know, I -- I -- I don't recall.

Q. Okay. Well --

A. I mean, whatever it is it is. I'm not arguing about whatever the paperwork shows, but that would -- in terms of what is typical and what isn't, Bill, that would not be typical. Normally they would bill the client directly.

Q. All right. At least in this instance, I can probably find it here with a little bit of looking, but I think it's in the -- I think it's in the materials that I looked at yesterday. Well, you don't have any recall, as I understand

22 (Pages 85 to 88)

## JENKINS-Direct by Mr. Gray

Page 89

it then, of how the billing actually occurred?

A. Correct.

Q. Fair enough, and if there are documents in Kennedy & Coe's files that reflect that the bill for those accounting services were sent by Hampton & Royce -- here's a copy that's -- these are not Bates numbered, but they were just copied from some of your materials. Hampton & Royce sent a billing statement February 28th, 1995 to Ernest Cure in care of Kennedy & Coe, Goodland, Kansas, do you see that?

A. Yes.

Q. Is that typical that it would be handled in that way, sir?

A. Yes, it would be typical that -- that they would transmit the bill to the client through our office, yes.

Q. Okay. Send the bill to you?

A. We would give it to the client.

Q. In care of Kennedy & Coe's office?

A. Yes.

Q. That part would be typical?

A. Yes.

Q. All right, and here's a letter from Kennedy & Coe over your signature that says, "Dear

## JENKINS-Direct by Mr. Gray

Page 90

Mr. Cure: Please find a statement from Hampton & Royce detailing services they provided during the month of January. Send your remittance directly to them"?

A. Yes.

Q. Correct?

A. That would be typical.

Q. Okay. That would be typical; and once again, here's the original bill which is enclosed with that letter reflecting the services that they provided, again sent to Mr. Cure in care of Kennedy & Coe at your Goodland office, correct?

A. Um-hmm.

Q. And that would be typical also, correct?

A. Um-hmm.

Q. Okay. Thank you, and would it also be typical that Hampton & Royce would not have separate face-to-face meetings or discussions with the client, but would rather rely on the assignment that was given to them by Kennedy & Coe?

A. It was typical that they didn't. I don't know that I would use the word rather, I think you indicated they would rather do that than not. I think they would have rather met with the client, but --

Page 91

Q. I don't mean prefer, I --

A. Okay. Yes, I see what you're saying. It was typical that they did not meet with the client.

Q. It was then typical that they completed whatever work was done based on written instructions that were communicated to them by you or --

A. That's correct.

Q. -- others at Kennedy & Coe?

A. That's correct.

Q. All right, thank you. All right.

MR. GRAY: I don't have any other questions. Thank you very much.

MR. MCNAMARA: Okay. I don't have any either.

MR. GRAY: Good.

COURT REPORTER: Can I ask you about signature? How do you want to handle it?

MR. MCNAMARA: You can send it to me and I'll get it to Mr. Jenkins to read and sign.

\* \* \* \* \* \* \* \*

Page 92

_____

WILLIAM H. JENKINS

STATE OF KANSAS

ss:

SHERMAN COUNTY

Subscribed to and sworn before me the undersigned authority, this, the____day of_____, 2009.

_____

NOTARY PUBLIC

My Commission Expires:_____

441b6eab-137a-4224-8f1e-2976742141f0

Statements on Responsibilities in Personal Financial Planning Practice

## Statements on Responsibilities in Personal Financial Planning Practice

The Statements on Responsibilities in Personal Financial Planning practice establish your responsibilities in providing PFP services.  They should serve as guidelines for you in the way you deliver PFP services.

Basic Personal Financial Planning Engagement Functions and Responsibilities
Working with Other Advisers
Implementation Engagement Functions and Responsibilities
Monitoring and Updating Engagements — Functions and Responsibilities
Developing a Basis for Recommendations

### STATEMENT ON RESPONSIBILITIES IN PERSONAL FINANCIAL PLANNING PRACTICE NO. 1

*Basic Personal Financial Planning Engagement Functions and Responsibilities*

#### Definition and Scope of Personal Financial Planning

**1.** Personal financial planning engagements are only those that involve developing strategies and making recommendations to assist a client in defining and achieving personal financial goals.

**2.** Personal financial planning engagements involve all of the following:

    a.) Defining the engagement objectives
    b.) Planning the specific procedures appropriate to the engagement
    c.) Developing a basis for recommendations
    d.) Communicating recommendations to the client
    e.) Identifying the tasks for taking action on planning decisions

**3.** Personal financial planning engagements may also include —

    a.) Assisting the client to take action on planning decisions.
    b.) Monitoring the client's progress in achieving goals.
    c.) Updating recommendations and helping the client revise planning decisions.

**4.** Personal financial planning does *not* include services that are limited to, for example —

    a.) Compiling personal financial statements.
    b.) Projecting future taxes.
    c.) Tax compliance, including, but not limited to, preparation of tax returns.
    d.) Tax advice or consultations.

**5.** Personal financial planning engagements may address all of a client's personal financial goals or may focus on a limited number of goals. When an engagement addresses a limited number of specific personal financial goals, the CPA should consider the client's overall financial circumstances in developing recommendations.

Copyright © 2004 by AICPA, Inc. All rights reserved.                                                  1

EXHIBIT
Jenkins Depo
1
12/16/08

EXHIBIT
3

**Statements on Responsibilities in Personal Financial Planning Practice**

### Guidance Applicable to Personal Financial Planning Engagements

**6.** The following is a summary of existing professional standards and published guidance applicable to personal financial planning engagements. Other standards and guidance may apply[1] depending on the scope of the services provided.

**7.** The CPA shall comply with the AICPA *Code of Professional Conduct* in all matters related to a personal financial planning engagement. The following is a partial list of the rules of the AICPA *Code of Professional Conduct:*

a.) Rule 102, Integrity and Objectivity. A member shall maintain objectivity and integrity, be free of conflicts of interest, and not knowingly misrepresent facts or subordinate his or her judgment to others.

b.) Rule 201, General Standards. A member shall undertake only those professional services the member or the member's firm can reasonably expect to be completed with professional competence, shall exercise due professional care in the performance of professional services, shall adequately plan and supervise the performance of professional services, and shall obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations relating to any professional services performed.

c.) Rule 301, Confidential Client Information. A member in public practice shall not disclose any confidential client information without the specific consent of the client.

d.) A member in public practice shall follow Rule 302, Contingent Fees and Rule 503, Commissions and Referral Fees, in making fee arrangements.

**8.** Personal financial planning often involves providing tax advice. The Tax Division of the AICPA has published guidance on tax advice in Statements on Standards for Tax Services (SSTS) No. 8, *Form and Content of Advice to Clients* (AICPA, *Professional Standards*, vol. 2, TX sec. 182). In addition to the Statements on Responsibilities in Personal Financial Planning Practice, CPAs should consider the guidance in SSTS No. 8 when personal financial planning activities involve tax advice. Other tax-related matters may also come to the CPA's attention in the course of providing personal financial planning services. Additional guidance on these matters may be found in other SRTPs.

**9.** When a personal financial planning engagement includes providing assistance in the preparation of personal financial statements or financial projections, the CPA should consider the applicable provisions of AICPA pronouncements, including—

a.) Statements on Standards for Accounting and Review Services (AICPA, *Professional Standards*, vol. 2, AR Secs. 100-600).

b.) Statement on Standards for Attestation Engagements *Financial Forecasts and Projections* (AICPA, *Professional Standards*, vol. 1, AT sec. 200).

---

[1] A member should also consult, if applicable, the ethical standards of his or her state CPA society, state board of accountancy, the Securities and Exchange Commission, and any other governmental agency which may regulate his business.

**Copyright © 2004 by AICPA, Inc. All rights reserved.**                    2

Statements on Responsibilities in Personal Financial Planning Practice

*c.) Guide for Prospective Financial Information.*

*d.) Personal Financial Statements Guide.*

**10.** CPAs providing business valuation services as part of a personal financial planning engagement should consider the Statement on Standards for Consulting Services (SSCS), *Consulting Services: Definitions and Standards* (AICPA, *Professional Standards*, vol. 2, CS sec. 100).

### Responsibilities of CPAs in Personal Financial Planning Engagements

*Defining the Engagement Objectives*

**11.** The personal financial planning engagement includes defining the objectives of the engagement so that the CPA can determine the services needed. The CPA should:

a.) Obtain an understanding of the client's goals and resources in order to determine the appropriate scope of service that will meet the client's needs.

b.) Reach an understanding with the client concerning the engagement objectives. When the CPA identifies issues not originally considered by the client that may require special attention, those issues should be brought to the client's attention.

c.) Evaluate the appropriateness of the original engagement objectives as the engagement proceeds.

**12.** The CPA should obtain an understanding of matters such as the client's family situation, commitment to the planning process, current cash flow and assets available, personal preferences, and relationships with other professionals. This understanding can be obtained through knowledge gained during a long-term relationship with the client, inquiry, and information gathering.

**13.** The CPA should document his or her understanding of the scope and nature of the services to be provided.  Such documentation could be in the form of an engagement letter or in the form of file memos that document oral understandings. This documentation may include a description of (a) engagement objectives; (b) the scope of services to be provided; (c) the roles and responsibilities of the CPA, the client, and other advisers in the personal financial planning process; (d) the fee arrangements; (e) the timing of the engagement; and (f) scope limitations and other constraints.

*Planning the Specific Procedures Appropriate to the Engagement*

**14.** The personal financial planning engagement should be adequately planned. The engagement's objectives form the basis for planning the engagement. The procedures should produce information that is useful in making planning recommendations. Procedures should be selected that are appropriate in the circumstances and reflect materiality and cost-benefit considerations. The CPA should document personal financial planning engagements in a manner that —

Copyright © 2004 by AICPA, Inc. All rights reserved.                3

**Statements on Responsibilities in Personal Financial Planning Practice**

a.) Shows that a systematic approach to the engagement was taken.

b.) Shows that the analysis and other procedures performed provide an adequate basis for the recommendations made.

*Developing a Basis for Recommendations*

**15.** Personal financial planning engagements involve collecting, analyzing, and integrating sufficient relevant information to develop a basis for recommendations. Relevant information may include, but is not limited to, an understanding of the client's goals, existing financial situation, available resources for achieving the goals, non-financial factors, and external factors. Relevant information may also include reasonable estimates, projections, and assumptions furnished by the client, provided by the client's advisers, or developed by the CPA.

**16.** In personal financial planning, some information deals with the future, which is uncertain. Planning may also involve a broad range of goals, which may change as events occur. Consequently, the CPA may develop recommendations based on several selected hypothetical events. The CPA should disclose the assumptions that could significantly impact the CPAs conclusions.

*Communicating Recommendations*

**17.** The CPA should communicate recommendations to the client in a manner that assists the client in evaluating strategies and implementing financial planning decisions. Such communications should ordinarily be in writing and include a summary of the client's goals and significant assumptions, a description of any limitations on the work performed, the recommendations made, and a statement that projected results may not be achieved.

**18.** The following is an illustration of a communication when recommendations are made only on selected goals and the CPA communicates the parameters of the limited engagement:

> We have considered ways to achieve your goal of providing for the education of your children. However, you have instructed us not to consider other planning areas that might have an impact on that goal. If we had done so, it is possible that different conclusions or recommendations might have resulted.

*Identifying the Tasks for Taking Action on Planning Decisions*

**19.** The CPA should assist clients to identify tasks that are essential in order to act on planning decisions. The CPA may also assist the client to set target dates for the completion of tasks and identify parties responsible for completing them.

**Other Personal Financial Planning Services**

**20.** Unless undertaken by specific agreement with the client, the CPA is not responsible for additional services. Such services include —

a.)    Assisting the client to take action on planning decisions.
b.)    Monitoring progress in achieving goals.

Copyright © 2004 by AICPA, Inc. All rights reserved.

4

**Statements on Responsibilities in Personal Financial Planning Practice**

    c.)    Updating recommendations and revising planning decisions.

*Assisting the Client to Take Action on Planning Decisions*

**21.** The CPA should have an understanding with the client, preferably in writing, regarding the degree of responsibility he or she will assume for helping the client to act upon planning decisions.

*Monitoring the Client's Progress in Achieving Goals*

**22.** A CPA is not responsible for monitoring the client's progress in achieving goals unless the CPA undertakes this obligation by specific agreement with the client.

*Updating Recommendations and Helping the Client Revise Planning Decisions*

**23.** A CPA is not responsible for updating recommendations unless the CPA undertakes this obligation by specific agreement with the client. The agreement should identify the scope of the CPA's responsibility for updating the plan and proposing new actions.

Copyright © 2004 by AICPA, Inc. All rights reserved.