

# Karsh Consulting P.C.

**Certified Public Accountants/Litigation Consultants**

Cherry Creek Plaza II  ·  650 South Cherry Street, Suite 500
Denver, Colorado 80246-1803
(303) 825-1000   FAX (303) 825-8800

January 15, 2009

Mr. William R. Gray
Purvis Gray, LLP
4410 Arapahoe Avenue
Boulder, Colorado  80303

Re:    Mary Ellen Bohnen, et al, Plaintiffs, vs Kennedy & Coe, LLC, et al, Defendants
Case No. 1:08 CV 00904-RPM

Dear Mr. Gray:

At your request I have reviewed the documents listed in Attachment A for the purpose of determining whether Kennedy and Coe, LLC and the responsible persons within Kennedy and Coe have met the professional standards of due care within the accounting profession in providing services to the Plaintiffs listed in the case caption.

In 1994, Kennedy and Coe, LLC (Kennedy and Coe) replaced the prior accountants for Cure, Inc. Kennedy and Coe prepared the income tax returns of Cure, Inc. for the years 1994 through 2002 (the fiscal year end of Cure, Inc. is February 28th). Kennedy and Coe were also the accountants for Joe and Mary Bohnen, Bohnen, Inc., and Ernest Cure. William H. Jenkins, (Chief Executive Officer of Kennedy and Coe until his retirement on March 31, 2003) was the primary responsible person for estate planning work being done by Kennedy and Coe for Ernest Cure. Joan Porsch and/or Jill Eberhart were the primary responsible persons with regard to the income tax work being done for Cure, Inc., Ernest Cure and Joe and Mary Bohnen. Neither Joan Porsch nor Jill Eberhart were partners of Kennedy and Coe during the period 1994 through 2003. The income tax returns for Cure, Inc. for the years 1994, 1995 and 1998 were signed by Joan Porsch; for 1997, 1999, 2000, 2001 and 2002 were signed by Jill Eberhart; and the 1996 return was signed by Daniel R. Robertson.

Mr. Jenkins explains in his deposition taken on December 16, 2008, that Kennedy and Coe had no formal procedures within Kennedy and Coe for coordinating various services, provided to closely-related individuals and businesses. The following is taken from his deposition (page 27, lines 16-25 and page 28, lines 1-22):

A. I was responsible for the estate planning. The other services – when I say other
services, whatever record-keeping was done, income tax return preparation or I'm
not sure what else, possibly payroll tax returns or whatever – I had no contact
with that, no responsibility for it. That would have been whoever the other CPA

EXHIBIT
12

Mr. William R. Gray
January 15, 2009
Page 2

Q. on the group at the time was, and that would – that would be very typical in Kennedy & Coe for certain people to be responsible for one range of services and somebody else to be responsible for some other service.

Q. How are those various services or closely-related individuals or businesses coordinated within Kennedy & Coe? How were they coordinated within Kennedy & Coe in this 1995 through 2002 time frame?

A. Well, I have the sense maybe you're looking for something pretty formal there. There isn't - it really isn't that, it's – these clients generally are not – don't have more than one or two or three people that are working on the client. They're usually in the same office, they oftentimes meet together with the client. So it's – it's a very informal system, I would say, of people being face-to-face and talking to each other about what they're running into or what he's trying to achieve, and so I don't feel like certainly in this case or really most cases coordination of services and the right hand knowing what the left hand is doing hasn't been an issue.

As I will explain later in this report, the lack of formal procedures for coordinating various client services and the lack of Partner oversight (i.e. that of Mr. Jenkins) resulted in (1) errors in the income tax returns of Cure, Inc., (2) the reliance of Ernest Cure and Mary Bohnen, as officers of Cure, Inc., co-trustees of both Eileen Rita Cure's Marital Trust (Marital Trust) and Family Trust (Family Trust) and as discretionary beneficiaries of the Family Trust on erroneous professional advice and erroneous documents, (3) errors in the estate planning documents of Ernest Cure, and (4) the failure of Ernest Cure to have exercised his limited and special power of appointment over the Family Trust.

More technically, Kennedy and Coe did not exercise due professional care as required of them. ET Section 56 – Article V – Due Care[1]

> .04 *"Members should be diligent in discharging responsibilities to clients, employers, and the public. Diligence imposes the responsibility to render services promptly and carefully, to be thorough, and to observe applicable technical and ethical standards.*
> .05 *"Due care requires a member to plan and supervise adequately any professional activity for which he or she is responsible."*

Eileen Rita Cure (first wife of Ernest Cure) died testate on March 27, 1992 with a traditional estate plan dividing her estate into two shares: a Marital Trust and a Family Trust. Ernest Cure and Mary Bohnen were named co-trustees of both the Marital Trust and the Family Trust. Ernest Cure served in this capacity until his death on September 11, 2002.

In April 2007, a trial was held: the Plaintiffs were Mary Bohnen's three sisters and Mary Bohnen was the Respondent. This trial among other matters was regarding breach of fiduciary duties and fraudulent concealment. The findings of fact by the judge are informative with regard to times

---

[1]    American Institute of Certified Public Accountants (AICPA) Professional Standards, Code of Professional Conduct

Mr. William R. Gray
January 15, 2009
Page 3

and events pertinent to the services of Kennedy and Coe in this case. The following excerpts were taken from the "Findings of Fact, Conclusions of Law and Judgment" entered by the District Court, Kit Carson County, Colorado on June 1, 2007, by Judge Hoyer. Ernest R. Cure is referred to as "Ernest", Eileen Rita Cure is referred to as "Eileen", Mary Ellen Bohnen is referred to as "Mary" and Jane Elizabeth Hubbard, Kathleen Ann Unrein and Teresa Muniz are referred to as "Petitioners". The full text of the Findings of Fact, Conclusions of Law and Judgment is attached as Exhibit A.

1. Findings of Fact

12. At the time of her death, Eileen owned 497 shares of Cure, Inc. In accordance with her Will and Trust Agreement, 85 shares were transferred to the Martial Trust and 412 shares were transferred to the Family Trust. The only assets ever held in the Family Trust were the 412 shares of common stock of Cure, Inc.

13. Ernest held a general power of appointment over the assets held within the Marital Trust. If Ernest declined to exercise the general power over the Marital Trust, the assets in the Marital Trust were to be added to the Family Trust and administered pursuant to the provisions of the Family Trust.

14. Ernest also held a "limited and special power of appointment" over Eileen's Family Trust enabling him to appoint all of the Family Trust assets to the benefit of any one or more of his daughters.

15. The initial beneficiaries of the Family Trust were Ernest and his four daughters. If the limited power of appointment over the Family Trust was not exercised by Ernest prior to his death, the Family Trust was to be divided into four equal shares, one for each of Ernest's daughters.

16. Following Eileen's death on March 27, 1992, the Petitioners and Mary became the current discretionary beneficiaries of the Family Trust subject to divestment by Ernest if he exercised the limited power of appointment.

20. After Eileen's death, Ernest and Mary were the only officers and directors of the Corporation. The Family Trust, as the owner of 412 shares of stock in the Corporation, was a minority shareholder.

22. After Eileen's death, Ernest and Mary became co-trustees of the Family Trust.

25. In December, 1994, Ernest met with his accountant, Bill Jenkins (herein "Jenkins"), for the purpose of discussing his estate and revising his will. Jenkins was a Certified Public Accountant and partner with the accounting firm, Kennedy & Coe.

Mr. William R. Gray
January 15, 2009
Page 4

26.    Following the 1994 meeting, Jenkins understood that it was Ernest's intent to revise his estate plan in a manner that would eliminate the Petitioners as potential beneficiaries under his will. It was further understood by Jenkins that Ernest would exercise his powers of appointment under Eileen's trusts so that all of the property, including the shares of stock in the Corporation, would pass to Mary.

27.    At the conclusion of the meeting, Jenkin's *{sic}* assistant prepared and sent a letter to Sid Reitz (herein "Reitz"), an estate planning attorney in Salina, Kansas. In the letter, Reitz was directed to draft estate planning documents which, among other things, provided for the exercise of the limited power of appointment by Ernest with regard to the assets of the Family Trust. The limited power of appointment was to be exercised for the benefit of Mary.

28.    Ernest did not personally meet with Reitz regarding the provisions of the will.

29.    On January 31, 1995, Ernest signed the will prepared by Reitz. Jenkins was present and acted as a witness. In the will, Ernest exercised the power of appointment with regard to the Marital Trust, but did not exercise the special or limited power of appointment regarding the Family Trust. Nevertheless, Jenkins believed that the will provided that upon Ernest's death, all of the shares of stock in the corporation would pass to Mary.

30.    After the 1995 will was signed by Ernest, Mary believed that Ernest had exercised the limited power of appointment over Eileen's Family Trust, and that the 412 shares of stock in the Corporation held by the Family Trust would pass to her at the time of her father's death. After the 1995 will was signed by Ernest, Mary believed that the Petitioners were no longer discretionary beneficiaries of her mother's Marital Trust or Family Trust.

31.    In 2000, Ernest decided to have his estate planning documents reviewed by a Colorado attorney. With Jenkins' assistance, Ernest contacted James Wade (herein "Wade"). At their first meeting with Wade, Ernest expressed concerns regarding the three daughters (Petitioners herein) who he believed had been disinherited. Wade testified that their strategy in updating Ernest's will was to make it "bullet proof" or more difficult to attack by the daughters who had been excluded.

32.    Wade testified that he was directed to prepare a will which would make Mary the sole beneficiary of Ernest's estate, including a provision regarding the exercise of the power of appointment over Eileen's trust for the benefit of Mary. The shares of stock in the corporation held by the trust were to pass to Mary. The

Mr. William R. Gray
January 15, 2009
Page 5

Petitioners were not to receive anything from their father's estate or from their mother's trust unless Mary predeceased Ernest.

33.    In May, 2002 {*sic*}, Wade received a letter from Kennedy & Coe which indicated that the 412 shares of corporate stock were held in Eileen's "Marital Trust." The letter does not mention the Eileen Cure Family Trust. Jenkins acknowledged that this information was incorrect as most of the shares of corporate stock were actually held by the Family Trust, not the Marital Trust.

34.    On October 10, 2000, Ernest met with Wade in Denver, Colorado and executed his will. On October 18, 2000, Ernest executed an identical will in Burlington, Colorado in the presence of his bankers and Wade. In this will, Ernest exercised his general power of appointment over Eileen's Martial Trust, but he did not exercise the limited power of appointment over Eileen's Family Trust.

35.    After the 2000 will was signed by Ernest, Mary believed that Ernest had exercised the limited power of appointment over Eileen's Family Trust and that the 412 shares of stock in the corporation would pass to her upon her father's death. Therefore, Mary believed that the Petitioners were not beneficiaries under Eileen's Marital Trust or Family Trust.

36.    Ernest died on September 11, 2002, and the 2000 will was admitted to probate.

37.    As the limited power of appointment over the Family Trust was not exercised by Ernest, the Petitioners, as beneficiaries of the Family Trust, own a beneficial interest of 23.1% of Cure, Inc. The remaining 76.9% of Cure, Inc. is owned directly or indirectly by Mary.

38.    Mary is the sole beneficiary of the Ernest Richard Cure Trust.

40.    After Ernest's will was admitted to probate, Jenkins discovered that the limited power of appointment over Eileen's Family Trust had not been exercised by Ernest. The will did not provide for the exercise of the limited power of appointment over the Family Trust by Ernest. After discovering the error, Jenkins contacted Wade and informed him that the will was incorrect. Wade testified that the will he had prepared was not consistent with Ernest's testamentary intent as it failed to leave all of the stock in the corporation to Mary. Jenkins and Wade then contacted Mary and advised her of the error.

41.    Until this error had been disclosed to Mary, she believed that under the terms of Ernest's will, the 412 share of corporate stock held by Eileen's Family Trust would pass to her. Based upon the information that she received from Ernest, Jenkins and Wade, she believed that all of the corporate stock held by

Mr. William R. Gray
January 15, 2009
Page 6

> Ernest or her mother's trust would pass to her upon her father's death. As a result
> of her reliance upon this information, she incorrectly believed that her sisters had
> no beneficial interest in the Family Trust or the corporation.

Mr. Jenkins first met with Ernest Cure in December 1994. Mr. Jenkins met with Ernest Cure for the express purpose of estate planning and he therefore held himself out as an advisor in the estate planning area and Kennedy and Coe promotes estate planning services. At this meeting, Ernest Cure advised Mr. Jenkins that he wanted everything that he had to be left to Mary (see Mr. Jenkins' deposition dated May 10, 2005, page 26, lines 2 and 3). Mr. Jenkins was the primary responsible CPA within Kennedy and Coe for the estate planning engagement with Ernest Cure (see Mr. Jenkins' deposition dated December 16, 2008, page 26, lines 1 through 5). Mr. Jenkins explains in his deposition that Kennedy and Coe has "a very informal system" for coordinating client services, which as described later in this report results in errors within the tax work done by Kennedy and Coe and the errors in service of Mr. Jenkins to his clients, Ernest Cure and Mary Bohnen (Mr. Jenkins' deposition dated December 16, 2008, page 28, lines 1 through 22). The lack of coordinated services and supervision is, in my opinion, non compliant with AICPA Standards, specifically ET Section 201 – General Standards[2],

> *.01 C. Planning and Supervision. Adequately plan and supervise the performance
> of professional services.*

Following the meeting with Ernest Cure, Mr. Jenkins contacted Sidney A. Reitz, by telephone, an attorney with the firm of Hampton, Royce, Engleman & Nelson regarding Ernest Cure. A letter was sent to Mr. Reitz, dated January 17, 1995, (Exhibit B) requesting that Mr. Reitz make changes to the existing trust agreement for Ernest Cure and his deceased wife. Certain documents are referenced in the letter as being enclosed with the letter. The letter to Mr. Reitz was signed by Linda Rummel, a paraprofessional with Kennedy and Coe. Copies of the letter were provided to both Ernest Cure and Mary Bohnen. I would point out that the letter to Mr. Reitz made no distinction in the Marital Trust and the Family Trust and referred only to the Eileen Rita Cure Trust as owning 412 shares of Cure, Inc. stock, whereas this stock was actually owned by the Family Trust.

Mr. Reitz forwarded copies of the proposed Second Supplemental Trust Agreement which amends the Ernest Richard Cure Trust in its entirety with a letter to Mr. Jenkins dated January 27, 1995. Mr. Reitz indicates in his letter "The Trust Agreement is extremely complex and the foregoing summary is simply a general explanation of some of the provisions contained therein". Mr. Reitz further states "…it is essential that Mrs. Cure be fully appraised that she is relinquishing a portion of her rights to Mr. Cure's property under Colorado Law. In this regard, it is imperative that Mrs. Cure seek independent legal counsel so that we can be certain she has been fully and completely informed of her rights under Colorado Law". (Exhibit C)

Also enclosed, were an original and one copy of a proposed Will which was prepared by Mr. Reitz for Ernest Cure. The Will drafted by Mr. Reitz was signed by Ernest Cure and Inez Cure on January 31, 1995 and witnessed by Linda Rummel and Mr. Jenkins.

---

[2]    American Institute of Certified Public Accountants (AICPA) Professional Standards, Code of Professional Conduct

Mr. William R. Gray
January 15, 2009
Page 7


Mr. Reitz did not talk with or meet with Ernest Cure or Mary Bohnen before drafting the documents sent to Mr. Jenkins on January 27, 1995, nor did he meet with them to explain the documents after drafting them. Mr. Jenkins met with Ernest Cure and obtained his signature on the documents.

Mr. Jenkins testified in his deposition dated May 10, 2005, (page 49, lines 12 through 14) that he reviewed the letter from Mr. Reitz and that he "just noted whether or not the documents that were included were those that were referred to. There was a Will and a Trust Agreement and other things referred to. But I wouldn't have read all of the agreements that were provided." (page 50, lines 5 through 12). In Mr. Jenkins deposition dated December 16, 2008, (page 65, lines 9 through 12) he testifies that he doesn't know whether he read the letter from Mr. Reitz. Mr. Jenkins further testifies in his deposition dated December 16, 2008, (page 65, lines 13 through 18):

Q. Did you expect that someone else within Kennedy and Coe would review Mr. Reitz's letter, the revised Will or the – and the trust instrument that Mr. Reitz generated to make certain that it contained the changes that you wanted made?
A. I don't believe I expected someone to.

Nonetheless Mr. Jenkins explained to Ernest Cure what he thought the documents contained as evidenced by Mr. Jenkins testimony in his deposition dated December 16, 2008, (page 65, lines 19 through 25 and page 66, lines 1 through 14) as follows:

Q. Okay. Without reading the will or the trust instrument and not recalling whether you read the letter or not, you nevertheless did explain to Ernest Cure what those documents contained, is that true?
A. What I – I explained to him what I thought they contained, yes.
Q. You thought they contained? Why would you not read the will knowing the family conflict that it was likely to generate, knowing that Ernest had told you he did not want to tell his three to-be-disinherited daughters that he was going to do that? Why would you not read the will to make certain that it was the way you intended it to be?
A. The only thing I can say is I expected that Sid Reitz and Hampton Royce had done what I had asked them to do. I have a long association with the firm and created a lot of estate plans through them and had gotten out of the thought process that I needed to review his work.

Mr. Jenkins, therefore, admits he did not review the documents received from Mr. Reitz and advised Ernest Cure based on what he thought the documents contained. There was a major discrepancy between the documents from Mr. Reitz and the desires of Ernest Cure. The letter dated January 17, 1995, from Linda Rummel asked Mr. Reitz to prepare a document to exercise the power of appointment over the Family Trust whereas the Will drafted by Mr. Reitz exercised the power of appointment over the Martial Trust. This error could have easily have been discovered by Mr. Jenkins had he only read and reviewed the draft documents provided to him

Mr. William R. Gray
January 15, 2009
Page 8

by Mr. Reitz and compared them to his understanding of the intent of Ernest Cure as expressed in the letter from Linda Rummel. (Exhibit D)

Mr. Jenkins knew the documents received from Mr. Reitz were draft documents as indicated in Mr. Reitz's letter accompanying the documents and therefore, Mr. Jenkins assumed a much greater role with his client than that of a CPA. Mr. Jenkins violated AICPA standard ET Section 201-General Standards[3] sited as follows:

A. *Professional Competence. Undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence.*
B. *Due Professional Care. Exercise due professional care in the performance of professional services.*
C. *Planning and Supervision. Adequately plan and supervise the performance of professional services.*
D. *Sufficient Relevant Data. Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed.*

Mr. Jenkins provided services which should have been provided by an attorney (he undertook professional services for which he was not qualified) as demonstrated by his explanation of draft legal documents to Ernest Cure and his participation in the process of Ernest Cure executing the legal documents.

Mr. Jenkins did not use due professional care in rendering advice to Ernest Cure and Mary Bohnen (he did not review the draft documents and gave wrong advice based on the documents signed).

Mr. Jenkins did not supervise the work of his associates (letter from Linda Rummel to Mr. Reitz contained misleading information).

Mr. Jenkins drew conclusions and made recommendations without reliance on the relevant documents (Ernest Cure's Will was in error and the other documents provided by Mr. Reitz were not reviewed by Mr. Jenkins).

Ernest Cure died September 11, 2002, therefore, Mr. Jenkins and the other professionals within Kennedy and Coe had an opportunity to have corrected the error in the Will and other documents prior to Ernest's death had they reviewed the Will and other documents. Kennedy and Coe prepared the income tax return of Cure, Inc. for the years 1994 (fiscal year ended 2/28/1995) through 2002 (fiscal year ended 2/28/2003). Further demonstrating the lack of supervision, lack

---

[3] American Institute of Certified Public Accountants (AICPA) Professional Standards, Code of Professional Conduct

Mr. William R. Gray
January 15, 2009
Page 9

of coordination of client services within Kennedy and Coe, and lack of due professional care are the errors in the income tax returns of Cure, Inc.[4]

Table 1, below, lists the disclosure in the income tax return of Cure, Inc. each year of the ownership of Cure, Inc., (this disclosure is required on Schedule K of Form 1120). In summary, for the years 1994 through 1997, the income tax return disclosed there was no individual, partnership, corporation, estate or trust that at the end of the tax year owned, directly or indirectly, 50% or more of the corporation's voting stock (which is not correct). For the years 1998 through 2000, the disclosure was that Ernest Cure owned 50% and Mary Bohnen owned 50% of the corporation's voting stock (which is not correct). For the year 2001, the ownership was shown with Ernest Cure owning 74% and Mary Bohnen owning 26% (which is not correct). The 2002 income tax return listed the ownership as Ernest Cure 44%, Mary Bohnen 26% and Eileen Rita Cure Family Trust 30%. The 2002 income tax return was filed after Ernest Cure's death and after Mr. Jenkins was made aware of the error in Ernest's Will after reading it for the first time after his death.

Table 1 – Summary From Income Tax Returns of Cure, Inc.

| Tax Year | Stock Ownership Greater Than 50% | Stock Ownership Percentage | | |
| --- | --- | --- | --- | --- |
| | | Ernest Cure | Mary Bohnen | Family Trust |
| 1994 | No | | | |
| 1995 | No | | | |
| 1996 | No | | | |
| 1997 | No | | | |
| 1998 | | 50% | 50% | |
| 1999 | | 50% | 50% | |
| 2000 | | 50% | 50% | |
| 2001 | | 74% | 26% | |
| 2002 | | 44% | 26% | 30% |

---

[4]    Statement on Standards for Tax Services No. 2, Answers to Questions on Returns
Introduction
1.    This Statement sets forth the applicable standards for members when signing the preparer's declaration on a tax return if one or more questions on the return have not been answered. The term *questions* includes requests for information on the return, in the instructions, or in the regulations, whether or not stated in the form of a question.
Statement
2.    A member should make a reasonable effort to obtain from the taxpayer the information necessary to provide appropriate answers to all questions before signing as preparer.
Explanation
3.    It is recognized that the questions on tax returns are not of uniform importance, and often they are not applicable to the particular taxpayer. Nevertheless, there are at least two reasons why a member should be satisfied that a reasonable effort has been made to obtain information to provide appropriate answers to the questions on the return that are applicable to a taxpayer.
a.    A question may be of importance in determining taxable income or loss, or the tax liability shown on the return, in which circumstance an omission may detract from the quality of the return.
b.    A member often must sign a preparer's declaration stating that the return is true, correct, and complete.

Mr. William R. Gray
January 15, 2009
Page 10

Mr. Jenkins had represented to Ernest Cure and Mary Bohnen in 1995 that all stock in Cure, Inc. would pass to Mary Bohnen upon Ernest's death. The income tax returns of Cure, Inc. were prepared each year thereafter though 2001 without any other representation as to ownership (in fact the ownership representations were wrong in those income tax returns).

In early 2000, Mr. Jenkins had a second chance at discovering the error in Ernest's Will and other documents. Mary Bohnen on February 28, 2000, met with Jill Eberhart, CPA and employee of Kennedy and Coe, and indicated that Ernest Cure had been diagnosed with Lou Gehrig's disease and his health was failing. Jill Eberhart told Mr. Jenkins in an email that Ernest Cure would like meet with him to discuss gifting of Cure, Inc. stock. Mr. Jenkins subsequently had a conversation with Mary Bohnen concerning Ernest Cure's estate plan. Mary conveyed to Mr. Jenkins the sense that her father wanted to make certain that his Will was unassailable or "bullet-proof" or that it could not be undone by her sisters. (See Mr. Jenkins deposition dated December 16, 2008, (page 69, lines 20 through 24)

Mr. Jenkins then contacted another attorney, James R. Wade, on the behalf of Ernest Cure and listed in a cover letter dated April 25, 2000 certain information to made available to Mr. Wade for his review, including Ernest Cure's existing Will (i.e. the Will drafted by Mr. Reitz) (Exhibit E). In this letter Mr. Jenkins notes that in his possession was Ernest Richard Cure's Will dated January 31, 1995 which contains his exercise of the power of appointment over the Marital Trust of Eileen Cure. Mr. Jenkins was correct in that Ernest Cure's Will did contain an exercise of power of appointment over the Martial Trust, however, the trust in question was the Family Trust which Mr. Jenkins clearly knew but did not point out.

Mr. Wade responded to Mr. Jenkins by letter dated May 4, 2000 with certain questions and Mr. Jenkins responded to Mr. Wade by letter dated May 8, 2000. Mr. Jenkins letter to Mr. Wade dated May 8, 2000 (Exhibit F) contained an attachment which was entitled:

> "Ernest Cure Trust
> Cure Inc.
> Eileen Cure Marital Trust"

This document is also in error as it shows the Eileen Cure Marital Trust as owning 412 shares of stock in Cure Inc. with a net worth of $768,083. These shares were in fact owned by the Family Trust. The following is taken from Mr. Jenkins deposition dated December 16, 2008, (page 72, lines 8 through 25, page 73, lines 1 through 25, page 74, lines 1 through 25, page 75, lines 1 through 25 and page 76, lines 1 through 25 and page 77 lines 1 though 6).

 Q. Now, in preparing this letter and the attachment, there are two other points that I may cover later but those are the two — number two is the one I wanted to focus on. Attached to this is a list of the Ernest Cure Trust, Cure, Inc. and Eileen Cure Martial Trust assets, they're in several categories. With regard to the Eileen Cure Marital Trust your attachment lists stock in Cure, Inc. 412 shares, do you see that?
 A. Yes.

Mr. William R. Gray
January 15, 2009
Page 11

Q. What was the source that you reviewed in order to report to Mr. Wade what assets were held in the Eileen Cure Marital Trust?

A. Well, I would not – the original source would have been the 706, but that is in error. That stock was held by the Eileen Cure Family Trust, not marital trust.

Q. Yes, and what I'm trying to figure out, with your help, is how this error was made. What would it have been – what documents would you have reviewed, if any, that showed that 412 shares of stock in Cure, Inc. were held by the Eileen Cure Martial Trust, sir?

A. I don't know of anything that supports that. It looks like to me it's – it's a mistake not based on reference to any document or – I don't know what to call it but an error. I don't – I think it's a matter of instead of writing Eileen Cure Family Trust, it was written as the Eileen Cure Martial Trust. I don't have any evidence that those 412 shares were ever owned by the marital trust.

Q. Okay. That's what I wanted to understand. Do you then know how it came to be that 412 shares of the Eileen Cure Family Trust were reported by you to Jim Wade as having actually been held by the Eileen Cure Marital Trust, sir?

A. I don't know how that happened.

Q. You did prepare this letter, did you not?

A. Yes.

Q. Do you have any recollection of having delegated the preparation of this letter to someone else?

A. I don't have any specific recollection of having delegated. I mean, there's delegation at some level because I don't type, but I don't know if I dictated it, if I hand-wrote notes and handed it to somebody, I don't actually know the creation of it, but I'm certainly not trying to express that I'm not responsible for the mistake that's there.

Q. Okay. You knew that Mr. Wade was counting on you to accurately report this information to him?

A. Yes, I'm sure he was thinking I would do my best to report things accurately.

Q. Okay, and you, I take it, knew that Ernest Cure and Mary Bohnen were also counting on you to accurately report the way the stock in Cure, Inc. was held to Mr. Wade?

A. Yes.

Q. You understood that, didn't you?

A. Um-hmm.

Q. Do you believe that you met the standard of care for CPAs in the way you reported how assets of Cure, Inc. were held in this letter of May 8, 2000 that you sent to Jim Wade?

A. My communication with Jim Wade was much more extensive that that one letter. He had the federal estate tax returns that showed that the 412 shares were owned by the family trust, he had telephone conversations with me that initiated all this. I met with him briefly before he met with Ernie. Obviously I don't have tape recordings or notes about all those conversations, but it is somewhat of a surprise to me now, looking back at it, that Jim wouldn't had said, well how did these assets get out of the family trust or how did this marital trust all at once get

Mr. William R. Gray
January 15, 2009
Page 12

> funded, or how could it have been funded?  So I just feel like there's a fairly broad conversation and other information that is inconsistent with that – that letter.
>
> Q.  Okay.  Well, going back to my question, do you believe that you met the standard of care for CPAs in this letter of May 8, 2000 in which you reported to Jim Wade that the assets of Cure, Inc. included 412 shares of stock held in the Eileen Cure Martial Trust?
>
> MR. MCNAMARA: Object to the form of the question.
>
> A.  I don't feel like I met the standard of care in that letter.
>
> Q.  Okay.
>
> A.  I do feel like I met the standard of care in a broader context of all the communication that I had with Jim about what we were trying to accomplish and how the assets were owned.
>
> Q.  Okay.  Did you have any memory of having told Jim Wade in any conversation that 412 shares of stock in Cure, Inc. were held in the Eileen Cure Family Trust, not in the marital trust as this letter suggests?
>
> A.  The only documentation I have is the fact that he has the federal estate tax return which shows that's how they were owned.
>
> Q.  Right.  I'm asking you about conversations, sir.
>
> A.  I don't have any documents – documented conversations.
>
> Q.  Do you have any memory of ever having told Mr. Wade that the 412 shares of stock were held in the Eileen Cure Family Trust, not the marital trust as it states in this letter?
>
> A.  This is one of those answers where I'm not sure what the -, I am confident when I first contacted Jim, based on my understanding of what Hampton, Royce, Engelman & Nelson had done, I clearly understood that the 412 shares owned by the family trust, I would have had to have misspoke to Jim as I misspoke in that letter, and I would like to think I didn't continually misspeak about what my understanding was, but -

As testified to, Mr. Jenkins admits he had not met the standard of care for CPAs in the preparation of the May 8, 2000 letter to Mr. Wade.  Mr. Jenkins is not aware of any documentation to Mr. Wade subsequently or otherwise correcting the error in the May 8, 2000 letter.  Mr. Jenkins met with Ernest Cure and Mr. Wade in Mr. Wade's office on June 16, 2000, discussing (according to Mr. Wade's time records) methods of protecting the Will against attack (see Deposition of James R. Wade dated July 19, 2005, page 124 lines 19 through 23).

Notes of Mr. Jenkins, dated 10/15/00, indicate an inquiry by Mr. Wade and Mr. Jenkins' response (Exhibit G).  Mr. Jenkins believes he faxed these notes to Mr. Wade, but there is no evident to that affect.

These notes dated 10/15/00 reflect again that Eileen Cure Marital Trust owns 412 shares of stock in Cure Inc., the same error as was in Mr. Jenkins letter dated May 8, 2000 to Mr. Wade.  Mr. Jenkins testified that in his notes the word Martial was circled and Family written in above the word Marital indicating a correction to Family, however, Mr. Jenkins could not recall clarifying

Mr. William R. Gray
January 15, 2009
Page 13

this with Mr. Wade (See Mr. Jenkins deposition dated December 16, 2008, (page 81, lines 3 through 25 and page 82, lines 1 and 2). Mr. Jenkins testified that he did not meet the standard of care for CPAs by knowing at this point in time, October 15, 2000, that an error had been made in reporting the assets but failing to communicate that to the person who was doing Ernest Cure's revised estate plan (See Mr. Jenkins deposition dated December 16, 2008, (page 82, lines 3 through 12). There is no evidence as to when Mr. Jenkins made this notation as to the error.

The Will prepared by Mr. Wade (Exhibit H), as part of the estate planning being provided by Mr. Jenkins, was executed by Ernest Cure on October 18, 2000, and contained the same error as Ernest Cure's Will dated January 31, 1995. When asked if he reviewed the documents that Mr. Wade prepared prior to Ernest Cure's death, Mr. Jenkins testified he had not. His testimony was "I was aware of them. I had copies of them. But I don't think I reviewed them, or I don't recall reviewing them" (See his deposition dated May 10, 2005, (page 68, lines 12 through 17).

For Mr. Jenkins not to have reviewed the Will and other estate planning documents to insure compliance with the wishes of Ernest Cure and Mary Bohnen and Mr. Jenkins understanding thereof demonstrates in my opinion, a lack of due professional care. Mr. Jenkins had a long standing client relationship with Ernest Cure and Mary Bohnen, held himself and Kennedy and Coe out as having knowledge and expertise in estate planning, made estate attorney referrals for Ernest Cure and participated in the interface with the estate attorney. Yet it appears Mr. Jenkins nor anyone else within Kennedy and Coe took the time to read the estate documents prepared in 1995 (in draft form) and again in 2000. Even after Mary Bohnen and Ernest Cure requested in the year 2000 that Mr. Jenkins insure the Will was "bullet proof" Mr. Jenkins and Kennedy and Coe ignored the legal documents and instead relied upon what they "thought" was to have been.

Mr. Jenkins was asked in his deposition dated December 16, 2008, (page 84, lines 11 through 17) if he knew in 1994 and 1995 what the term "current discretionary beneficiaries of the family trust meant, and he responded "Well, I think I would have had an understanding generally of what that meant". Mr. Jenkins held himself and Kennedy and Coe out as having knowledge and expertise in estate planning, which certainly involves the use of trusts in one form or another. In my opinion, Mr. Jenkins and Kennedy and Coe went beyond their role as CPAs in the initial contact and estate planning engagement with Ernest Cure in 1994 an 1995, as described above. Mr. Jenkins testified (see his deposition dated December 16, 2008, page 85, lines 18 through 25 and page 86, lines 1 through 3):

Q. Did you then believe that Mary and Ernest as trustees of the Eileen Rita Cure Family Trust owed fiduciary duties to Mary's three sisters up until the point in time of Ernest's death?

A. I, with hindsight, understand that that was a continuing responsibility, a trustee's responsibility; and I promise not to say it again, but Ernie made it absolutely clear that it was not his intent to use discretion in that manner.

It is evident from the income tax returns of Cure, Inc., prepared by Kennedy and Coe, and other work paper documents provided by Kennedy and Coe that Kennedy and Coe and the responsible person on the various client engagements were aware, because of the estate planning services, accounting and tax return preparation and other client services for the related parties, of

Mr. William R. Gray
January 15, 2009
Page 14

transactions and operating activities by Ernest Cure and Mary Bohnen within Cure, Inc., which breached their duties as co-trustees of the Family Trust and as officers, directors and majority shareholders of Cure, Inc.  Kennedy and Coe and the responsible persons within Kennedy and Coe were aware that Ernest Cure and Mary Bohnen had responsibilities and duties as co-trustees of the Family Trust and as officers, directors and majority shareholders of Cure, Inc.  Kennedy and Coe and the responsible persons within Kennedy and Coe were aware of such transactions and operating activities through (1) their involvement in the tax planning for Ernest Cure, Mary Bohnen and Cure, Inc., (2) the design and implementation of a deferred compensation plan for Cure, Inc., (3) review of the accounting and tax records of Cure, Inc., (4) communication with Ernest Cure and Mary Bohnen and (5) preparation of the income tax returns for the related parties.  Even though Kennedy and Coe and more specifically Mr. Jenkins held themselves out as having knowledge and expertise in estate planning, tax and accounting, they did not advise their clients as to their fiduciary duties in their multiple roles and thus allowed them to record many of the unreasonable and improperly paid expenses and costs on the books of Cure, Inc., understating income and improperly disbursing assets of Cure, Inc.  Kennedy and Coe also had a duty to advise Ernest Cure and Mary Bohnen of such noncompliance and errors and the consequences of such noncompliance and errors as their trusted professional advisors and as practitioners before the Internal Revenue Service which requires they must exercise due diligence in preparing and filing income tax returns[5].

The "Findings of Fact, Conclusions of Law and Judgment" entered by the District Court, Kit Carson County, Colorado on June 1, 2007, by Judge Hoyer, found transactions on the books of Cure, Inc. that were not proper and which provided personal benefits to Ernest Cure and Mary Bohnen totaling $346,244.37.

Mr. Jenkins testified in his deposition dated December 16, 2008, (see page 86 lines 4 through 23):

Q. Okay.  Whether he intended to use his discretion in that manner or not, did you understand that he and Mary nevertheless did owe fiduciary duties to his other three daughters in the administration of the Eileen Rita Cure Family Trust?

A. I understand that now.

Q. Did you understand it in 1994-1995?

A. The simple answer is no, I didn't consider it, I didn't reflect on it or think of its consequences.  I didn't – if I would have – well, I don't know what would happen if I would have done whatever, but –

Q. Do you believe that you met the standard of care for CPAs engaged in estate planning work particularly considering that fact that you recognize that Ernest Cure considered you his most trusted financial or estate planning advisor –

A. Yes.

---

[5]    Treasury Department Circular No. 230 Regulations governing the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and appraisers before the Internal Revenue Service.

Mr. William R. Gray
January 15, 2009
Page 15

I disagree with Mr. Jenkins. In my opinion, the standard of care for CPAs was not met. A very important and relevant document in the performance of services for Ernest Cure, Mary Bohnen and Cure, Inc. was Ernest Cure's Will and estate documents which Mr. Jenkins or other responsible person within Kennedy and Coe did not bother to read and understand. They were certainly aware of these documents, had copies of these documents and were instrumental in providing important information used and relied upon in the preparation of these documents[6]. Mr. Jenkins went further and advised Ernest Cure and Mary Bohnen as to the Will and estate documents, even though he himself never read the documents, and Ernest Cure and Mary Bohnen relied upon his counsel and the advice of the other Kennedy and Coe employees in this regard. If Kennedy and Coe and Mr. Jenkins did not have the necessary expertise they should not have provided services and held themselves out as experts in estate matters and as having the knowledge of related tax and accounting services.

After Ernest's Will was admitted to probate, Mr. Jenkins discovered that the limited power of appointment over the Family Trust had not been exercised by Ernest. Ernest's Will did not provide for the exercise of the limited power of appointment over the Family Trust by Ernest. A petition was filed by Mary Bohnen in the probate proceeding seeking reformation of Ernest Cure's Will. Judge Vannoy found that the Will could not be reformed and ruled against Mary Bohnen. Judge Vannoy's decision in the Reformation Case was recently affirmed by the Colorado Court of Appeals. Judge Hoyer took judicial notice of the Reformation Case and so noted in his Findings of Fact, Conclusions of Law and Judgment" entered by the District Court, Kit Carson County, Colorado on June 1, 2007. The Family Trust called for the Family Trust to

---

[6] Statement on Standards for Tax Services No. 3, Certain Procedural Aspects of Preparing Returns

1. This Statement sets forth the applicable standards for members concerning the obligation to examine or verify certain supporting data or to consider information related to another taxpayer when preparing a taxpayer's tax return.

2. In preparing or signing a return, a member may in good faith rely, without verification, on information furnished by the taxpayer or by third parties. However, a member should not ignore the implications of information furnished and should make reasonable inquiries if the information furnished appears to be incorrect, incomplete, or inconsistent either on its face or on the basis of other facts known to a member. Further, a member should refer to the taxpayer's returns for on or more prior years whenever feasible.

3. If the tax law or regulations impose a condition with respect to deductibility or other tax treatment of an item, such as taxpayer maintenance of books and records or substantiating documentation to support the reported deduction or tax treatment, a member should make appropriate inquiries to determine to the member's satisfaction whether such condition has been met.

4. When preparing a tax return, a member should consider information actually known to that member from the tax return of another taxpayer if the information is relevant to that tax return and its consideration is necessary to properly prepare that tax return. In using such information, a member should consider any limitations imposed by any law or rule relating to confidentiality.

5. The preparer's declaration on a tax return often states that the information contained herein is true, correct, and complete to the best of the preparer's knowledge and belief based on all information known to the preparer. This type of reference should be understood to include information furnished by the taxpayer or by third parties to a member in connection with the preparation of the return.

Mr. William R. Gray
January 15, 2009
Page 16

be divided into four equal shares following the death of Ernest Cure, exactly what Ernest Cure and Mary Bohnen had thought was to be avoided by the revision to Ernest Cure's Will (in both 1995 and 2000) and exercise of his limited power of appointment.

Therefore, rather than all shares of the Family Trust passing to Mary Bohnen at Ernest Cure's death, she was required by the Court to acquire the corporate stock held by the separate share trusts of her three sisters at a price equal to the hypothetical value of such stock had the breaches of fiduciary duty, described above, not occurred ($269,138.73 for each separate share or a total of $807,416.19, plus pre-judgment interest).

Conclusion

In my opinion, Kennedy and Coe and the various responsible persons within Kennedy and Coe, as identified above, did not use due professional care in providing professional services to Mary Ellen Bohnen, in her various individual and representative capacities and as a result Mary Bohnen suffered significant damages as set forth in the Findings of Fact, Conclusions of Law and Judgment entered by the District Court, Kit Carson County, Colorado on June 1, 2007 and incurred significant attorney's fees and costs (approximately $591,619) to defend against the motions in the litigation as identified above.

Since the Court found that unreasonable and improperly paid expenses and costs were recorded on the books of Cure, Inc. amended income tax returns may need to be filed for Cure, Inc. to reflect the proper accounting for these transactions and the understatement of income. In addition, to the extent that certain of the unreasonable and improperly paid expenses and costs could be considered income benefiting Mary Bohnen or Ernest Cure or be construed to be gifts, the income tax returns of Mary Bohnen and Ernest Cure may also need to be amended. If the income tax returns, for Cure, Inc., Mary Bohnen or Ernest Cure, are amended additional income taxes may be owed along with penalty and interest thereon. There may be additional damages related to costs for the preparation of amended income tax returns and related taxes, penalty and interest.

Additional information and documents are necessary to determine the amount of additional income taxes, penalty and interest plus costs to amend the applicable income tax returns.

I was provided in discovery certain invoices from Kennedy and Coe to Cure, Inc., Ernest Cure and The Ernest R. Cure Estate. Even though Kennedy and Coe provided services beginning in late 1994, no invoices were produced in discovery for the period 1994 through 1996. The first invoice produced is dated February 10, 1997. Additionally there were no invoices produced in discovery after May 31, 2000 through February 2, 2001, even though we know services were provided by Mr. Jenkins during this period of time.

If additional information and documents become available, I will update my report, conclusions, and opinions if requested.

Mr. William R. Gray
January 15, 2009
Page 17


Qualifications

A summary of my qualifications, including all publications within the last ten years, is presented in Attachment B.

My time on this engagement is being charged at my normal hourly rate for this type of work of $300 per hour. Other staff members are being billed at rates varying from $80 to $190 per hour. Our fee for the services provided on this engagement are not contingent on the outcome of this litigation.

Other Testimony

The cases in which I have testified as an expert at trial or by deposition within the preceding four years are listed in Attachment C.

If you have any questions regarding this matter please feel free to call.

Sincerely,

Karsh Consulting, P.C.

James R. TenBrook
President

JRT/smm

Enclosures



**Karsh Consulting** P.C.
**Certified Public Accountants/Litigation Consultants**
Cherry Creek Plaza II · 650 South Cherry Street, Suite 500
Denver, Colorado 80246-1803
(303) 825-1000   FAX (303) 825-8800

March 11, 2009

Mr. William R. Gray
Purvis Gray, LLP
4410 Arapahoe Avenue
Boulder, Colorado  80303

Re:   Mary Ellen Bohnen, et al, Plaintiffs, vs Kennedy & Coe, LLC, et al, Defendants
       Case No. 1:08 CV 00904-RPM

Dear Mr. Gray:

At your request, I have reviewed the report of A. Marvin Strait, commenting on my report dated January 15, 2009.  I have set forth below my critique and rebuttal of Mr. Strait's comments.

Mr. Strait first comments on what he identifies as two engagements Mr. Jenkins performed for Mr. Cure: the engagement in 1994/1995; and the engagement in 2000.  Mr. Strait states as follows:

> *"The fact is the two engagements were materially different as regards the relationship with the client, the work performed, the level of the responsibility and the end products."*

I find this comment quite extraordinary as Mr. Jenkins was only one of the responsible persons among several on the various Kennedy and Coe service engagements for Ernest Cure, Cure, Inc., Joe and Mary Bohnen and Bohnen, Inc., for the years 1994 through 2002.  Albeit he was the Partner from Kennedy and Coe working on the engagements and the person that Ernest Cure looked to as his most trusted professional advisor.

Mr. Strait by focusing on estate planning work for Ernest Cure both in 1994/1995 and again in 2000, ignores the fact that Kennedy and Coe and Mr. Jenkins were providing various accounting, consulting and tax services (e.g. tax return preparation, tax planning, payroll and bookkeeping services, advising regarding medical and meal expenses, planning, etc) to the parties identified above during the years 1994 through 2002.  The fact that Kennedy and Coe and Mr. Jenkins continued to provide professional services is not in dispute and they therefore had a responsibility to exercise due professional care in discharging their responsibilities to Ernest Cure and Mary Bohnen and the other parties identified above.

The following is taken from Mr. Jenkins' deposition taken on December 16, 2008 (page 83, lines 7 through 25 and page 84, lines 1 through 5):

Mr. William R. Gray
March 11, 2009
Page 2

Q.   After the Sid Reitz will and estate plan documents were signed by Ernest Cure, did you continue to give advice to Ernest Cure and to Mary Bohnen following that execution?

A.   Well, certainly I was giving advice when we started to redo the estate plan or re-confirm it, but are you asking me kind of on a continuing association between '95 and –

Q.   Yes, between '95 and 2000 did you render any accounting services to Ernest Cure, Mary Bohnen, Cure, Inc., or any Cure-related business entity or person?

A.   I don't know, I don't recall, I'd have to get into time records or something to –

Q.   Well, we know for certain the Cure, Inc. and Ernest Cure and Mary Bohnen and Joe Bohnen and other Bohnen-related businesses and individuals such as Michael Bohnen and Bohnen Farms had additional accounting services rendered by Kennedy & Coe during that period of time.

A.   Yes I understand that.

Q.   You knew that?

A.   Yes.

Q.   And what you're telling me is that you don't personally recall whether or not you were personally involved in any of those services, is that true?

A.   That's correct, that's correct.

I reviewed certain billing records of Kennedy and Coe, which were produced, however, it should be noted that not all billing records were produced. These invoices reflected continued charges for professional services as provided by Kennedy and Coe to Cure, Inc. and Ernie Cure during the period February 1997 to October 2003. The following are excerpts from a few of the invoices (invoice date and Bates stamp listed) that point out the integral involvement of Kennedy and Coe in the affairs of Ernest Cure, Mary Bohnen and Cure, Inc.

March 10, 1998 (KC 000007)
Review estimate workpapers, telecom to Mary with questions, prepare estimate spreadsheet.
Tax planning.
No date (KC 000011)
Discuss medical expenses that will be reimbursed by Cure, Inc. in 1999.
March 31, 1999 (KC 000013)
Telecon with Mary regarding additional questions and transactions that need to occur before 2/28/99 (wages to her and her dad, medical reimbursement, grocery reimbursement, payroll tax deposit, etc.), copy amortization schedule for Ernest, prepare list for information need for year end.
Review estimate worksheet with Mary, discuss what needs done for the tax return, discuss Ernie wanting to gift stock from the corporation.
March 31, 2000 (KC 000016)
Estimate meeting with Mary, notes to the file, e-mail to Bill Jenkins regarding Ernest contacting him regarding possible gifting of Cure, Inc. and other revisions to estate planning.

Mr. William R. Gray
March 11, 2009
Page 3

<u>March 30, 2001 (KC 00021)</u>
Kennedy and Coe will prepare employment contacts for Ernie and Mary that include as one of their duties the preparation of meals on premises and will update the note with Joe and Mary as the previous loan has expired.
<u>May 31, 2001 (KC 000025)</u>
Review Goodland files for a copy of the deferred compensation agreement executed in 1995. Telephone call with Jill regarding the file kept in Goodland that is used for Bill's planning updates with Ernie.
Professional services in connection with preparation of Health Insurance and Medical Expense Reimbursement Plans for Ernie and Mary.
<u>May 31, 2002 (KC 000032)</u>
Will update minutes when doing Bohnen, Inc.'s estimate.
<u>August 29, 2002 (KC 000034)</u>
Review Deferred Compensation Agreement executed January 31, 1995 which provides for $2,500 per month.
Review Deferred Compensation Plan and the Medical Reimbursement Plan. Consulting in connection with Deferred Compensation and Medical Reimbursement Plans.

Mr. Strait agrees with me that Mr. Jenkins did not use due professional care in rendering advice to Ernest Cure and Mary Bohnen as he did not review the draft documents received from Mr. Reitz and gave wrong advice based on the documents signed. Mr. Strait states as follows:

> "...as regards the will signed in 1995 and that he did not review the draft will he received from Mr. Reitz before he presented it to Mr. Cure for his signature. As such, it is my opinion that Mr. Jenkins did not meet the due care required of a professional in that capacity."

And further,

> "When Mr. Jenkins received the will from Mr. Reitz, he met with Mr. Cure, explained to him what he thought it contained and served as a witness to the signing. Unfortunately, the will contained a significant error in that the limited power of appointment was exercised for the marital trust, but not for the family trust that owned the 412 shares in Cure, Inc. As a result, had Mr. Cure passed away when that will was effective, the 412 shares would have passed to all four daughters rather than the one daughter, Mary Bohnen, that he intended to be the sole beneficiary. Mr. Jenkins did not identify that error and the will was executed by Mr. Cure not knowing that it was not in accordance with his desires."

In fact, Mr. Jenkins did not even read the Will before he advised Mr. Cure of its contents and his understanding of what he was signing.

Mr. William R. Gray
March 11, 2009
Page 4

The following excerpts were taken from the "Findings of Fact, Conclusions of Law and Judgment[1]":

28.     Ernest did not personally meet with Reitz regarding the provisions of the will.

29.     On January 31, 1995, Ernest signed the will prepared by Reitz. Jenkins was present and acted as a witness. In the will, Ernest exercised the power of appointment with regard to the Marital Trust, but did not exercise the special or limited power of appointment regarding the Family Trust. Nevertheless, Jenkins believed that the will provided that upon Ernest's death, all of the shares of stock in the corporation would pass to Mary.

30.     After the 1995 will was signed by Ernest, Mary believed that Ernest had exercised the limited power of appointment over Eileen's Family Trust, and that the 412 shares of stock in the Corporation held by the Family Trust would pass to her at the time of her father's death. After the 1995 will was signed by Ernest, Mary believed that the Petitioners were no longer discretionary beneficiaries of her mother's Marital Trust or Family Trust.

Ernest believed he had exercised the limited power of appointment as Mr. Jenkins represented to him that he had and Mary believed that her three sisters were no longer discretionary beneficiaries of her mother's Marital Trust or Family Trust. Mr. Jenkins and Kennedy and Coe advised no differently until after Ernest Cure's death on September 11, 2002 and in fact had provided advice consistent with Ernest's and Mary's understanding and belief as represented to them by Mr. Jenkins.

If Mr. Jenkins was as Mr. Strait says: "essentially the sole professional contact for Mr. Cure as regards the will", one would expect that Mr. Jenkins would have exercised due professional care (which Mr. Strait and I agree he didn't); and, additionally he would have communicated to the other responsible persons within the Kennedy and Coe firm the results of his estate planning and supervised the work of other professionals within Kennedy and Coe. Mr. Strait apparently doesn't disagree with me that Kennedy and Coe do not have "formal procedures" for the supervision and coordination of client services. Mr. Strait opines that informal procedures such as discussions in the hallways "often have better communication and coordination than can be provided by a structured impersonal process".

I would suggest that formal procedures requiring Partners to review important communications regarding client matters, before they are sent to attorneys and other third parties, and procedures requiring that Partners or other responsible parties review critical documents, (i.e. wills and trusts

---

[1]     "Findings of Fact, Conclusions of Law and Judgment" entered by the District Court, Kit Carson County, Colorado on June 1, 2007, by Judge Hoyer. Ernest R. Cure is referred to as "Ernest", Eileen Rita Cure is referred to as "Eileen", Mary Ellen Bohnen is referred to as "Mary" and Jane Elizabeth Hubbard, Kathleen Ann Unrein and Teresa Muniz are referred to as "Petitioners". The full text of the Findings of Fact, Conclusions of Law and Judgment is attached as Exhibit A to my January 15, 2009 report.

Mr. William R. Gray
March 11, 2009
Page 5

which have continuing significance to a client engagement) are the kinds of procedures demonstrating due professional care. Kennedy and Coe has violated the standard of due professional care in this regard.

In my opinion the standard of due professional care requires (a) documentation of important matters affecting a client, (b) supervision of the work of other professionals within ones firm who are relying on such documentation, to insure understanding by those providing client service and (c) formal procedures, such as the use of checklists and work programs, to insure compliance and consistency, and can't be accomplished while talking in the hallway, in social settings or the various other informal ways suggested by Mr. Strait. Kennedy and Coe have multiple office locations in various states which raises greater concerns about the need for formal procedures to provide adequate supervision of all professional services. Internal quality-control procedures ensure that services are competently delivered and adequately supervised.

A critical document, the letter to Mr. Reitz, asking Mr. Reitz to prepare a document to exercise the power of appointment over the Family Trust was signed by Linda Rummel, a paraprofessional with Kennedy and Coe. I would point out that the letter to Mr. Reitz made no distinction as to the Marital Trust and the Family Trust and referred only to the Eileen Rita Cure Trust as owning 412 shares of Cure, Inc. stock, whereas this stock was actually owned by the Family Trust. This is the type communication which should have been read and approved by Mr. Jenkins (since he was "essentially the sole professional contact for Mr. Cure as regards his will"). Mr. Jenkins however, doesn't remember whether he read this letter (see his deposition taken on December 16, 2008 (page 47, lines 10 through 22) and Kennedy and Coe has no formal procedure to insure such a letter is approved by a Partner or to document whether it was reviewed by anybody. Linda Rummel a paraprofessional prepared and signed the letter. I have already dealt with Mr. Jenkins' admission he did not review the documents received from Mr. Reitz in response to this letter and advised Ernest Cure based on what he thought the documents contained.

Mr. Strait suggests that given that Mr. Cure and Ms. Bohnen became trustees in 1992 of the Eileen Cure trusts -

> "...it should reasonably be expected that they already knew or should have known of their fiduciary obligations and in my opinion, Mr. Jenkins did not fail to meet the standard of care in that regard".

Mr. Strait misses the issue, in that based on Mr. Jenkins' representations, Ernest believed he had exercised the limited power of attorney, as Mr. Jenkins represented to him that he had, and Mary believed that her three sisters were no longer discretionary beneficiaries of her mother's Marital Trust or Family Trust. Mr. Jenkins and Kennedy and Coe advised no differently until after Ernest Cure's death on September 11, 2002.

Mr. William R. Gray
March 11, 2009
Page 6

The following excerpts were taken from the "Findings of Fact, Conclusions of Law and Judgment[2]":

40. After Ernest's will was admitted to probate, Jenkins discovered that the limited power of appointment over Eileen's Family Trust had not been exercised by Ernest. The will did not provide for the exercise of the limited power of appointment over the Family Trust by Ernest. After discovering the error, Jenkins contacted Wade[3] and informed him that the will was incorrect. Wade testified that the will he had prepared was not consistent with Ernest's testamentary intent as it failed to leave all of the stock in the corporation to Mary. Jenkins and Wade then contacted Mary and advised her of the error.

41. Until this error had been disclosed to Mary, she believed that under the terms of Ernest's will, the 412 shares of corporate stock held by Eileen's Family Trust would pass to her. Based upon the information that she received from Ernest, Jenkins and Wade, she believed that all of the corporate stock held by Ernest or her mother's trust would pass to her upon her father's death. As a result of her reliance upon this information, she incorrectly believed that her sisters had no beneficial interest in the Family Trust or the corporation.

So if Mr. Strait is right that Mr. Cure and Ms. Bohnen should reasonably be expected that they already knew or should have known of their fiduciary obligations it follows that based on Mr. Jenkins' representations they considered Mary Bohnen to be the sole beneficiary of Eileen's Family Trust as Mr. Cure was told by Mr. Jenkins he had exercised the limited power of appointment in Mary's favor. This is a significant change in circumstances and Mr. Jenkins, essentially the sole professional contact for Mr. Cure as regards his Will, believed that the Will provided that upon Ernest's death, all of the shares of stock in Cure, Inc. would pass to Mary. Mr. Jenkins and other Kennedy and Coe responsible parties did not advise Mr. Cure and Ms. Bohnen otherwise as to their fiduciary obligations after the exercise (or what Mr. Jenkins thought was the exercise) of the limited power of appointment over the Family Trust.

In this regard, I point out in my January 15, 2009 report, in my opinion Mr. Jenkins was providing services which should have been provided by an attorney and by doing so he undertook professional services for which he was not qualified and could not reasonably expect to complete with professional competence. Mr. Strait comments that my claim is *"inconsistent and highly questionable"*.

---

[2]    "Findings of Fact, Conclusions of Law and Judgment" entered by the District Court, Kit Carson County, Colorado on June 1, 2007, by Judge Hoyer. Ernest R. Cure is referred to as "Ernest", Eileen Rita Cure is referred to as "Eileen", Mary Ellen Bohnen is referred to as "Mary" and Jane Elizabeth Hubbard, Kathleen Ann Unrein and Teresa Muniz are referred to as "Petitioners". The full text of the Findings of Fact, Conclusions of Law and Judgment is attached as Exhibit A to my January 15, 2009 report.

[3]    Wade refers to James R. Wade, with the law firm of Wade Ash Woods Hill & Farley, P.C.

Mr. William R. Gray
March 11, 2009
Page 7

Let me site some examples from Mr. Jenkins deposition that support my claim. Mr. Jenkins testifies in his deposition dated December 16, 2008, (page 65, lines 9 through 18):

Q.    Did you read the letter from Mr. Reitz that accompanied the documents he returned to your office?
A.    I don't know.
Q.    Did you expect that someone else within Kennedy and Coe would review Mr. Reitz's letter, the revised Will or the – and the trust instrument that Mr. Reitz generated to make certain that it contained the changes that you wanted made?
A.    I don't believe I expected someone to.

Nonetheless Mr. Jenkins explained to Ernest Cure what <u>he thought the documents contained</u> and Mr. Cure relied upon this advice, as evidenced by Mr. Jenkins testimony in his deposition dated December 16, 2008, (page 65, lines 19 through 25 and page 66, lines 1 through 14) as follows:

Q.    Okay. Without reading the will or the trust instrument and not recalling whether you read the letter or not, you nevertheless did explain to Ernest Cure what those documents contained, is that true?
A.    What I – I explained to him what I thought they contained, yes.
Q.    You thought they contained? Why would you not read the will knowing the family conflict that it was likely to generate, knowing that Ernest had told you he did not want to tell his three to-be-disinherited daughters that he was going to do that? Why would you not read the will to make certain that it was the way you intended it to be?
A.    The only thing I can say is I expected that Sid Reitz and Hampton Royce had done what I had asked them to do. I have a long association with the firm and created a lot of estate plans through them and had gotten out of the thought process that I needed to review his work.

Clearly if Mr. Jenkins "had gotten out of the thought process that I needed to review his work" maybe he should have had an attorney explain it.

In Mr. Jenkins' deposition dated May 10, 2005, page 63, lines 11 though 25 and page 64, line 1) he testifies as follows (referring to the letter that transmitted the documents to Jim Wade):

Q.    And Item No. 2 says, "Ernest Richard Cure's Will dated January 31, 1995, which contains his exercise of the power of appointment over the Marital Trust of Irene Cure."
A.    Right.
Q.    Were you aware at that time that the power of appointment in the '95 Will exercised the power of appointment over the Marital Trust?
A.    If I was, I wasn't alert enough or connecting yet that that Will was improperly prepared. And it's highly likely that someone had gathered this information and put it in this letter, prepared the letter on my behalf, which I signed. But I acknowledge what your --the issue that you're raising here does refer to the power of appointment over the Marital Trust.

Mr. William R. Gray
March 11, 2009
Page 8

I would suggest that Mr. Jenkins was out of his area of expertise or if you prefer as he testifies "wasn't alert enough or connecting", whatever that means?

Mr. Jenkins's deposition dated May 10, 2005, page 30, lines 6 though 23 and page 31, lines 1 through 3) reads as follows (referring to notes of Mr. Jenkins taken at a meeting with Ernie and Mary on December 28, 1994):

> Q.    I'm having trouble reading one of the words in No. 1 there. Could you read that for me, please.
> A.    "Ernie would like to use his limited power over the Family Trust to leave everything to Mary."
> Q.    And did you explain to him the difference between the Marital Trust and the Family Trust in this meeting?
> A.    I would have explained to him the operation of the Family Trust. In Ernie's mind and I think Mary's, in the way I recall it, they never really considered the Marital Trust as being something that Ernie didn't already have or had control over. And our conversation would have been focused around the provisions governing the Family Trust created by Eileen.
>
> Mr. Mallgren: Could you reread the question because I don't think he really answered it.
>
> (Last question read.)
> A.    Yes.

Significant in this testimony is Mr. Jenkins stating that his conversation were with regard to the <u>provisions governing</u> the Family Trust and <u>operation of</u> the Family Trust which are legal issues.

Mr. Jenkins testimony in his deposition dated December 16, 2008, (page 84, lines 12 through 22), page 85, lines 13 through 25 and page 86 lines 1 through 16) reads as follows:

Page 84.
> Q.    In 1994 and 1995, Mr. Jenkins did you know what the term current discretionary beneficiaries of the family trust meant?
> A.    Well, I think I would have had an understanding generally of what that meant.
> Q.    Okay, what did it mean at that – in that time frame to you, sir?
> A.    That at the discretion of some trustee, the discretion of one or more of the trustees, they could have made a distribution to a beneficiary.

Pages 85 and 86.
> Q.    You understood that whatever legal status that might be changed as a result of Mr. Cure's 1994-1995 estate plan would only take effect as of his death, true?
> A.    That's true.

Mr. William R. Gray
March 11, 2009
Page 9

Q.   All right.  Did you then believe that Mary and Ernest as trustees of the Eileen Rita Cure Family Trust owed fiduciary duties to Mary's three sisters up until the point in time of Ernest's death?

A.   I with hindsight, understand that that was a continuing responsibility, a trustee's responsibility; and I promise not to say it again, but Ernie made it absolutely clear that it was not his intent to use discretion in that manner.

Q.   Okay.  Whether his intended to use his discretion in that manner or not, did you understand that he and Mary nevertheless did owe fiduciary duties to his other three daughters in the administration of the Eileen Rita Cure Family Trust?

A.   I understand that now.

Q.   Did you understand it in 1994-1995?

A.   The simple answer is no, I didn't consider it, I didn't reflect on it or think of its consequences.  I didn't – if I would have – well I don't know what would happen if I would have done whatever, but --.

Again this is an example of Mr. Jenkins not understanding the provisions of a legal document, the Eileen Rita Cure Family Trust and not understanding the limited power of appointment provision.

I was aware when writing my January 15, 2009 report that Mr. Jenkins was a CPA and had some experience in the area of estate planning.  I was also aware that Mr. Jenkins is not a financial planner, was not a Personal Financial Specialist nor did he have any certifications in estate planning.  I was also aware that the Kennedy and Coe firm held themselves out as providing services in the estate planning area.  Their website states in part as follows:

"With help from Kennedy and Coe, you can ensure that your family – and not the federal government – is the primary beneficiary of your estate, avoid exposing your assets to a divorce settlement and eliminate potential strain on your family.  Our experienced consultants can help you prepare you business and the rest of your estate, so that when the time comes, each step in the succession process will go as smoothly as possible.  With plans designed to meet your unique needs, every detail of your estate will be closely examined – no matter how simple or complex it might be."

In an article that Mr. Jenkins co-authored, in The Practicing CPA, November 1998, it states in part as follows:

**Always focus on the target**
*Conflict often occurs when an estate planning conversation turns into a disagreement about asset or estate decisions, management responsibilities and contributions or previous personal conflicts.  Avoid this by developing a timeline and schedule for the steps in the process.  <u>Create an agenda</u> for each meeting, <u>crossing off steps as you work through them</u> until you meet your client's goals.*
(Underlining added for emphasis.)

Mr. William R. Gray
March 11, 2009
Page 10

It appears in this case that Mr. Jenkins and Kennedy and Coe have not followed their own advice nor provided the services they represent to provide.

Mr. Strait states

> *"Indeed, according to the damages section in Mr. TenBrooks {sic} report, the plaintiffs incurred no damages as the result of theses alleged problems".*

I was not asked to opine to the damages in this case but rather to opine as stated in the first paragraph of my January 15, 2009 report whether Kennedy and Coe, LLC and the responsible persons within Kennedy and Coe have met the professional standards of due care within the accounting profession in providing services to the Plaintiffs. It is my understanding the damages are very well summarized in the forty-three (43) pages of the Findings of Fact, Conclusions of Law and Judgment entered by the District Court, Kit Carson County, Colorado on June 1, 2007, that evidence as to attorney's fees will be presented separately and that discovery is continuing with regard income tax consequences and associated penalties and interest.

Mr. Strait states:

> *"In the year 2000 the services that Mr. Jenkins provided to Mr. Cure were materially different. Mr. Jenkins was not the professional contact for Mr. Cure, was not present at the private meeting Mr. Cure had with Mr. Wade and was neither consulted nor present when the will was delivered, presented, explained and executed. Clearly, as regards estate planning and Mr. Cure's new will executed in the year 2000, Mr. Jenkins was not Mr. Cure's most trusted professional advisor."*

I have relied upon Mr. Jenkins' sworn testimony in his depositions as to his involvement with Mr. Cure, Mary Bohnen and the Eileen Rita Cure Family Trust and his role and services provided with regard to the 2000 Will of Mr. Cure. The following are in pertinent part from Mr. Jenkins' deposition, I have bolded for reference certain key testimony highlighting some of Mr. Jenkins' and Kennedy and Coes' involvement.

Mr. Jenkins testimony in his deposition dated December 16, 2008, (page 72, lines 8 through 25, page 73, lines 1 through 25, page 74, lines 1 through 25, page 75, lines 1 through 25 and page 76, lines 1 through 25 and page 77 lines 1 though 6).

Q.    Now, in preparing this letter and the attachment, there are two other points that I may cover later but those are the two – number two is the one I wanted to focus on. Attached to this is a list of the Ernest Cure Trust, Cure, Inc. and Eileen Cure Martial Trust assets, they're in several categories. With regard to the Eileen Cure Marital Trust your attachment lists stock in Cure, Inc. 412 shares, do you see that?

A.    Yes.

Q.    What was the source that you reviewed in order to report to Mr. Wade what assets were held in the Eileen Cure Marital Trust?

Mr. William R. Gray
March 11, 2009
Page 11

A.  Well, I would not – **the original source would have been the 706, but that is in error.** That stock was held by the Eileen Cure Family Trust, not marital trust.

Q.  Yes, and what I'm trying to figure out, with your help, is how this error was made. What would it have been – what documents would you have reviewed, if any, that showed that 412 shares of stock in Cure, Inc. were held by the Eileen Cure Martial Trust, sir?

A.  I don't know of anything that supports that. **It looks like to me it's – it's a mistake not based on reference to any document or – I don't know what to call it but an error.** I don't – I think it's a matter of instead of writing Eileen Cure Family Trust, it was written as the Eileen Cure Martial Trust. I don't have any evidence that those 412 shares were ever owned by the marital trust.

Q.  Okay. That's what I wanted to understand. Do you then know how it came to be that 412 shares of the Eileen Cure Family Trust were reported by you to Jim Wade as having actually been held by the Eileen Cure Marital Trust, sir?

A.  I don't know how that happened.

Q.  You did prepare this letter, did you not?

A.  Yes.

Q.  Do you have any recollection of having delegated the preparation of this letter to someone else?

A.  I don't have any specific recollection of having delegated. I mean, there's delegation at some level because I don't type, but I don't know if I dictated it, if I hand-wrote notes and handed it to somebody, I don't actually know the creation of it, but I'm certainly not trying to express that I'm not responsible for the mistake that's there.

Q.  Okay. **You knew that Mr. Wade was counting on you to accurately report this information to him?**

A.  **Yes, I'm sure he was thinking I would do my best to report things accurately.**

Q.  Okay, and you, **I take it, knew that Ernest Cure and Mary Bohnen were also counting on you to accurately report the way the stock in Cure, Inc. was held to Mr. Wade?**

A.  **Yes.**

Q.  You understood that, didn't you?

A.  Um-hmm.

Q.  Do you believe that you met the standard of care for CPAs in the way you reported how assets of Cure, Inc. were held in this letter of May 8, 2000 that you sent to Jim Wade?

A.  **My communication with Jim Wade was much more extensive than that one letter.** He had the federal estate tax returns that showed that the 412 shares were owned by the family trust, **he had telephone conversations with me** that initiated all this. **I met with him briefly before he met with Ernie.** Obviously I don't have tape recordings or notes about all those conversations, but it is somewhat of a surprise to me

Mr. William R. Gray
March 11, 2009
Page 12

> now, looking back at it, that Jim wouldn't had said, well how did these assets get out of the family trust or how did this marital trust all at once get funded, or how could it have been funded?  So I just feel like there's a fairly broad conversation and other information that is inconsistent with that – that letter.
>
> Q.   Okay.  **Well, going back to my question, do you believe that you met the standard of care for CPAs in this letter of May 8, 2000 in which you reported to Jim Wade that the assets of Cure, Inc. included 412 shares of stock held in the Eileen Cure Martial Trust?**
> MR. MCNAMARA: Object to the form of the question.
> A.   **I don't feel like I met the standard of care in that letter.**

It appears the Mr. Strait doesn't agree with Mr. Jenkins or me that Mr. Jenkins did not meet the standard of due professional care.

Mr. Strait refers to the error in Mr. Jenkins' letter of May 8, 2000, in which he reported to Jim Wade that the assets of Cure, Inc. included 412 shares of stock held in the Eileen Cure Martial Trust, as an "inadvertent error".  The Webster's New American Dictionary defines inadvertent as "heedless and inattentive".  The error was reported though out the documents of Mr. Jenkins and Kennedy and Coe, the Form 706 was wrong or in error as testified to by Mr. Jenkins, the Cure, Inc. income tax returns were in error for the years 1994 through 2001, as set forth in my January 15, 2009 report, and the letter to Mr. Wade was in error.  Clearly, Mr. Jenkins nor anyone else within the firm of Kennedy and Coe took the time to read the 1995 or 2000 Wills of Mr. Cure even after their clients, Ernest Cure and Mary Bohnen came to them a second time to make certain that the property (stock in Cure, Inc.) would be disposed of in a manner that Ernest Cure wanted it to be disposed of, which was all to Mary Bohnen.  In my opinion, not to have done so, is not only heedless and inattentive, but irresponsible and demonstrates a failure to meet the due professional care standard in providing professional services.

If you have any questions regarding this matter please feel free to call.

Sincerely,

Karsh Consulting, P.C.

James R. TenBrook
President

JRT/smm

Enclosures