# Transcript of the Deposition of:
## MARY ELLEN BOHNEN

### January 8, 2009

## MARY ELLEN BOHNEN v. KENNEDY AND COE, LLC, et al.

### Civil Action No. 1:08-cv-00904-RPM

### Taken By: TIMOTHY K. McNAMARA, Esq.

### Court Reporter: JACQUE WILSON, RDR



EXHIBIT
13



Wilson George
court reporters, inc.

405 Mason Court, Suite 117, Fort Collins, CO 80524 970-224-3000
600 17th Street, Suite 2800 South, Denver, CO 80202 303-861-5000
801 8th Street, Suite 220, Greeley, CO 80631 970-353-0300
800-845-3001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:   1:08-cv-00904-RPM

---

DEPOSITION OF:   MARY ELLEN BOHNEN

January 8, 2009

---

MARY ELLEN BOHNEN, individually, as Trustee and Beneficiary of the EILEEN RITA CURE TRUST, and as Trustee/Personal Representative and Heir of the ESTATE OF ERNEST RICHARD CURE ,

Plaintiff,

v.

KENNEDY AND COE, LLC, and WILLIAM H. JENKINS,

Defendants.

---

Taken pursuant to Notice on behalf of Defendants at 370 17th Street, Suite 4650, Denver, Colorado, at 8:58 a.m., January 8, 2009, before Jacque Wilson, a Registered Diplomate Reporter and Notary Public of the State of Colorado.

DEPOSITION OF MARY ELLEN BOHNEN

15

vehicles. Is it your understanding that the judge also found that as to the expenses incurred to purchase various vehicles, that they were reasonable and justified and no damages were awarded for issues related to those motor vehicles?

A    That is my understanding.

Q    On page -- by the way, on Items One, Two, Three, and Four, this being the medical reimbursement plan, the meal reimbursement plan, rent and housing for officers, and health insurance, there are references to Kennedy & Coe or the corporation's accountants and advice that was rendered regarding those four items.

Is it your recollection that you and/or your father did consult with Kennedy & Coe regarding those four topics?

A    That's correct.

Q    The issue of motor vehicles, there is no reference to Kennedy & Coe and I take it that nobody from Kennedy & Coe advised your father to purchase motor vehicles prior to their purchase. Is that your understanding?

A    That's correct.

Q    Item number six is telephone and utilities. That's on page 25. Is it your

16

understanding that the Court also found that these expenditures were justified and no damages were awarded for those?

A    That is my understanding.

Q    Is it also true that the folks at Kennedy & Coe did not participate in any decisions regarding the expenditures for or related to telephone and utilities?

(Mr. Joe Bohnen left the proceedings.)

Q    (BY MR. MCNAMARA) In other words, there might have been some discussion after the fact at year end for tax purposes, but prior to the expenditures, am I correct that there were no discussions with Kennedy & Coe seeking their input or counsel regarding incurring those expense?

A    I don't know of any specific conversations with him, that's right.

Q    Okay. Item number eight beginning on page 27 is entitled "Other Corporate Expenditures Contested By Petitioners." The first of those in paragraph 114 involves $4,339 in miscellaneous expenses, correct?

A    That's correct.

Q    As I read the ruling here, the Court says, "Mary has provided no evidence that these are proper corporate expenses." Correct?

17

A    That's correct.

Q    Therefore, the Court found that those expenses were not justified and included in part of the damages that were awarded to your sisters, correct?

A    Correct.

Q    Am I also correct that Kennedy & Coe was not involved in counseling you regarding those miscellaneous expenses or in any way do you hold them at fault for those damages of $4,339?

A    Well, I think that maybe I wasn't counseled into what -- what would have been accepted expenses or not, perhaps, in regards to having fiduciary duties to the sisters.

Q    But as to these expenses, the Court found you simply didn't have any evidence one way or the other, which is not Kennedy & Coe's fault, is it?

A    I don't -- I don't know if it's their fault or if it's mine. I -- I don't know.

Q    You certainly knew that to the extent you wanted to claim deductions on your tax returns or the company's tax returns, that you needed to keep records of expenses and have those available at tax time, did you not?

A    Yes.

18

Q    Certainly Ms. Eberhart at Kennedy & Coe told you that, correct?

A    Yes.

Q    And she's actually still your accountant today, is she not?

A    She is.

Q    And when I say yours, perhaps we should define that. She -- or what -- what services does Ms. Eberhart and Kennedy & Coe provide to you at the current time?

A    She does our tax work for our personal tax return and for Bohnen, Inc., a corporation that we have for feeding cattle, and she has just recently taken over Cure, Inc.

Q    Did she and Kennedy & Coe also provide tax-related services for Cure, Inc., at any time in the past?

A    Yes.

Q    When did -- if you've just gone back to her here recently, is that for the 2008 tax year that you have retained her to do tax work for Cure, Inc.?

A    She did the 2007 tax return.

Q    Okay. For Cure, Inc.?

A    Yes.

DEPOSITION OF MARY ELLEN BOHNEN

19

Q   Did she do the 2006 tax return for Cure, Inc.

A   No.

Q   Do you remember for 2005?

A   No.

Q   She didn't or you don't remember?

A   She did not. I'm sorry.

Q   Okay. How many years there -- how many years did she not do the returns is maybe my question.

A   Probably she did them up until -- she probably did 2002, I'm not sure about 2003, and then didn't do them again until 2007.

Q   So there's --

A   And the reason for that is that the custodian took Cure, Inc., away from us and so they did it themselves.

Q   So the only time when Kennedy & Coe wasn't doing the Cure, Inc., work is during that period of time that the custodian was in charge of those matters and took care of that himself?

A   That -- that's correct.

Q   Paragraph 115 refers to some farm expenses in the amount of 25,569 and appears to find that all of those costs and expenses are justified with the

20

exception of $646. Am I right?

A   That's correct.

Q   Do you know what the $646 was for or involved?

A   I don't remember anymore.

Q   Okay. Was Kennedy & Coe involved in any fashion with respect to counseling you prior to the expenditure of any of these farm expenses, the entire 25,569?

A   Would you repeat that again?

Q   Sure. Prior to the time that the corporation spent those moneys, the 25,569, was Kennedy & Coe consulted about whether it would be appropriate to, in fact, spend that money?

A   No.

Q   I take it any familiarity or awareness Kennedy & Coe would have had of those farm expenses would have been sometime near or after year end in the process of doing the company's tax returns. True?

A   That's correct.

Q   Okay. Paragraph 116 involves legal fees in the amount of 6,976, and it appears to me the Court found that those expenses were appropriate. Is that your understanding?

21

A   That's my understanding.

Q   Okay. Paragraph 117 says that the corporation paid legal fees in the amount of $2,614 on behalf of Ernest for the preparation of his 1995 will and deferred compensation agreement and that those fees should not have been paid by the corporation. Correct?

A   That's correct.

Q   Okay. Are you holding Kennedy & Coe responsible for the $2,614 that became part of the damage award in this case?

A   Yes.

Q   Why?

A   I was not advised that I couldn't pay them due to fiduciary duty to my sisters.

Q   And why do you believe that was Kennedy & Coe's obligation or duty to -- to tell you?

A   I felt -- feel like that was part of their responsibilities of working with me, that they should have known that I had fiduciary duties that I had to be responsible for.

Q   Paragraph 118 refers to various repairs and expenses and the Court finds that the sum of $49,156 could not be accounted for by you and, therefore, should not have been paid by the

22

corporation. Correct?

A   That's correct.

Q   All right. I assume you're not holding Kennedy & Coe responsible for the fact that you could not account for those expenses. True?

A   Well, I -- I feel like that maybe they were responsible in that they didn't keep me advised of what I had to keep records for in regards to how much of the fiduciary duty I owed and how much of that I needed to be responsible for.

Q   Did Kennedy & Coe ever tell you that you didn't need to keep all your records?

A   No.

Q   Paragraph 119 refers to credit card charges by your father totaling $38,727. And the Court says those could not be accounted for by you and were improper expenses of the corporation, correct?

A   That's correct.

Q   Okay. I take it you don't hold Kennedy & Coe responsible for your father's credit card charges over the years.

A   Only to the point of advice as to the fiduciary duty part of it.

Q   Paragraph 120 says that Cure, Inc.,

7 (Pages 19 to 22)

DEPOSITION OF MARY ELLEN BOHNEN

23

expended $17,031 on fuel and oil for vehicles used by you and your father and the Court concluded those costs were primarily related to personal use and, therefore, were improper, correct?

A    That's what it found.

Q    Okay. I take it you don't hold Kennedy & Coe responsible for the fact that you had to reimburse your sisters for any personal use of vehicles by you and your father.

A    I don't think I was advised correctly as to our fiduciary duties in that manner.

Q    Irrespective of any fiduciary duties or advice, is it not true that you and your father would have incurred those expenses for fuel and oil regardless of -- of your awareness of any fiduciary duties and, therefore, those would be expenses that you're responsible for and not Kennedy & Coe?

A    I think if we'd have known of the fiduciary duties, we would have -- it would have been handled in a different way. It's -- it says fuel and oil for vehicles used by Ernest and Mary, and I -- they didn't provide any fuel and oil for me. That was all my dad. I don't know where that came from.

But I think if we'd have had proper

24

advice, we'd have handled that situation differently.

Q    How would you have handled it?

A    I don't know. We'd evaluate it at the time and -- and perhaps he'd have paid for it with his own card or he'd have kept track of it or there would have been something different.

Q    And if he kept track of it differently, he still would have spent the 17,000, though, right? He would have just kept his records differently. True?

A    Perhaps.

Q    Paragraph 121 involves charitable contributions that your father made to St. Mary's Catholic School in the amount of $33,475 and the Court finds that it was improper for those moneys to be paid by the corporation. Correct?

A    That's correct.

Q    And I take it you don't hold Kennedy & Coe accountable for your father's desire to support St. Mary's?

A    I hold them accountable for not giving us the advice of the fiduciary duty to our sisters before giving the charitable contribution.

Q    You think your father would have declined

25

to support St. Mary's based on some awareness of fiduciary duties?

A    I -- I don't know about that. He probably wouldn't have used Cure, Inc. Wouldn't have paid it through Cure, Inc., if he would have known the fiduciary duty.

Q    Did he have any other resources besides Cure, Inc., and these trusts?

A    No.

Q    So if he was going to buy gas for his car or contribute to St. Mary's, he only had one place it could come from, right?

A    From where? We're saying it could have came from money that he had invested or loaned to Cure, Incorporated.

Q    I'm sorry? From -- from what source?

A    From -- he had money loaned to Cure, Inc.

Q    Okay. So if he -- he had loaned money to Cure, Inc., that means he no longer had it, but Cure, Inc., held it as part of its cash or capital, correct?

A    Correct.

Q    So it was Cure, Inc.'s, money at that point, correct?

A    It was his money --

26

MR. GRAY: Objection to the form of the question. Go ahead.

THE DEPONENT: It was -- it was his money, but loaned to Cure, Inc.

Q    (BY MR. MCNAMARA) Okay. When the bank loans you money, it becomes your money, you just have an obligation to pay it back, true?

A    That's correct.

Q    And is that any different than the Cure, Inc., situation? Your dad loaned money to Cure, Inc., it became the company's money, the company merely had an obligation to pay it back on the books?

A    Correct.

Q    Okay. So is it true that other than the resources of Cure, Inc., or any of the resources of the trusts, your father did not have any independent source of income or assets?

A    That's correct.

Q    Paragraph 122 involves deferred compensation payments to Inez Cure, your father's second wife, totaling $15,000, correct?

A    That's correct.

Q    And apparently you testified that that agreement was adopted by Cure, Inc., upon the advice

DEPOSITION OF MARY ELLEN BOHNEN

27

of your accountants and I assume that was Kennedy & Coe. Correct?

A    That's correct.

Q    And what -- who gave you that advice and what do you remember about it?

A    The advice came from Bill Jenkins in some estate planning work that he was doing with my father.

Q    Do you recall when those discussions or that -- took place or that advice was rendered?

A    In that 1995 will planning session.

Q    Okay. Ms. Bohnen, do you know when Cure, Inc., the corporate entity, was formed or created?

A    1972.

Q    Do you know what professionals your father consulted at the time of the creation of Cure, Inc.?

A    Yes.

Q    And who was that?

A    Norm Ahrens.

Q    Who is Mr. Ahrens?

A    He's an attorney who was at Cheyenne Wells, Colorado, at the time.

Q    Okay. Do you know what advice Mr. Ahrens and his firm gave your father at that time regarding the operations of Cure, Inc., and any duties owed by

28

majority shareholders to minority shareholders?

A    I was not a part of that.

MR. MCNAMARA:  Okay. Mark that as Number 2, please.

(Deposition Exhibit No. 2 marked.)

Q    (BY MR. MCNAMARA) Ms. Bohnen, do you recognize Exhibit Number 2 that I've just handed you?

A    Yes.

Q    What -- what is that?

A    It's an order regarding attorney fees and costs and terminating custodianship.

Q    This particular order summarizes the total damages and fees that the Court ordered you to pay to your sisters or the outcome of all of this litigation. Is that a fair summary?

A    That's correct.

Q    In paragraph five, in the third sentence, if my counting is correct here, it says, "Respondent has indicated that she will be paying the judgments with financing that will be closed through an escrow with a title company and the parties have agreed that upon the payment from escrow of the amounts set forth below to the Petitioners, the Custodianship will be terminated."

29

Did I read that correctly?

A    You did.

Q    Okay. Did you, in fact, pay the various court-ordered obligations to your sisters through this financing that was closed through an escrow with a title company? Or maybe a simpler question is, how did you pay off your sisters? How's that?

A    Okay. I don't remember the -- it being in escrow. It was financed through Farm Credit.

Q    Okay.

A    Through two different loans. I don't remember there being an escrow involved or -- they did some -- I think some title work and checked that, but I don't remember.

Q    Okay. So if I'm understanding your testimony correctly, basically you borrowed the money from Farm Credit to pay off your sisters.

A    Correct.

Q    And you did that through two different loans.

A    Correct.

Q    Were the loans taken out at the same time?

A    Correct.

Q    Why were there two loans rather than one?

A    Actually, there was -- it would be three,

30

but there was -- we had set up an $800,000 loan earlier thinking that it was going to come to a settlement or -- so we were getting money prepared so we had 800,000 set -- set up. And it had been set up for several months.

And then when that wasn't enough, they set up another $420,000 loan, and they -- the additional 100 -- I think it was 137 was just put onto our regular operating loan. So there's two actual loans, but that wasn't enough to cover it all so they put the other over onto our operating.

Q    And when you say our, I take it you're referring to you and your husband.

A    My husband and I.

Q    Is that in your personal names or in a company name or who's -- who's the borrower on the loan or the line of credit to which you added the 137, the existing operating line?

A    Joe and Mary Bohnen.

Q    Okay. And not -- is that loan guaranteed by anyone?

A    Joe and Mary Bohnen.

Q    Okay. Anybody besides yourself and your husband?

A    No.

DEPOSITION OF MARY ELLEN BOHNEN

31

Q    Okay. And what security does the bank have or have you given the bank for that loan? Have you pledged some of your real estate or any other assets to support that loan?

MR. GRAY: Just for clarification, when you say that loan, you're speaking of the one that she just spoke about?

Q    (BY MR. MCNAMARA) If I call that one the operating line, is that kind of what you call --

A    That's correct.

Q    What do you call it?

A    Operating line.

Q    What security is there for the operating line that you and your husband have at Farm Credit?

A    I think it's everything that we own and will ever own.

Q    Including all assets and real estate?

A    Yes. A lot of the real estate is already encumbered under their own loans, but anything that's not.

Q    Is that operating line a relationship with Farm Credit that you've had for a number of years?

A    It is.

Q    Do you have an idea of when that relationship began or when you first entered into

32

those agreements with Farm Credit?

A    In the '90s. I would say probably mid '90s. '95 would be -- something in there.

Q    Okay. Then you mentioned an $800,000 loan. Was that also in the form of a line of credit or what type of transaction or agreement was that?

A    It's a -- it's on a line of credit.

Q    Okay. And it was a maximum of $800,000 and you drew the entire 800, I take it.

A    Yes. Maybe I'm wrong. That is a -- an actual loan that we make -- it wouldn't be operating. It would be that we make payments on it once a year. And I think -- I'm not positive, but I think it's a five-year -- to be paid out in five years.

Q    Okay. And who is or are the borrowers on the $800,000 loan?

A    It's actually in my name.

Q    Just Mary Bohnen?

A    I think it just says Mary Bohnen, I believe, but Cure, Inc., signed for it.

Q    Do you know if -- did Cure, Inc., actually borrow the money or did Cure, Inc., guarantee Mary Bohnen's borrowing of the money?

A    I think Cure, Inc., guaranteed.

33

Q    And what about -- well, and with respect to the Cure, Inc., guarantee, did Cure, Inc., pledge assets or real estate to the bank as part of that borrowing?

A    Yes, they did.

Q    Okay. Do you know exactly what assets were pledged?

A    I think everything they own and will ever own.

Q    Okay. Kind of the way banks do that, right?

A    That's the way they do it, I think.

Q    And with respect to the $420,000 loan, who is the borrower on that loan?

A    I believe it's the same way.

Q    So you think it's -- it's Mary Bohnen individually is the borrower, but Cure, Inc., has guaranteed that loan as well?

A    Correct.

(Mr. Joe Bohnen entered the proceedings.)

Q    (BY MR. MCNAMARA) Part of your damage claim also involves attorneys' fees that you paid over a period of time to the Rothgerber law firm, correct?

A    That's correct.

34

Q    I forget the exact number, 450, $500,000, something in that neighborhood? Whatever it is, it is?

A    That's correct.

Q    Who paid those fees to the Rothgerber firm?

A    They were paid with a check from Ernest Cure Trust.

Q    All of them?

A    Yes.

Q    Did -- was there an engagement letter between the Rothgerber firm and someone involving or regarding its representation of you in this litigation?

A    Probably.

Q    I take it sitting here today you don't remember one way or the other. There either is or isn't, but you don't remember?

A    I don't remember, but seems to be customary that there always is and so I would think there would have been.

Q    Okay. But you're certain that all of the fees were paid by check drawn on the account of the Ernest Cure Trust. Correct?

A    I -- I'm almost certain. I guess there's