October 19, 2006    DEPOSITION OF MARY BOHNEN    In Re Cure

## Page 4

PROCEEDINGS

MARY BOHNEN, having been first duly sworn to testify truthfully, was examined and testified as follows:

EXAMINATION

BY MR. McDERMOTT:

Q   Good morning, Ms. Bohnen.

A   Good morning.

Q   My name is Rob McDermott from the law firm of Mallgren & Ferrell and our firm represents your sisters, Theresa, Kay, and Jane.

Could you please state your name and address for the record?

A   Mary Ellen Bohnen, 36470 County Road CC, Bethune, Colorado 80805.

Q   And is your house located on Cure, Inc., land?

A   That's correct.

Q   And how long have you lived there?

A   Since 1981.

Q   And what is your occupation?

A   I am an office manager for my husband and I -- I was -- took care of Cure, Inc., books, but I don't do that anymore.

## Page 5

Q   You're currently an office manager?

A   Yes.

Q   And what is the business address and telephone number of the office-manager position?

A   The business address is 317 Colorado Avenue, Stratton, Colorado. The phone number is 719-348-5471.

Q   You understand that you're under oath and your testimony is being recorded verbatim?

A   I do.

Q   If you don't understand a question that I've asked, please ask me to repeat it and I'll do so.

A   I will.

Q   And if you realize your prior answers are inaccurate or incomplete, please let me know and we'll go back and clarify any changes you may have.

A   Okay.

Q   And do you have any medical conditions or medications that you're taking that may impair your ability to recall past events?

A   No.

Q   Or otherwise testify truthfully or accurately today?

A   No.

MR. McDERMOTT: Justin, my understanding is that we have some form of an agreement reg...

## Page 6

deposition testimony being admissible.

MR. CUMMING: It would be my understanding that sworn testimony from a related matter would be admissible in this matter.

MR. McDERMOTT: Okay. No additional -- I thought there was some form of an agreement with Tony with regard to prior deposition testimony.

MR. CUMMING: I thought that's what was said. I'm sorry. No, I guess I -- in this instance, in this entire dispute, there has been sworn testimony at the receiver custodian hearing on May 6th, 2004, and then there have been depositions in 2005 in the related matter, the reformation case, and it would be my understanding that the testimony, to the extent relevant and not otherwise objectionable, would be admissible.

MR. McDERMOTT: Thank you.

Q   (BY MR. McDERMOTT) On September 28th, 2005, you were deposed in the related matter. Do you recall that?

A   Yes, I do.

Q   And have you recently reviewed that transcript?

A   Yes, I looked over it.

Q   And based on that review, is there any testimony that you now know is either inaccurate or incomplete?

## Page 7

A   Not that I noticed.

Q   And have any events occurred between that deposition and now that would change your testimony from that time?

A   No.

Q   What officer positions have you held at Cure, Inc.?

A   I was the secretary-treasurer. And then after my dad died, I acted as president.

Q   And approximately how many years in each position?

A   I think about the mid-'80s is probably when I became secretary-treasurer, until 2002.

Q   And can you summarize your duties as a secretary-treasurer for Cure, Inc.? What were you responsible for?

A   Well, I did -- I did about anything that needed to be done. I did the mail. I kept the books. I kept the checkbook and paid the bills and just did all-around office work.

Q   And approximately how many hours a week did you spend on those activities?

A   That -- that would be hard to -- be very difficult for me to say because there were times I'd spend ...urs here or an hour here or 15 minutes there, so

EXHIBIT

*19*

October 19, 2006          DEPOSITION OF MARY BOHNEN                    In Re Cure

## Page 92

contract worker doing something other than painting for Cure, Inc.?

A   Nothing that comes to mind.

Q   Okay.  All right.  And was Kennedy & Coe responsible for preparing either your individual tax returns or Ernest Cure's individual tax returns?

A   They prepared both of them -- somewhere in that time period.

Q   And was that service provided as a service separate from the Cure, Inc., preparation engagement or was that part and parcel to the services provided to Cure, Inc.?

A   They were separate.

Q   They were separate.  Did you have a separate agreement with Cure, Inc., for the preparation of individual tax returns?

A   A written agreement with Kennedy & Coe for Cure, Inc.'s services.

Q   Was there a separate written agreement for services to prepare your individual tax returns?

A   Don't remember.

Q   Okay.  And for your father?  Do you recall if there was a written agreement?

A   No, I don't recall.

Q   Do you recall getting separately invoiced for the services of preparing your individual tax returns?

## Page 93

A   Yes, I do.

Q   And do you know whether your father was separately invoiced for his individual tax return preparation?

A   I think so.

Q   And did Kennedy & Coe prepare any other individual tax returns for people that were related to you? Did they prepare it for Michael Bohnen, Debbie --

A   Not that I know of.

Q   And are there any other relatives that they prepared tax returns for that you know of?

A   They have prepared them for my daughter, my youngest daughter who's in college.

Q   I don't recall if I've asked you this, but did Kennedy & Coe and Cure, Inc., have a written engagement -- a written contract for services?

A   Not that I remember.

Q   Okay.  You testified earlier, I believe, that Dan Robinson was the preparer for the Cure, Inc., tax returns early on when Kennedy & Coe had been retained. Other -- and I believe Jill Eberhart at some point took over; is that correct?

A   That's correct.

Q   Okay.  Is there anyone else that has worked on the Cure, Inc., tax returns that you know of?

## Page 94

A   Joan Porsch was probably involved in some of it at certain times.

Q   Okay.  And what was it you recall Joan doing?

A   Nothing specifically.

Q   Okay.  You didn't have any direct dealings with Joan?

A   Nothing that I remember on Cure, Inc.

Q   Okay.  All right.  Let's go to Exhibit 16.

(Deposition Exhibit 16 was marked.)

Q   This deferred compensation agreement that I have entered as Exhibit 16, do you know whether there has been an updated deferred compensation agreement after this 1995 date?

A   Not that I'm aware of.

Q   Okay.  And was Ernest Cure the only participant in the deferred compensation agreement with Cure, Inc.?

A   As far as I know.

Q   And why was this plan put in place?

A   I guess it was put in place because Kennedy & Coe recommended it.

Q   Did Kennedy & Coe give either you or your father specific reasons why you should put this plan in place?

A   Well, what I remember of it was that there

## Page 95

was years that dad hadn't been paid any salary and this -- some of the salary that he took was minimal and they wanted to guarantee that he would have some income if he couldn't perform his duties and Inez could also have an income after -- if -- or if dad passed away.

Q   Was this plan necessary to the business operations of Cure, Inc.?

A   I -- I don't think so.

Q   Okay.  And do you think Cure, Inc., benefited from this plan being in place?

A   Well, to the extent that when Inez signed -- I mean, when Cure, Inc., agreed to this, Inez agreeing to the -- to accept that as what she would receive if something happened to dad.

Q   So this was part of the agreement with Inez to release any claim to the ownership of Cure, Inc. --

A   Correct.

Q   -- upon your father's death? And how would you say, if at all, did the family trust benefit from this plan being put in place?

A   To the same extent that Cure, Inc., did.

Q   And was there ever a deferred compensation plan put in place for you?

A   No.

Q   Was it -- you said Kennedy & Coe advised you

26 (Pages 92 to 95)